©COPY

1  MARC M. SELTZER (54534)
   mseltzer@susmangodfrey.com
2  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
3  Los Angeles, CA  90067-6029
   Telephone:  (310) 789-3100
4  Facsimile:  (310) 789-3150
5
6  ANDREW J. ENTWISTLE
   aentwistle@entwistle-law.com
7  WILLIAM S. GYVES
   wgyves@entwistle-law.com
8  ROBERT N. CAPPUCCI
   rcappucci@entwistle-law.com
9  JOHNSTON de F. WHITMAN, JR.
   jwhitman@entwistle-law.com
10
11 JONATHAN H. BEEMER
   jbeemer@entwistle-law.com
12 ENTWISTLE & CAPPUCCI LLP
13 280 Park Avenue, 26th Floor West
   New York, NY  10017
14 Telephone:  (212) 894-7200
   Facsimile:  (212) 894-7272
15
16 Attorneys for Plaintiffs

17          UNITED STATES DISTRICT COURT

18          CENTRAL DISTRICT OF CALIFORNIA

19              WESTERN DIVISION

20



21 CENTAUR CLASSIC CONVERTIBLE     | CV10 5699 PSG (SHx)
   ARBITRAGE FUND LTD., ARGENT
22 CLASSIC CONVERTIBLE ARBITRAGE   | Case No.
   FUND II L.P., ARGENT LOWLEV
23 CONVERTIBLE ARBITRAGE FUND II
   LLC, CENTAUR LOWLEV ARBITRAGE  | COMPLAINT FOR VIOLATIONS
24 FUND LTD., ARGENTUM MULTI-       | OF THE FEDERAL SECURITIES
   STRATEGY FUND LLC, ARGENTUM     | LAWS AND CALIFORNIA STATE
25 MULTI-STRATEGY FUND LTD.,        | LAW
   LYXOR/ARGENT LOW LEVERAGE
26 FUND LIMITED, HFR CA GLOBAL      | JURY TRIAL DEMANDED
27 SELECT MASTER TRUST, ACUITY
28

MASTER FUND, LTD., CARLYLE
MULTI-STRATEGY MASTER FUND
LIQUIDATING TRUST,
LYXOR/ACUITY FUND LIMITED,
POLYGON GLOBAL OPPORTUNITIES
MASTER FUND, RHAPSODY FUND,
L.P., ARPEGGIO  FUND, NUVEEN
MULTI-STRATEGY INCOME AND
GROWTH FUND, NUVEEN MULTI-
STRATEGY INCOME AND GROWTH
FUND 2, RADCLIFFE SPC, LTD.,
TEMPO MASTER FUND L.P., CANYON
CAPITAL ARBITRAGE MASTER
FUND, LTD., THE CANYON VALUE
REALIZATION FUND (CAYMAN),
LTD., CANYON VALUE REALIZATION
MAC 18, LTD., CANYON VALUE
REALIZATION FUND, L.P.,
LYXOR/CANYON CAPITAL
ARBITRAGE FUND LIMITED, GLG
MARKET NEUTRAL FUND, MOHICAN
VCA MASTER FUND, LTD., ADI
ARBITRAGES ABSOLU, ADI
CONVERT ABSOLU, ADI CONVEX,
ADI CONVEX ABSOLU, KALLISTA CB
ARBITRAGE FUND LIMITED, CASAM
ADI CB ARBITRAGE LIMITED, DELTA
INSTITUTIONAL, L.P., DELTA
ONSHORE, L.P., DELTA PLEIADES,
L.P., DELTA OFFSHORE MASTER,
LTD., RHP MASTER FUND, LTD., HFR
CA LAZARD RATHMORE MASTER
TRUST, RAMIUS CONVERTIBLE
ARBITRAGE MASTER FUND LTD.,
RCG PB, LTD., S.A.C. ARBITRAGE
FUND, LLC, STARK MASTER FUND
LTD., STEELHEAD PATHFINDER
MASTER, L.P., CAMULOS MASTER
FUND L.P., CONCORDIA PARTNERS
L.P., CONCORDIA INSTITUTIONAL
MULTI-STRATEGIES LTD., and

1

CONCORDIA MAC 29, LTD.,

2

               Plaintiffs,

3

     vs.

4

5

COUNTRYWIDE FINANCIAL
CORPORATION (n/k/a Bank of America

6

Home Loans), ANGELO R. MOZILO,
DAVID SAMBOL, and ERIC P.

7

SIERACKI,

8

          Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION ................................................................................3

    A.     Defendants Misrepresented and Omitted Material Facts In Documents
          Incorporated Into the Offering Memorandum ...............................................7

    B.     Defendants Gradually Disclosed The Truth Concerning
          Countrywide's Underwriting Practices and Subprime Mortgage
          Exposures While Continuing to Misrepresent the Risks to the
          Company .........................................................................................................10

II.    JURISDICTION AND VENUE ...........................................................................13

III.   THE PARTIES .....................................................................................................14

    A.     Plaintiffs and Their Direct Reliance on Defendants' Material
          Misrepresentations and Omissions ..............................................................14

         1.     The Argent Funds ..............................................................................14

         2.     The Acuity Funds ...............................................................................18

         3.     Polygon Global Opportunities Master Fund ......................................21

         4.     The Symphony Funds ........................................................................22

         5.     Radcliffe SPC, Ltd. ...........................................................................24

         6.     Tempo Master Fund L.P. ...................................................................26

         7.     The Canyon Funds .............................................................................27

         8.     GLG Market Neutral Fund .................................................................30

         9.     Mohican VCA Master Fund, Ltd. ......................................................31

         10.    The OFI Funds ...................................................................................33

         11.    CASAM ADI CB Arbitrage Limited .................................................35

         12.    The Trafelet Delta Funds ...................................................................37

         13.    RHP Master Fund, Ltd. ......................................................................39

         14.    HFR CA Lazard Rathmore Master Trust ...........................................40

         15.    The Ramius Funds .............................................................................41

         16.    S.A.C. Arbitrage Fund, LLC .............................................................43

         17.    Stark Master Fund Ltd. ......................................................................45

         18.    Steelhead Pathfinder Master, L.P. .....................................................47

         19.    Camulos Master Fund L.P. ................................................................48

         20.    The Concordia Funds .........................................................................49

i

B.    Defendants ...........................................................................................50

    1.    Countrywide Financial Corporation.....................................50

    2.    The Individual Defendants ....................................................51

        a.    Angelo R. Mozilo ......................................................53

        b.    David Sambol ............................................................54

        c.    Eric P. Sieracki ........................................................55

IV.   BACKGROUND ....................................................................................57

A.    Countrywide's Business Operations And Aggressive Growth Strategy.......57

    1.    Countrywide's Business Segments .......................................57

        a.    The Mortgage Banking Segment ..............................58

        b.    The Banking Segment................................................59

        c.    The Capital Markets Segment ..................................60

    2.    Countrywide's Loan Types ...................................................61

        a.    Prime Mortgage Loans.............................................62

        b.    Prime Home Equity Loans........................................63

        c.    Nonprime Mortgage Loans ......................................64

B.    Defendants Provided Inherently High-Risk Loans to Unqualified Borrowers, Exposing the Company to Significant Credit Losses.................68

    1.    Defendants Originated Stated Income, Or "No-doc" Loans, Without Requiring Supporting Documentation to Verify the Borrower's Income.............................................................73

    2.    Defendants Provided "Piggyback" Loans Permitting Borrowers to Finance the Entire Home Value ......................74

C.    Countrywide's Substantial Credit and Liquidity Risks................................75

    1.    Countrywide Faced Substantial Liquidity Risks From the Company's Dependence on Financing To Fund Loan Originations and Purchases ...................................................76

    2.    Countrywide's Credit Risk...................................................77

        a.    Credit Risk From Subordinated Retained Interests .................77

        b.    Credit Risk From Representations and Warranties .................79

V.    COUNTRYWIDE'S MAY 2007 DEBENTURES OFFERING ............................80

VI.   DEFENDANTS' MATERIALLY  FALSE AND MISLEADING STATEMENTS.................................................................................83

A.   Material Misrepresentations and Omissions Of Material Fact In The 2006 Form 10-K .................................................................................. 84

1.   Countrywide's Loan Quality ................................................... 84

2.   Countrywide's Credit and Underwriting Practices ..................... 88

3.   Countrywide's Loans Held for Investment ................................ 94

4.   Countrywide's Allowance for Loan Losses ................................ 96

5.   Countrywide's Valuation and Impairment of Retained Interests in Loans Sold ........................................................................ 99

6.   Countrywide's Valuation and Impairment of MSRs ................. 101

7.   Countrywide's "Representations and Warranties" ................... 104

8.   Countrywide's Liquidity ...................................................... 107

9.   Countrywide's Internal Controls ........................................... 109

10.  Countrywide's Purported Risk Factors .................................. 117

B.   Material Misrepresentations and Omissions Of Material Fact In The First Quarter 2007 Form 10-Q .................................................... 121

1.   Countrywide's Loan Quality ................................................. 122

2.   Countrywide's Credit and Underwriting Practices ................... 123

3.   Countrywide's LHI and Allowance for Loan Losses ................. 124

4.   Countrywide's Retained Interests and Related Impairment of Retained Interests in Loans Sold .......................................... 125

5.   Countrywide's Valuation and Impairment of MSRs ................. 127

6.   Countrywide's "Representations and Warranties" ................... 127

7.   Countrywide's Liquidity ...................................................... 129

8.   Countrywide's Internal Controls ........................................... 130

9.   Countrywide's Purported Risk Factors .................................. 132

VII.   DEFENDANTS' PARTIAL DISCLOSURES OF PREVIOUSLY MISREPRESENTED AND/OR CONCEALED MATERIAL FACTS AND CONTINUING MATERIAL MISREPRESENTATIONS AND OMISSIONS ................................................................................ 132

A.   The July 24, 2007 Press Release and Conference Call ................. 133

1.   Continuing Misrepresentations and Omissions Regarding Countrywide's Loan Quality and Underwriting Practices ......... 137

|  | 2. | Continuing Misrepresentations and Omissions Regarding Countrywide's Reported Financial Results and Accounting Practices ................................................................ 138 |
|  | 3. | Continuing Misrepresentations and Omissions Regarding Countrywide's Liquidity .......................................... 139 |
| B. | | The August 2, 2007 Press Release and August 6, 2007 Form 8-K............ 141 |
| C. | | Continuing Misrepresentations and Omissions of Material Fact In The Second Quarter 2007 Form 10-Q ....................................... 142 |
|  | 1. | Countrywide's Loan Quality............................................ 144 |
|  | 2. | Countrywide's Credit and Underwriting Practices .................... 145 |
|  | 3. | Countrywide's Valuation and Impairment of MSRs .................. 145 |
|  | 4. | Countrywide's "Representations and Warranties" .................... 146 |
|  | 5. | Countrywide's Internal Controls...................................... 148 |
|  | 6. | Countrywide's Risk Factors........................................... 149 |
| D. | | The August 16, 2007 Press Release ..................................... 150 |
| E. | | The September 7, 2007 Press Release.................................... 152 |
| F. | | The October 24, 2007 Form 8-K ........................................ 153 |
| G. | | The October 26, 2007 Press Release and Conference Call .................... 154 |
| H. | | The Third Quarter 2007 Form 10-Q...................................... 158 |
| I. | | The November 13, 2007 Press Release .................................. 162 |
| J. | | Countrywide Rumored as Headed for Bankruptcy ........................ 163 |
| VIII. | POST-RELEVANT PERIOD EVENTS .......................................... 164 |
| A. | | Federal and State Investigations Into Defendants' Conduct ................... 164 |
| B. | | Bank of America Agrees to Purchase Countrywide and the Company Continues to Suffer Under the Weight of its Misrepresented Imprudent Lending ................................................ 167 |
| IX. | DEFENDANTS' GAAP AND INTERNAL CONTROL VIOLATIONS ............ 168 |
| A. | | Defendants Misstated the Company's Allowance for Loan Losses and Earnings by Failing to Reserve for Losses Arising From Probable Delinquencies and Defaults............................... 171 |
|  | 1. | Defendants Violated GAAP by Failing to Adequately Increase Countrywide's Allowance For Loan Losses Resulting From the Company's Shift to Origination of High-Risk Loans and Declining Home Values ............................................... 174 |

iv

2.    Defendants Violated GAAP by Failing to Adequately Increase the Allowance for Loan Losses for Rising Delinquencies and Defaults ................................................................177

B.    Defendants Misstated Earnings by Failing to Timely Record Impairment on Retained Interests and MSRs.............................182

1.    Subordinated Retained Interests and Liability For Future Draw Obligations on HELOCs .................................................182

2.    Mortgage Servicing Rights .........................................186

C.    Defendants Misstated Liabilities and Earnings by Failing to Adequately Accrue for Losses Resulting From Breaches of Representations and Warranties ...............................................188

D.    Defendants' Failure to Disclose the True Risk Arising from the Company's Inherently High-Risk Loan Practices Violated GAAP and SEC Regulations.....................................................191

E.    Defendants' Internal Control Violations.....................................198

X.    ADDITIONAL SCIENTER ALLEGATIONS ........................................203

A.    Internal Company Documents Demonstrate The Individual Defendants' Knowledge of the Risks That Countrywide's Overly Aggressive and Poorly Underwritten Loans Posed to the Company ..........205

B.    The Individual Defendants Knew That Countrywide Had Substantially Loosened its Lending Standards to Provide High-Risk Affordability Loans to Sub-Prime Borrowers............................................212

1.    The "Exception Processing System" Revealed Countrywide's Significant Credit Risk Exposure From Production of High-Risk Affordability Loans .................................................214

2.    The Individual Defendants Knew That Countrywide Unconditionally Approved High-Risk Affordability Loans to Non-Qualified Borrowers to Materially Boost the Company's Loan Volume..............................................................215

3.    Countrywide Failed To Comply With Underwriting Regulations Issued By Federal Bank Regulatory Agencies .............217

4.    The Individual Defendants Closely Monitored Countrywide's Lending Practices and Credit Risk Exposure During the Relevant Period ...............................................................219

a.    Credit Committee...............................................220

b.    Asset/Liability Committee.....................................220

          c.      Earnings Forecasting Committee............................................222

          d.      Finance Committee ................................................................223

          e.      Audit and Ethics Committee..................................................224

      5.  The Individual Defendants Knowingly Ignored Numerous
          Market Warnings of Accelerated Delinquencies and Defaults
          and Rapidly Declining Home Values.........................................227

          a.      The Individual Defendants Knew That Steep Declines in
                  Home Prices, Beginning In Late 2005, Would Lead to
                  Heighted Loan Defaults.........................................................228

          b.      The Individual Defendants Knew of Rising
                  Delinquencies and Foreclosures in the Company's
                  Subprime Loan Portfolio During the Relevant Period ..........231

          c.      The Individual Defendants Knew That Competing
                  Mortgage Companies Were Collapsing as a Result of the
                  Rise in Defaults and Delinquencies on Subprime Loans .......234

  C.  Defendants Were Motivated to Commit the Fraud Alleged Herein ...........237

      1.  The Individual Defendants Were Motivated to Commit the
          Fraud Alleged Herein to Profit From Insider Sales .........................237

      2.  The Individual Defendants Were Motivated to Engage in
          Massive Stock Buy-Back Programs in Order to Inflate the
          Company's Stock Price and Conceal the Company's True Loss
          Exposure...........................................................................................244

      3.  The Individual Defendants Were Motivated to Artificially
          Inflate the Value of Countrywide's Stock To Receive Massive
          Incentive-Based Compensation........................................................246

XI.   LOSS CAUSATION................................................................................249

XII.  GROUP PLEADING ..............................................................................250

XIII. NO STATUTORY SAFE HARBOR .......................................................251

XIV.  TOLLING OF THE STATUTE OF LIMITATIONS .............................252

CLAIMS FOR RELIEF ........................................................................................252

FIRST CLAIM FOR RELIEF...............................................................................252

  Violation of § 10(b) of The Securities Exchange Act of 1934 And Rule 10b-
      5 Promulgated Thereunder Against All Defendants ...................................252

SECOND CLAIM FOR RELIEF ..........................................................................255

   Violation of § 20(a) of The Securities Exchange Act of 1934 Against the
     Individual Defendants ............................................................................255

THIRD CLAIM FOR RELIEF ..........................................................................258

   Violation of Sections 25400(d) and 25500 Of The California Corporations
     Code Against Defendant Countrywide.........................................................258

FOURTH CLAIM FOR RELIEF .......................................................................259

   Violation of Section 25504.1 of The California Corporations Code Against
     Defendant Countrywide..............................................................................259

FIFTH CLAIM FOR RELIEF ............................................................................261

   Fraud and Deceit Under California Law Against All Defendants .......................261

SIXTH CLAIM FOR RELIEF............................................................................263

   Negligent Misrepresentation Under California Law Against All Defendants ......263

PRAYER FOR RELIEF.....................................................................................265

JURY DEMAND ..............................................................................................267

Plaintiffs Centaur Classic Convertible Arbitrage Fund Ltd., Argent Classic Convertible Arbitrage Fund II L.P., Argent LowLev Convertible Arbitrage Fund II LLC, Centaur LowLev Arbitrage Fund Ltd., Argentum Multi-Strategy Fund LLC, Argentum Multi-Strategy Fund Ltd., Lyxor/Argent Low Leverage Fund Limited, HFR CA Global Select Master Trust, Acuity Master Fund, Ltd., Carlyle Multi-Strategy Master Fund Liquidating Trust, Lyxor/Acuity Fund Limited, Polygon Global Opportunities Master Fund, Rhapsody Fund, L.P., Arpeggio Fund, Nuveen Multi-Strategy Income and Growth Fund, Nuveen Multi-Strategy Income and Growth Fund 2, Radcliffe SPC, Ltd., Tempo Master Fund L.P., Canyon Capital Arbitrage Master Fund, Ltd., The Canyon Value Realization Fund (Cayman), Ltd., Canyon Value Realization MAC 18, Ltd., Canyon Value Realization Fund, L.P., Lyxor/Canyon Capital Arbitrage Fund Limited, GLG Market Neutral Fund, Mohican VCA Master Fund, Ltd., ADI Arbitrages Absolu, ADI Convert Absolu, ADI Convex, ADI Convex Absolu, Kallista CB Arbitrage Fund Limited, CASAM ADI CB Arbitrage Limited, Delta Institutional, L.P., Delta Onshore, L.P., Delta Pleiades, L.P., Delta Offshore Master, Ltd., RHP Master Fund, Ltd., HFR CA Lazard Rathmore Master Trust, Ramius Convertible Arbitrage Master Fund Ltd., RCG PB, Ltd., S.A.C. Arbitrage Fund LLC, Stark Master Fund Ltd., Steelhead Pathfinder Master L.P., Camulos Master Fund L.P., Concordia Partners L.P., Concordia Institutional Multi-Strategies Ltd., and Concordia MAC 29, Ltd. (collectively, the "Plaintiffs") by their undersigned attorneys, for their Complaint (the "Complaint"), make the following allegations against Defendants (as defined below), based upon personal knowledge as to

their own acts and based upon the investigation conducted by and under the supervision of counsel, including, but not limited to, review and analyses of:

(i)    the Offering Memorandum, dated May 16, 2007 (the "Offering Memorandum"), issued by Countrywide Financial Corporation ("Countrywide" or the "Company") in connection with the offering (the "May 2007 Debentures Offering" or "Offering") of Countrywide Series A Floating Rate Convertible Senior Debentures Due 2037 (the "Series A Debentures") and Countrywide Series B Floating Rate Convertible Senior Debentures Due 2037 (the "Series B Debentures") (collectively, the "Debentures");

(ii)    Countrywide's filings with the Securities and Exchange Commission ("SEC");

(iii)    press releases and other public statements issued by Defendants;

(iv)    publicly available internal Company documents and e-mails;

(v)    news articles and analysts' reports concerning Countrywide and/or the Debentures;

(vi)    transcripts from conference calls held with securities

analysts;

(vii)   relevant federal banking regulations;

(viii)  relevant Congressional hearing transcripts;

(ix)    industry statistics and publications;

(x)     official records of regulatory actions taken by federal and

state authorities with respect to Countrywide and/or the

Individual Defendants named herein; and

(xi)    official records in related actions.

Many additional facts supporting the allegations herein are known only to Defendants and are within their exclusive custody and control.  Plaintiffs believe that additional evidentiary support for the allegations herein will exist after a reasonable opportunity to conduct discovery.

Plaintiffs purchased Countrywide Series A Debentures and/or Countrywide Series B Debentures issued pursuant to the Offering Memorandum on the Offering and/or in the aftermarket from May 16, 2007 through November 21, 2007 (the "Relevant Period") and were damaged thereby.

## I.    SUMMARY OF THE ACTION

1.    This action arises from Defendants' misrepresentation and deliberate concealment of material facts concerning Countrywide's mortgage underwriting practices, the quality of its loans, and the dire risks that Defendants' irresponsibly

aggressive lending campaign posed to the Company.  Plaintiffs directly relied upon Defendants' materially misleading statements in purchasing the Countrywide Debentures discussed herein at artificially inflated prices during the Relevant Period. (*See* Section III.A, *infra*.)  By this action, Plaintiffs seek to recover damages they suffered when Defendants finally disclosed previously misrepresented and omitted material facts, substantially eroding the Debentures' value.

2.      During the Relevant Period, Countrywide was one of the leading mortgage lenders in the United States.  As alleged below in Section IV, Defendants pursued a reckless strategy to increase the Company's market share and to earn elevated fees by providing residential mortgage loans to unqualified borrowers, *i.e.* subprime mortgages. Countrywide not only originated subprime loans for sale on the secondary market, but also retained massive volumes of these volatile loans on the Company's balance sheet.

3.      While concealing the true extent and impact of its dependence upon selling high-risk and low quality loans, Countrywide sought billions of dollars of investor capital to finance its operations.  In connection with these efforts, Countrywide announced on May 16, 2007 that it was issuing the Debentures in a $4 billion offering. (*See* Section V, *infra*.)

4.      As alleged below in Section VI, Defendants misrepresented and omitted material facts concerning Countrywide's business practices, performance and prospects in the SEC filings incorporated into the Offering Memorandum.  Defendants' materially false and misleading statements artificially inflated the Debentures' prices.

5.     Beginning on July 24, 2007, Defendants gradually disclosed the truth underlying certain previously misrepresented and/or concealed facts concerning the Company's subprime mortgage underwriting practices and related risks.  Upon these partial disclosures, in which Defendants continued to misrepresent material facts, the Debentures' value declined in a series of material steps, directly causing Plaintiffs' losses.  (*See* Section VII, *infra*.)

6.     Defendants' misconduct alleged herein not only decimated the Debentures' value, but also triggered regulatory investigations and forced Countrywide to the brink of bankruptcy.  Ultimately, Countrywide could no longer exist independently, and agreed to a fire-sale acquisition by Bank of America.  (*See* Section VIII, *infra*.)

7.     The financial statements that Countrywide issued during the Relevant Period violated Generally Accepted Accounting Principles ("GAAP").  (*See* Section IX, *infra*.)  In issuing these financial statements, and in making the other material misstatements alleged herein, Defendants knew or were deliberately reckless in disregarding that their statements concerning Countrywide's business practices, performance, and prospects misrepresented and omitted material facts.  (*See* Section X, *infra*.)  Defendants' numerous GAAP violations further support the inference that Defendants acted with scienter making materially false and misleading statements during the Relevant Period.

8.     Defendants Angelo R. Mozilo ("Mozilo") and David Sambol ("Sambol") sold a combined 1,220,125 shares of Countrywide common stock and received

5

$45,795,551 in aggregate proceeds from the May 16, 2007 announcement of the Offering through the Company's first partial disclosure of previously misrepresented and concealed material facts on July 24, 2007.  Remarkably, these insider stock sales occurred at the same time that Defendants deliberately inflated the value of the Company's shares by using approximately $863 million of the Offering proceeds to repurchase Countrywide common stock.

9.     As detailed below in Section X.C., Defendants' insider stock sales took place while Defendants knew -- as their contemporaneous e-mails reveal -- that the Company faced severe undisclosed risks from its poorly underwritten loans, particularly Pay-Option Adjustable Rate mortgages ("pay-option ARMs") and subprime second mortgages.

10.     On June 4, 2009, the SEC filed a civil complaint against Defendants Mozilo, Sambol and Sieracki in the United States District Court for the Central District of California (the "SEC Action").  The complaint in the SEC Action charges each of the Individual Defendants with securities fraud based upon many of the same misrepresentations and omissions alleged herein.  The SEC also charges Defendant Mozilo with illegal insider trading based upon his deliberate manipulation of stock trading plans while in possession of material nonpublic information.  On November 3, 2009, the Court denied Defendants' motions to dismiss the SEC's complaint, and the case is scheduled for trial in October 2010.

### A.   Defendants Misrepresented and Omitted Material Facts In Documents Incorporated Into the Offering Memorandum

11.     In July 2003, Defendant Mozilo charted a course for Countrywide to increase its share of the United States residential mortgage market from 13% to 30%. Defendant Mozilo proclaimed that his goal was for Countrywide to "dominate the purchase market and get [the Company's] overall market share to the ultimate 30% by 2006-2007."

12.     Subprime loans, which carried interest rates that were typically two or three percentage points higher than traditional fixed-rate mortgages, were at the heart of Countrywide's expansion strategy.  Not only could the Company earn greater fees from such loans, but they also had increased value on the secondary market based upon the higher interest rates and resulting cash flows available to investors.

13.     To "defeat" its competition, Countrywide expanded its already-loose underwriting guidelines, and provided loans to virtually all prospective borrowers, regardless of risk.  Indeed, the Company's Chief Risk Officer, John P. McMurray ("McMurray") authored an August 6, 2007 e-mail acknowledging that Countrywide "has long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering."  By matching the most aggressive (and least prudent) underwriting standards in the market, Countrywide assumed ultimately crippling credit risks.

14.     Countrywide routinely offered high-risk mortgage loans based upon a borrower's bare assertion of his or her income -- even when Defendants knew that the borrower was lying.  In this regard, Defendant Mozilo admitted in a June 1, 2006 e-mail

to Defendant Sambol and others that the Company originated the majority of its pay-option ARMs on a stated-income (*i.e.* no documentation) basis and that there was "evidence" that borrowers were providing oral income representations that "do[] not match up with IRS records."

15.    Despite this, Defendants falsely claimed in the Company's 2006 Form 10-K, filed with the SEC on March 1, 2007 and explicitly incorporated into the Offering Memorandum, that Countrywide's pay-option ARMs were "prudently underwritten."

16.    Countrywide also improperly offered "piggyback," or second mortgages, to enable unqualified borrowers to finance 100% or more of the purported value of a home through two separate loans, often without any borrower down payment.  Defendants claimed in Countrywide's 2006 Form 10-K that Countrywide "consistently produc[ed] quality mortgages" and "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities."  Defendants similarly claimed in the 2007 First Quarter Form 10-Q that "[w]e assess a loan's quality by considering the borrower's credit profile and the quality of collateral securing the loan."  Defendants' contemporaneous internal communications reveal that these representations were false.

17.    For example, Defendant Mozilo stated the following concerning the Company's piggyback loans in an April 17, 2006 e-mail to Defendant Sambol and others:  "In all of my years in the business I have never seen a more toxic product . . . the FICOs are below 600, below 500 and some below 400 compounded by the fact that these are 100% loans which must always be written off in the event of foreclosure."

Defendant Mozilo's references to low Fair Isaac Corporation ("FICO") scores highlighted his concerns over the mounting volume of loans that the Company knowingly provided to borrowers with weak credit profiles.

18.    Countrywide also retained on its balance sheet substantial volumes of these admittedly "toxic" mortgage loans pending sale on the secondary market and for investment purposes.  The Company's balance sheet exposure to these mortgage products grew in both size and risk as the market for mortgage-backed securities evaporated during the Relevant Period.  Defendants knew, but failed to disclose, that the Company's lending activity and the intensifying market downturn were wreaking havoc on Countrywide and its borrowers.

19.    For example, Defendant Mozilo's March 28, 2006 e-mail to Defendants Sambol and Sieracki noted that growing delinquencies in the Company's pay-option ARM portfolio, which comprised a substantial portion of the loans Countrywide held for investment ("LHI"), posed "serious problems that could cause Countrywide to "face both financial and regulatory consequences."

20.    In his June 1, 2006 e-mail to Defendant Sambol and others, Defendant Mozilo further acknowledged that Countrywide's risky pay-option ARMs were subject to likely rate increases that would cause "a payment shock which is going to be difficult if not impossible for [borrowers] to manage."  For this reason, Mozilo recognized in June 2006 that Countrywide "should take a careful look at [its] reserves and begin to assume the worst."

21.    In a September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo similarly urged that that the Company should begin divesting its pay-option ARMs.  According to Defendant Mozilo, Countrywide had "no way, with any reasonable certainty, to assess the real risk of holding these loans" and was "flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."

22.    Although they recognized numerous problems arising from the Company's lending practices before the Relevant Period began, Defendants neither effectively addressed nor disclosed these known threats to the Company's viability in the 2006 Form 10-K or in the First Quarter 2007 Form 10-Q, which were incorporated into the Offering Memorandum.  Even when they began to correct Countrywide's prior misstatements later in the Relevant Period, Defendants continued to misrepresent and omit material facts.

**B.    Defendants Gradually Disclosed The Truth Concerning Countrywide's Underwriting Practices and Subprime Mortgage Exposures While Continuing to Misrepresent the Risks to the Company**

23.    Beginning on July 24, 2007, Defendants gradually disclosed certain previously misrepresented and concealed material facts concerning Countrywide's underwriting practices and subprime mortgage exposure.  Although Defendants continued to misrepresent material facts concerning Countrywide's business practices and liquidity, their partial corrective disclosures removed portions of the artificial inflation from the Debentures' prices.

24.     For example, Countrywide's July 24, 2007 Press Release announcing the Company's Second Quarter 2007 financial results, and the related conference call with analysts held the same day, revealed that Countrywide used a broad definition of "prime" loan.  While borrowers with FICO scores of 660 or less are typically considered "subprime," Countrywide's McMurray stated that the Company's definition of prime "covers a very vast spectrum" and referred to "prime loan[s] with FICOs in the low 500s."  McMurray further indicated that "a prime loan with FICOs in the low 500s is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO."

25.     In connection with the July 24, 2007 Press Release, Defendants also admitted that Countrywide's stated income (no documentation) loans were responsible for serious delinquencies and defaults.  Defendants, however, falsely claimed that Countrywide was tightening its credit guidelines and that it had eliminated several of the Company's riskiest loan types.

26.     Yet, months later in the Company's October 26, 2007 Press Release and during a related conference call held the same day, Defendants began to admit, among other things, that Countrywide:  (i) did not implement a "wholesale revamping and tightening" of its underwriting guidelines until the third quarter of 2007; and (ii) had not entirely eliminated high-risk and reduced documentation subprime loans, including pay-option ARMs.  In fact, Countrywide continued to originate high-risk loans throughout the second and third quarters of 2007, causing Countrywide to report in its November

11

13, 2007 Press Release a massive 43.2% increase in delinquencies and a 54.7% increase in foreclosures in the Company's loan portfolio during October 2007 as compared to October 2006.

27.    Despite making positive statements during the Relevant Period concerning the Company's liquidity position, Defendants finally began to acknowledge in Countrywide's 2007 Second Quarter Form 10-Q, filed with the SEC on August 9, 2007, that the Company faced certain liquidity risks from its misrepresented underwriting practices.

28.    In an effort to reassure investors about the Company's liquidity position, Countrywide announced on August 16, 2007 that it drew down its entire $11.5 billion emergency credit facility to "supplement[] its liquidity funding position." Defendants, nevertheless, falsely maintained through the end of the Relevant Period on November 21, 2007 that the Company was adequately capitalized and would return to profitability in the fourth quarter of 2007.

29.    Countrywide's partial disclosures of previously misrepresented and/or concealed material facts, beginning on July 24, 2007, caused the price of the Series A Debentures to drop from their Offering price by $231.69 per debenture, or approximately 23.35%, to close at $760.45 per debenture on November 21, 2007. Similarly, the price of the Series B Debentures declined from their Offering price by $264.69 per debenture, or approximately 26.84%, to close at $721.12 per debenture on November 21, 2007.

30.    Plaintiffs purchased more than $3 billion in face amount of the Debentures during the Relevant Period and incurred damages of approximately $200 million thereby.

## II.    JURISDICTION AND VENUE

31.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The action also alleges claims under Sections 25400, 25500 and 25504.1 of the California Corporations Code and the law of California.

32.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

33.    In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, and interstate telephone communications.

34.    This Court has jurisdiction over the causes of action under the California Corporations Code pursuant to California Corporations Code § 25008, and over the common law causes of action as alleged herein because Defendants' Misconduct occurred primarily in the state of California.

35.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination of materially false and misleading information in connection with the sale of a security, occurred in this District.

## III.   THE PARTIES

### A.     Plaintiffs and Their Direct Reliance on Defendants' Material Misrepresentations and Omissions

#### 1.     The Argent Funds

36.     Plaintiff Centaur Classic Convertible Arbitrage Fund Ltd. (f/k/a Argent Classic Convertible Arbitrage Fund Ltd.) ("Centaur Ltd.") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

37.     Plaintiff Argent Classic Convertible Arbitrage Fund II L.P. ("Argent L.P.") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

38.     Plaintiff Argent LowLev Convertible Arbitrage Fund II LLC ("Argent LowLev") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

39.     Plaintiff Centaur LowLev Arbitrage Fund Ltd. (f/k/a Argent LowLev Convertible Arbitrage Fund Ltd.) ("Centaur LowLev Ltd.") is a company organized

under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

40.    Plaintiff Argentum Multi-Strategy Fund LLC ("Argentum LLC") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

41.    Plaintiff Argentum Multi-Strategy Fund Ltd. ("Argentum Ltd.") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

42.    Plaintiff Lyxor/Argent Low Leverage Fund Limited ("Lyxor/Argent") is a multi-class investment company with limited liability incorporated under the Companies (Jersey) Law 1991, with a registered address at 18 Esplanade, St. Helier, JE4 8RT Jersey, Channel Islands.

43.    Plaintiff HFR CA Global Select Master Trust ("HFR Argent") is a trust organized under the laws of Bermuda, with a principal place of business located in Bermuda.

44.    Plaintiffs (i) Centaur Ltd., (ii) Argent L.P., (iii) Argent LowLev, (iv) Centaur LowLev Ltd., (v) Argentum LLC, (vi) Argentum Ltd., (vii) Lyxor/Argent, and (viii) HFR Argent are referred to collectively herein as the "Argent Funds."

45.     Each of the Argent Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager and/or investment adviser, Argent Management Co. LLC ("Argent Management"), and was damaged thereby.  Argent Management had investment discretion and was authorized to purchase and sell securities on behalf of each of the Argent Funds, within the guidelines set by the Argent Funds, including the Countrywide Debentures purchased during the Relevant Period.

46.     Argent Management caused each of the Argent Funds to purchase the Countrywide Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents:

- the Offering Memorandum;

- Countrywide's 2006 Form 10-K, incorporated by reference into the Offering Memorandum and filed with the SEC on March 1, 2007 (the "2006 Form 10-K");

- Countrywide's Form 10-Q for the first quarter of 2007, incorporated by reference into the Offering Memorandum and filed with the SEC on May 9, 2007 (the "First Quarter 2007 Form 10-Q");

- a Countrywide press release announcing the Company's financial results for the second quarter of 2007, filed on Form

8-K with the SEC on July 24, 2007 (the "July 24, 2007 Press Release");

- Countrywide's Form 10-Q for the second quarter of 2007, filed with the SEC on August 9, 2007 (the "Second Quarter 2007 Form 10-Q")

- a Countrywide press release announcing the Company's draw on its credit facilities, filed on Form 8-K with the SEC on August 16, 2007 (the "August 16, 2007 Press Release"); and

- a Countrywide press release dated September 7, 2007 announcing workforce reduction measures at the Company (the "September 7, 2007 Press Release").

47.     On behalf of each of the Argent Funds, Argent Management read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 46:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization; (vi) the valuation and impairment of Countrywide's mortgage servicing rights; (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary

market; and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting.

48.     Argent Management and the Argent Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 46 were materially false and misleading and omitted material facts as alleged herein.  The Argent Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 2.     The Acuity Funds

49.     Plaintiff Acuity Master Fund, Ltd. ("Acuity Master Fund") is a company organized under the laws of the British Virgin Islands, with a principal place of business located at 4 Greenwich Office Park, Greenwich, Connecticut 06831.

50.     Plaintiff Carlyle Multi-Strategy Master Fund Liquidating Trust (the "Carlyle Trust") is a trust organized under the laws of the State of Delaware, with a principal place of business located at Rodney Square North, 1100 North Market Street, Wilmington, DE 19890-0001.  The Carlyle Trust was formed to hold the remaining assets of the Carlyle Multi-Strategy Master Fund, Ltd. (the "Carlyle Master Fund") upon dissolution of the Carlyle Master Fund.  Both the Carlyle Trust and the Carlyle Master Fund are referred to collectively herein as "Carlyle."

51.     Plaintiff Lyxor/Acuity Fund Limited ("Lyxor/Acuity") is a multi-class investment company with limited liability incorporated under the Companies (Jersey)

Law 1991, with a registered address at 18 Esplanade, St Helier, JE4 8RT Jersey, Channel Islands.

52.     Plaintiffs (i) Acuity Master Fund, (ii) Carlyle, and (iii) Lyxor/Acuity are referred to collectively herein as the "Acuity Funds."

53.     Each of the Acuity Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Acuity Capital Management, LLC ("Acuity Capital"), and was damaged thereby.  Acuity Capital had investment discretion and was authorized to purchase and sell securities on behalf of each of the Acuity Funds, within the guidelines set by the Acuity Funds, including the Countrywide Debentures purchased during the Relevant Period.

54.     Acuity Capital caused each of the Acuity Funds to purchase the Countrywide Debentures based on Acuity Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Countrywide press release entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition" (the "August 2, 2007 Press Release"); (vi) Countrywide press release disclosing the Company's short-term liquidity sources, filed on Form 8-K with the SEC on August 6, 2007 (the "August 6, 2007 Form 8-K"); (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and the (x)

October 26, 2007 Countrywide press release announcing financial results for the third quarter of 2007 (the "October 26, 2007 Press Release").

55.     On behalf of each of the Acuity Funds, Acuity Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 54: (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting; and (x) the credit and borrower risk factors associated with the Company.

56.     Acuity Capital and the Acuity Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 54 were materially false and misleading and omitted material facts as alleged herein.  The Acuity Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 3.    Polygon Global Opportunities Master Fund

57.    Plaintiff Polygon Global Opportunities Master Fund ("Polygon") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

58.    Polygon purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment managers Polygon Investment Partners LP ("Polygon Investment LP") and Polygon Investment Partners LLP ("Polygon Investment LLP"), and was damaged thereby.  Both Polygon Investment LP and Polygon Investment LLP had shared investment discretion and were authorized to purchase and sell securities on behalf of Polygon, within the guidelines set by Polygon, including the Countrywide Debentures purchased during the Relevant Period.

59.    Polygon Investment LP and Polygon Investment LLP caused Polygon to purchase the Countrywide Debentures based on their review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

60.    On behalf of Polygon, Polygon Investment LP and Polygon Investment LLP read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 59:  (i) the quality of Countrywide's mortgage

21

loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's allowance for loan losses; (v) Countrywide's internal control procedures for mortgage origination and financial reporting; and (vi) the credit and borrower risk factors associated with the Company.

61.    Polygon, Polygon Investment LP, and Polygon Investment LLP did not know, and had no reason to know, that Defendants' representations contained in the documents listed in ¶ 59 were materially false and misleading and omitted material facts as alleged herein.  Polygon would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 4.    The Symphony Funds

62.    Plaintiff Rhapsody Fund, L.P. (the "Rhapsody Fund") is a limited partnership organized under the laws of the State of California, with a principal place of business located at 555 California Street, San Francisco, California 94104.

63.    Plaintiff Arpeggio Fund (the "Arpeggio Fund") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 555 California Street, San Francisco, California 94104.

64.    Plaintiff Nuveen Multi-Strategy Income and Growth Fund ("Nuveen") is a business trust organized under the laws of the State of Massachusetts, with a principal place of business located at 333 West Wacker Drive, Chicago, Illinois 60606.

65.     Plaintiff Nuveen Multi-Strategy Income and Growth Fund 2 ("Nuveen 2") is a business trust organized under the laws of State of Massachusetts, with a principal place of business located at 333 West Wacker Drive, Chicago, Illinois 60606.

66.     Plaintiffs (i) Rhapsody Fund, (ii) Arpeggio Fund, (iii) Nuveen, and (iv) Nuveen 2 are referred to collectively herein as the "Symphony Funds."

67.     Each of the Symphony Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Symphony Asset Management, LLC ("Symphony"), and was damaged thereby.  Symphony had investment discretion and was authorized to purchase and sell securities on behalf of each of the Symphony Funds, within the guidelines set by the Symphony Funds, including the Countrywide Debentures purchased during the Relevant Period.

68.     Symphony caused each of the Symphony Funds to purchase the Countrywide Debentures based on Symphony's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) July 24, 2007 Press Release; (iv) August 2, 2007 Press Release; (v) August 6, 2007 Form 8-K; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; and the (viii) September 7, 2007 Press Release.

69.     On behalf of each of the Symphony Funds, Symphony read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed

in ¶ 68:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting, and (x) the credit and borrower risk factors associated with the Company.

70.    Symphony and the Symphony Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 68 were materially false and misleading and omitted material facts as alleged herein.  The Symphony Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 5.    Radcliffe SPC, Ltd.

71.    Plaintiff Radcliffe SPC, Ltd. ("Radcliffe") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands.

72.    Radcliffe purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, RG Capital Management, L.P. ("RG

Capital"), and was damaged thereby.  RG Capital had investment discretion and was authorized to purchase and sell securities on behalf of Radcliffe, within the guidelines set by Radcliffe, including the Countrywide Debentures purchased during the Relevant Period.

73.    RG Capital caused Radcliffe to purchase the Countrywide Debentures based on RG Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; (x) October 26, 2007 Press Release; and (xi) Countrywide's Form 10-Q for the third quarter of 2007, filed with the SEC on November 9, 2007 (the "Third Quarter 2007 Form 10-Q").

74.    On behalf of Radcliffe, RG Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 73:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing

rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting, and (x) the credit and borrower risk factors associated with the Company.

75.     RG Capital and Radcliffe did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 73 were materially false and misleading and omitted material facts as alleged herein.  Radcliffe would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 6.     Tempo Master Fund L.P.

76.     Plaintiff Tempo Master Fund L.P. ("Tempo") is a limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 2 Greenwich Plaza, Greenwich, Connecticut 06830.

77.     Tempo purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, JD Capital Management LLC ("JD Capital"), and was damaged thereby.  JD Capital had investment discretion and was authorized to purchase and sell securities on behalf of Tempo, within the guidelines set by Tempo, including the Countrywide Debentures purchased during the Relevant Period.

78.     JD Capital caused Tempo to purchase the Countrywide Debentures based on JD Capital's review of, and direct reliance upon, the Company information and

representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

79.     On behalf of Tempo, JD Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 78: (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's allowance for loan losses; and (v) the credit and borrower risk factors associated with the Company.

80.     Tempo and JD Capital did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 78 were materially false and misleading and omitted material facts as alleged herein.  Tempo would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 7.     The Canyon Funds

81.     Plaintiff Canyon Capital Arbitrage Master Fund, Ltd. ("Canyon Arbitrage") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

82.     Plaintiff The Canyon Value Realization Fund (Cayman), Ltd. ("Canyon Value (Cayman)") is an exempted company organized under the laws of the Cayman

Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

83.    Plaintiff Canyon Value Realization MAC 18, Ltd. ("Canyon MAC") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, West Bay Road, Grand Cayman KY1-1205, Cayman Islands.

84.    Plaintiff Canyon Value Realization Fund, L.P. ("Canyon Value") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located 615 South DuPont Highway, Dover, Delaware 19901.

85.    Plaintiff Lyxor/Canyon Capital Arbitrage Fund Limited. ("Lyxor/Canyon") is a multi-class investment company with limited liability incorporated under the Companies (Jersey) Law 1991, with a registered address at 18 Esplanade, St Helier, JE4 8RT Jersey, Channel Islands.

86.    Plaintiffs (i) Canyon Arbitrage, (ii) Canyon Value (Cayman), (iii) Canyon MAC, (iv) Canyon Value, and (v) Lyxor/Canyon are referred to collectively herein as the "Canyon Funds."

87.    Each of the Canyon Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Canyon Capital Advisors LLC ("Canyon Capital"), and was damaged thereby.  Canyon Capital had investment discretion and was authorized to purchase and sell securities on behalf of

each of the Canyon Funds, within the guidelines set by the Canyon Funds, including the Countrywide Debentures purchased during the Relevant Period.

88.    Canyon Capital caused each of the Canyon Funds to purchase the Countrywide Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

89.    On behalf of each of the Canyon Funds, Canyon Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 88:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting, and (x) the credit and borrower risk factors associated with the Company.

90.    Canyon Capital and the Canyon Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 88 were materially

false and misleading and omitted material facts as alleged herein.  The Canyon Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

## 8.   GLG Market Neutral Fund

91.    Plaintiff GLG Market Neutral Fund ("GLG") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 87 Mary Street, George Town, Grand Cayman, KY1-9001, Cayman Islands.

92.    GLG purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager GLG Partners LP ("GLG Partners"), and was damaged thereby.  GLG Partners had investment discretion and was authorized to purchase and sell securities on behalf of GLG, within the guidelines set by GLG, including the Countrywide Debentures purchased during the Relevant Period.

93.    GLG Partners caused GLG to purchase the Countrywide Debentures based on GLG Partners' review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) July 24, 2007 Press Release; (iii) August 16, 2007 Press Release; and the (iv) October 26, 2007 Press Release.

94.    On behalf of GLG, GLG Partners read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the Company's liquidity contained in the documents listed in ¶ 93 above.

95.     GLG and GLG Partners did not know, and had no reason to know, that Defendants' representations contained in the documents listed in ¶ 93 were materially false and misleading and omitted material facts as alleged herein.  GLG would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 9.     Mohican VCA Master Fund, Ltd.

96.     Plaintiff Mohican VCA Master Fund, Ltd. ("Mohican") an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 21 Railroad Avenue, Cooperstown, New York 13326.

97.     Mohican purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Mohican Financial Management LLC ("Mohican Financial"), and was damaged thereby.  Mohican Financial had investment discretion and was authorized to purchase and sell securities on behalf of Mohican, within the guidelines set by Mohican, including the Countrywide Debentures purchased during the Relevant Period.

98.     Mohican Financial caused Mohican to purchase the Countrywide Debentures based on Mohican Financial's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv)

July 24, 2007 Press Release; (v) August 2, 2007 Press Release; and the (vi) August 6, 2007 Form 8-K.

99.     On behalf of Mohican, Mohican Financial read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 98:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's portfolio of loans held-for-investment; (iv) Countrywide's allowance for loan losses; (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vi) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (vii) Countrywide's internal control procedures for mortgage origination and financial reporting, and (viii) the credit and borrower risk factors associated with the Company.

100.    Mohican Financial and Mohican did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 98 were materially false and misleading and omitted material facts as alleged herein.  Mohican would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 10.    The OFI Funds

101.   Plaintiff ADI Arbitrages Absolu ("ADI Arbitrages") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

102.   Plaintiff ADI Convert Absolu ("ADI Convert") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

103.   Plaintiff ADI Convex is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

104.   Plaintiff ADI Convex Absolu ("ADI Absolu") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

105.   Plaintiff Kallista CB Arbitrage Fund Limited ("Kallista") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

106.   Plaintiffs (i) ADI Arbitrages, (ii) ADI Convert, (iii) ADI Convex, (iv) ADI Absolu, and (v) Kallista are referred to collectively herein as the "OFI Funds."

107.   Each of the OFI Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, ADI – Alternative Investments S.A. (n/k/a OFI Asset Management) ("OFI"), and was damaged thereby.  ADI (n/k/a OFI), as the investment manager of the OFI Funds during the

Relevant Period, had investment discretion and was authorized to purchase and sell securities on behalf of each of the OFI Funds, within the guidelines set by the OFI Funds, including the Countrywide Debentures purchased during the Relevant Period.

108.   ADI (n/k/a OFI), as the investment manager of the OFI Funds during the Relevant Period, caused each of the OFI Funds to purchase the Countrywide Debentures based on its review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release; and the (ix) September 7, 2007 Press Release.

109.   On behalf of each of the OFI Funds, ADI (n/k/a OFI), as the investment manager of the OFI Funds during the Relevant Period, read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 108:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures

for mortgage origination and financial reporting; and (x) the credit and borrower risk factors associated with the Company.

110.   ADI (n/k/a OFI) and the OFI Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 108 were materially false and misleading and omitted material facts as alleged herein.  The OFI Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

## 11.   CASAM ADI CB Arbitrage Limited

111.   Plaintiff CASAM ADI CB Arbitrage Limited ("CASAM") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

112.   CASAM purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, ADI – Alternative Investments S.A. (n/k/a OFI Asset Management), and was damaged thereby.  ADI had investment discretion and was authorized to purchase and sell securities on behalf of CASAM, within the guidelines set by CASAM, including the Countrywide Debentures purchased during the Relevant Period.

113.   ADI caused CASAM to purchase the Countrywide Debentures based on ADI's review of, and direct reliance upon, the Company information and representations

contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release; and the (ix) September 7, 2007 Press Release.

114.   On behalf of CASAM, ADI read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 113:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting; and (x) the credit and borrower risk factors associated with the Company.

115.   ADI and CASAM did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 113 were materially false and misleading and omitted material facts as alleged herein.  CASAM would not have purchased any of the Countrywide Debentures, or would not have purchased them at the

prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 12.   The Trafelet Delta Funds

116.   Plaintiff Delta Institutional, L.P. ("Delta Institutional") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

117.   Plaintiff Delta Onshore, L.P. ("Delta Onshore") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

118.   Plaintiff Delta Pleiades, L.P. ("Delta Pleiades") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

119.   Plaintiff Delta Offshore Master, Ltd. ("Delta Offshore") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Queensgate House, South Church Street, George Town, Grand Cayman KY1-1108, Cayman Islands.

120.   Plaintiffs (i) Delta Institutional, (ii) Delta Onshore, (iii) Delta Pleiades, and (iv) Delta Offshore are referred to collectively herein as the "Trafelet Delta Funds."

121.   Each of the Trafelet Delta Funds purchased the Countrywide Series A Debentures during the Relevant Period through their investment manager, Trafelet Capital Management, L.P. ("Trafelet Capital"), and was damaged thereby.  Trafelet

Capital had investment discretion and was authorized to purchase and sell securities on behalf of each of the Trafelet Delta Funds, within the guidelines set by the Trafelet Delta Funds, including the Countrywide Debentures purchased during the Relevant Period.

122.   Trafelet Capital caused each of the Trafelet Delta Funds to purchase the Countrywide Debentures based on Trafelet Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) August 2, 2007 Press Release; (ii) the August 6, 2007 Form 8-K; (iii) Second Quarter 2007 Form 10-Q; (iv) August 16, 2007 Press Release; and the (v) September 7, 2007 Press Release.

123.   On behalf of each of the Trafelet Delta Funds, Trafelet Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 122:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) the valuation and impairment of Countrywide's mortgage servicing rights; (iv) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; and (v) the credit and borrower risk factors associated with the Company.

124.   Trafelet Capital and the Trafelet Delta Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 122 were materially false and misleading and omitted material facts as alleged herein.  The Trafelet Delta Funds would not have purchased any of the Countrywide Debentures, or

would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 13.   RHP Master Fund, Ltd.

125.   Plaintiff RHP Master Fund, Ltd. ("RHP") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at P.O. Box 1234, Queensgate House, South Church Street, Grand Cayman KY1-1108, Cayman Islands.

126.   RHP purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Rock Hill Investment Management, L.P. ("Rock Hill"), and was damaged thereby.  Rock Hill had investment discretion and was authorized to purchase and sell securities on behalf of RHP, within the guidelines set by RHP, including the Countrywide Debentures purchased during the Relevant Period.

127.   Rock Hill caused RHP to purchase the Countrywide Debentures based on Rock Hill's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

128.   On behalf of RHP, Rock Hill read, reviewed and directly relied upon Defendants' misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 127:  (i) the quality of

Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; and (vi) the credit and borrower risk factors associated with the Company.

129.   RHP and Rock Hill did not know, and had no reason to know, that Defendants' representations contained in the documents listed in ¶ 127 were materially false and misleading and omitted material facts as alleged herein.  RHP would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

**14.    HFR CA Lazard Rathmore Master Trust**

130.   Plaintiff HFR CA Lazard Rathmore Master Trust (f/k/a HFR RVA Lazard Rathmore Master Trust) ("HFR Lazard") is a trust organized under the laws of Bermuda, with a principal place of business located at 65 Front Street, Hamilton HM12, Bermuda.

131.  HFR Lazard purchased the Countrywide Series A and B Debentures during the Relevant Period through its trading manager Lazard Asset Management, LLC ("Lazard") and was damaged thereby.  Lazard had investment discretion and was authorized to purchase and sell securities on behalf of HFR Lazard, within the guidelines set by HFR Lazard, including the Countrywide Debentures purchased during the Relevant Period.