132.   Lazard caused HFR Lazard to purchase the Countrywide Debentures based on Lazard's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Second Quarter 2007 Form 10-Q; (ii) August 16, 2007 Press Release; and the (iii) September 7, 2007 Press Release.

133.   On behalf of HFR Lazard, Lazard read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 132:  (i) the quality of Countrywide's mortgage loan portfolios and (ii) Countrywide's liquidity.

134.   Lazard and HFR Lazard did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 132 were materially false and misleading and omitted material facts as alleged herein.  HFR Lazard would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 15.   The Ramius Funds

135.   Plaintiff Ramius Convertible Arbitrage Master Fund Ltd. (f/k/a RCG Latitude Master Fund, Ltd.) ("Ramius") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, Winward 1, Grand Cayman KY1-1205, Cayman Islands.

136.    Plaintiff RCG PB, Ltd. ("RCG") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, Winward 1, Grand Cayman KY1-1205, Cayman Islands.

137.    Plaintiffs (i) Ramius and (ii) RCG are referred to collectively herein as the "Ramius Funds."

138.    Both of the Ramius Funds purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Ramius Advisors LLC ("Ramius Advisors"), and were damaged thereby.  Ramius Advisors had investment discretion and was authorized to purchase and sell securities on behalf of both of the Ramius Funds, within the guidelines set by the Ramius Funds, including the Countrywide Debentures purchased during the Relevant Period.

139.    Ramius Advisors caused both of the Ramius Funds to purchase the Countrywide Debentures based on Ramius Advisors' review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; (viii) September 7, 2007 Press Release; and the (ix) October 26, 2007 Press Release.

140.    On behalf of both of the Ramius Funds, Ramius Advisors read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the

documents listed in ¶ 139: (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's liquidity; (iii) Countrywide's portfolio of loans held-for-investment; (iv) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; and (v) the credit and borrower risk factors associated with the Company.

141.   Ramius Advisors and the Ramius Funds did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 139 were materially false and misleading and omitted material facts as alleged herein.  The Ramius Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 16.   S.A.C. Arbitrage Fund, LLC

142.   Plaintiff S.A.C. Arbitrage Fund, LLC ("S.A.C. Arbitrage") is a limited liability company organized under the laws of Anguilla, British West Indies, with a principal place of business located at Mitchell House, Box 174, The Valley, Anguilla, British West Indies.

143.   S.A.C. Arbitrage purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager at the time, S.A.C. Capital Advisors, LLC ("S.A.C. Capital"), and was damaged thereby.  S.A.C. Capital had investment discretion and was authorized to purchase and sell securities on behalf of

S.A.C. Arbitrage, within the guidelines set by S.A.C. Arbitrage, including the Countrywide Debentures purchased during the Relevant Period.

144.   S.A.C. Capital caused S.A.C. Arbitrage to purchase the Countrywide Debentures based on S.A.C. Capital's review of, and direct reliance upon, the information and representations contained in the Company's earnings conference calls, SEC filings, press releases and other publicly available materials during the Relevant Period specifically including, but not limited to the following documents:  the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; and the (viii) August 16, 2007 Press Release.

145.   On behalf of S.A.C. Arbitrage, S.A.C. Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 144:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) Countrywide's internal control procedures for mortgage origination and financial reporting, and (ix) the credit and borrower risk factors associated with the Company.

146.   S.A.C. Capital and S.A.C. Arbitrage did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 144 were materially false and misleading and omitted material facts as alleged herein.   S.A.C. Arbitrage would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 17.   Stark Master Fund Ltd.

147.   Plaintiff Stark Master Fund Ltd. ("Stark") is a corporation organized under the laws of the British Virgin Islands, with a principal place of business located in Tortola, British Virgin Islands.

148.   Stark purchased the Countrywide Series A and B Debentures during the Relevant Period at the direction of its investment manager Stark Offshore Management LLC ("Stark Offshore"), and was damaged thereby.   Stark Offshore had investment discretion and was authorized to purchase and sell securities on behalf of Stark, within the guidelines set by Stark, including the Countrywide Debentures purchased during the Relevant Period.

149.   Stark Offshore caused Stark to purchase the Countrywide Debentures based on Stark Offshore's review of, and direct reliance upon, the Company information and representations contained in the following documents:  the (i) 2006 Form 10-K; (ii) July 24, 2007 Press Release; (iii) August 2, 2007 Press Release; (iv) August 6, 2007 Form 8-

K; (v) Second Quarter 2007 Form 10-Q; (vi) September 7, 2007 Press Release; (vii) October 26, 2007 Press Release; and (viii) Third Quarter 2007 Form 10-Q.

150.   On behalf of Stark, Stark Offshore read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein concerning the following categories of information, among others, contained in the documents listed in ¶ 149:  (i) the quality of Countrywide's mortgage loan portfolio; (ii) Countrywide's credit and loan underwriting practices; (iii) Countrywide's liquidity; (iv) Countrywide's portfolio of loans held-for-investment; (v) Countrywide's allowance for loan losses; (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations; (vii) the valuation and impairment of Countrywide's mortgage servicing rights; (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market; (ix) Countrywide's internal control procedures for mortgage origination and financial reporting; and (x) the credit and borrower risk factors associated with the Company.

151.   Stark Offshore and Stark did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 149 were materially false and misleading and omitted material facts as alleged herein.  Stark would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

## 18.   Steelhead Pathfinder Master, L.P.

152.   Plaintiff Steelhead Pathfinder Master, L.P. ("Steelhead") is a limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 333 108th Avenue NE, Bellevue, Washington 98004.

153.   Steelhead purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Steelhead Partners LLC ("Steelhead Partners"), and was damaged thereby.  Steelhead Partners had investment discretion and was authorized to purchase and sell securities on behalf of Steelhead, within the guidelines set by Steelhead, including the Countrywide Debentures purchased during the Relevant Period.

154.   Steelhead Partners caused Steelhead to purchase the Countrywide Debentures based on Steelhead Partners' review of, and direct reliance upon, the Company information and representations contained in the Offering Memorandum and the Countrywide earnings release for the first quarter of 2007.

155.   On behalf of Steelhead, Steelhead Partners read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein during the Relevant Period concerning the following categories of information contained in the documents referenced in ¶ 154:  (i) the quality of Countrywide's mortgage loan portfolio; and (ii) Countrywide's liquidity.

156.   Steelhead Partners and Steelhead did not know, and had no reason to know, that Defendants' representations in the documents referenced in ¶ 154 were materially

47

false and misleading and omitted material facts as alleged herein.  Steelhead would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations during the Relevant Period were materially false and misleading and omitted material facts.

### 19.   Camulos Master Fund L.P.

157.   Plaintiff Camulos Master Fund L.P. ("Camulos") is an exempted limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 3 Landmark Square, Stamford, Connecticut 06901.

158.   Camulos purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Camulos Capital L.P. ("Camulos Capital"), and was damaged thereby.  Camulos Capital had investment discretion and was authorized to purchase and sell securities on behalf of Camulos, within the guidelines set by Camulos, including the Countrywide Debentures purchased during the Relevant Period.

159.   Camulos Capital caused Camulos to purchase the Countrywide Debentures based on Camulos Capital's review of, and direct reliance upon, the Company information and representations contained in Countrywide's financial statements and press releases issued during the Relevant Period.

160.   On behalf of Camulos, Camulos Capital read, reviewed and directly relied upon Defendants' material misrepresentations alleged herein during the Relevant Period and contained in the documents referenced in ¶ 159.

161.    Camulos Capital and Camulos did not know, and had no reason to know, that Defendants' representations in the documents listed in ¶ 159 were materially false and misleading and omitted material facts as alleged herein.  Camulos would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

### 20.    The Concordia Funds

162.    Plaintiff Concordia Partners L.P. ("Concordia Partners") is a limited partnership organized under the laws of Bermuda, with a principal place of business located at 2 Church Street, Hamilton HM11, Bermuda.

163.    Plaintiff Concordia Institutional Multi-Strategies Ltd. ("Concordia Institutional") is a company organized under the laws of Bermuda, with a principal place of business located at 2 Church Street, Hamilton HM11, Bermuda.

164.    Plaintiff Concordia MAC 29 Ltd. ("Concordia MAC") is a company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KVI-1205, Cayman Islands.

165.    Plaintiffs (i) Concordia Partners, (ii) Concordia Institutional, and (iii) Concordia MAC are referred to collectively herein as the "Concordia Funds."

166.    Each of the Concordia Funds purchased the Countrywide Series B Debentures during the Relevant Period through their investment manager, Concordia Advisors LLC ("Concordia Advisors"), and was damaged thereby.  Concordia Advisors

had investment discretion and was authorized to purchase and sell securities on behalf of each of the Concordia Funds, within the guidelines set by the Concordia Funds, including the Countrywide Debentures purchased during the Relevant Period.

167.   Concordia Advisors caused each of the Concordia Funds to purchase the Countrywide Debentures based on Concordia Advisors' review of, and direct reliance upon, the Company information and representations contained in Countrywide's financial statements and press releases issued during the Relevant Period.

168.   On behalf of each of the Concordia Funds, Concordia Advisors read, reviewed and directly relied upon Countrywide's material misrepresentations alleged herein during the Relevant Period and contained in the documents referenced in ¶ 167.

169.   Concordia Advisors and the Concordia Funds did not know, and had no reason to know, that Defendants' representations during the Relevant Period were materially false and misleading and omitted material facts as alleged herein.  The Concordia Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' representations in these documents were materially false and misleading and omitted material facts.

**B.    Defendants**

**1.    Countrywide Financial Corporation**

170.   During the Relevant Period, Defendant Countrywide was incorporated under the laws of the State of Delaware, with a principal place of business located at 4500 Park Granada Boulevard, Calabasas, California 91302.  Countrywide common

shares traded on the NYSE under the symbol "CFC" during the Relevant Period. Throughout the Relevant Period, Countrywide engaged in mortgage lending and other finance-related operations focused primarily on real estate finance.

171.   During the Relevant Period, the Company was one of the largest originators of subprime loans in the country.  In addition, during this period, Countrywide was the largest mortgage lender in the United States.  It boasted of being a "leader in nearly every aspect of real estate finance," and was considered, based on its reports to the investing public, one of the best performing financial services companies over the past 25 years, earning high rankings as a Fortune 500 company beginning in 2000.

172.   Following the merger between Bank of America and Countrywide 2008, the Company became a wholly-owned subsidiary of Bank of America and was renamed Bank of America Home Loans in April 2009.  For ease of reference, the Company is still referred to herein as Countrywide.

### 2.   The Individual Defendants

173.   Each of the Individual Defendants (defined below) had the duty to make full, candid and timely disclosures of all material facts relating to Countrywide's business, operations, performance and prospects.  Among other things, the Individual Defendants were required to:

(i)   conduct and supervise Countrywide's business in accordance with all applicable laws and regulations;

(ii)    supervise the preparation of the Company's SEC filings and approve any publicly-issued reports concerning Countrywide's financial reporting and results;

(iii)   ensure that Countrywide established and followed adequate management and accounting internal controls; and

(iv)   refrain from obtaining personal benefits, at the expense of the public purchasers of Countrywide securities, including the Debentures, by misappropriating proprietary non-public information concerning Countrywide.

174.   As senior officers and controlling persons of a publicly-held company governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue.

175.   As a result of the Individual Defendants' failure to fulfill the foregoing obligations, the prices of Countrywide Debentures were artificially inflated during the Relevant Period. In response to the gradual emergence of the truth, the prices of Countrywide Debentures fell in precipitous steps. As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs were injured.

### a.   Angelo R. Mozilo

176.   Defendant Mozilo, Countrywide's co-founder, was at all relevant times, Chairman of the Company's Board of Directors ("Board of Directors" or "Board") and Chief Executive Officer ("CEO").  Mozilo became a member of the Company's Board in 1969, and served as President of the Company from March 2000 through December 2003.  Mozilo also served as President of the Mortgage Bankers Association of America (the "MBAA") from 1991 to 1992 and served on the MBAA's board of directors during that same period.  The MBAA is a national association based in Washington, D.C. representing the real estate finance industry.

177.   During the Relevant Period, Mozilo made materially false and misleading direct public statements in, inter alia, the July 24, 2007 Press Release and the October 26, 2007 Press Release.  Defendant Mozilo also signed and/or certified the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) Second Quarter 2007 Form 10-Q; and the (iv) Third Quarter 2007 Form 10-Q.  Defendant Mozilo assisted in the preparation of Countrywide's materially false and misleading press releases and false and misleading SEC filings, which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

178.   During the Relevant Period, Defendant Mozilo sold approximately 2,299,588 of his shares of Countrywide common stock for proceeds of over $69 million,

while in the possession of material adverse information about Countrywide, which had not been disclosed to the investing public, including Plaintiffs. In addition, Mozilo received total compensation in 2007, 2006 and 2005 of $10.8 million, $51.8 million and $22.9 million, respectively, based almost exclusively on the Company's reported financial performance.

### b.    David Sambol

179.    Defendant Sambol was, at all relevant times, Countrywide's President and Chief Operating Officer ("COO"). Sambol also served as President and Chief Executive Officer of Countrywide Bank, FSB ("Countrywide Bank"). From 2004 to 2006, Sambol served as Executive Managing Director for the Company's Business Segment Operations. In 2004, Defendant Sambol took over the Company's core lending operations. At a time of skyrocketing home prices and fierce competition among lenders to attract borrowers, Defendant Sambol spearheaded Countrywide's growth through origination of (and retaining interests in) inherently high-risk, non-traditional loans to increase loan volume and capture a high percentage of the mortgage lending market. Leading Countrywide's core business operations, Sambol had oversight responsibility for Countrywide Bank, Countrywide Insurance Group, Countrywide Capital Markets and Countrywide Global Operations. In 2007, Sambol served as Chairman and CEO of Countrywide Home Loans ("CHL"), in which he was previously President and COO from 2004 to 2006. In September 2007, Sambol became a director of Countrywide.

180.   Defendant Sambol signed the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts:  the (i) First Quarter 2007 Form 10-Q; (ii) Second Quarter 2007 Form 10-Q; and the (iii) Third Quarter 2007 Form 10-Q.  Defendant Sambol assisted in the preparation of Countrywide's materially false and misleading press releases and SEC filings which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

181.   During the Relevant Period, Defendant Sambol sold approximately 36,125 of his shares of Countrywide common stock for proceeds of approximately $1.35 million, while in the possession of material adverse information about Countrywide, which had not been disclosed to the investing public, including Plaintiffs.  In addition, Sambol received total compensation in 2007, 2006 and 2005 of $10.4 million, $12.0 million and $6.4 million, respectively, based almost exclusively on the Company's reported financial performance.

### c.    Eric P. Sieracki

182.   Defendant Sieracki was, at all relevant times, Executive Managing Director and Chief Financial Officer ("CFO") of Countrywide and Countrywide Bank.  He was also a voting member of the Executive Strategy Committee of the Company's Board of Directors.  At all relevant times, Defendant Sieracki was responsible for overseeing the Company's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation.  He also served as the Company's

senior manager in the areas of investor relations, corporate development and equity capital activities.  During the Relevant Period, Defendant Sieracki sold approximately 2,902 shares of his Countrywide common stock for proceeds of approximately $113,000, while in possession of material adverse information about Countrywide, which had not been disclosed to the investing public, including Plaintiffs.

183.   Sieracki made materially false and misleading public statements in the August 2, 2007 Press Release.  Defendant Sieracki also signed and/or certified the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts:  the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) Second Quarter 2007 Form 10-Q; (iv) Third Quarter 2007 Form 10-Q; and the (v) August 6, 2007 Form 8-K.  Defendant Sieracki assisted in the preparation of Countrywide's materially false and misleading press releases and SEC filings which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

184.   Defendant Sieracki received total compensation in 2006 and 2007 of approximately $2.6 million and $2.9 million, respectively, based almost exclusively on the Company's reported financial performance.

185.   Defendants Mozilo, Sambol, and Sieracki are collectively referred to herein as the "Individual Defendants."  Defendant Countrywide and the Individual Defendants are collectively referred to herein as "Defendants."

# IV.    BACKGROUND

## A.    Countrywide's Business Operations And Aggressive Growth Strategy

186.    Countrywide, co-founded by Defendant Mozilo and David Loeb in 1969, was a California-based holding company.  During the Relevant Period, Countrywide and its subsidiaries engaged in mortgage lending and other finance-related operations focused primarily on real estate lending.

187.    Beginning in 2003, Defendant Mozilo implemented an aggressive growth strategy, calling for Countrywide to capture an unprecedented 30% of the national residential loan market at a time when the Company's market share was only 13%. Mozilo publicly announced this Company directive on a July 22, 2003 conference call with analysts during which Mozilo stated that Countrywide's goal was "to dominate the purchase market and to get [the Company's] overall market share to the ultimate 30% by 2006-2007."

### 1.    Countrywide's Business Segments

188.    During the Relevant Period, Countrywide managed its business through five business segments, including:  (i) the Mortgage Banking Segment; (ii) the Banking Segment; and (iii) the Capital Markets Segment.

189.    The Mortgage Banking, Banking and Capital Markets Segments comprised more than 90% of Countrywide's pre-tax earnings and revenue prior to and during the Relevant Period.  Thus, virtually all of the value of an investment in Countrywide derived from the Company's ability to carry on its mortgage-related business.

57

### a.  The Mortgage Banking Segment

190.   The Company described its Mortgage Banking Segment as its "core business."  Countrywide's Mortgage Banking Segment, comprised of the Loan Production, Loan Servicing and Closing Services sectors, originated, purchased, sold and serviced non-commercial mortgage loans nationwide.  For the years-ended December 31, 2006, 2005 and 2004, respectively, the Mortgage Banking Segment comprised approximately $2.06 billion (48%), $2.4 billion (59%) and $2.3 billion (65%), respectively, of the Company's pre-tax income.

191.   Countrywide sold most of the mortgage loans that it originated in the secondary mortgage market, primarily in the form of securitized loans.  The Company typically retained the rights to service those loans, known as mortgage servicing rights ("MSRs"), pursuant to contractual agreements between Countrywide and the investors/purchasers of Countrywide's loans.

192.   According to the 2006 Form 10-K, Countrywide's contractual mortgage servicing obligations included, among other services, the collection and remittance of loan payments, responding to customer inquiries, accounting for principal and interest, holding custodial (impound) funds for payment of property taxes and insurance premiums, counseling delinquent mortgagors and supervising foreclosures and property dispositions.

193.   Countrywide also often retained a financial interest in the underlying loans it securitized ("retained interest"), which entitled the Company to the remaining interest

payments received into the securitization pools after all required payments had been paid to other investors of higher priority.

194.    Defendants represented in the Company's 2006 Form 10-K, incorporated by reference in the Offering Memorandum, that Countrywide's "senior financial management exercise[d] extensive and active oversight" over the valuation of MSRs and retained interests.  The Company recognized MSRs and retained interests as assets in Countrywide's financial statements at the time of sale when the servicing rights and/or retained interests were contractually separated from the loans.

195.    Pursuant to applicable accounting rules, Countrywide was required to report its MSR and retained interest assets at fair value on the balance sheet.  In the event of borrower delinquency or default on the underlying loans, the Company was further required by GAAP to reduce the value of its MSRs and retained interests to recognize impairment of those assets.  As discussed below in Section IX, Countrywide failed to comply with their obligations in this regard.

### b.    The Banking Segment

196.    For the years-ended December 31, 2006, 2005 and 2004, respectively, the Banking Segment comprised approximately $1.38 billion (32%), $1.1 billion (26%) and $582 million (16%), respectively, of the Company's pre-tax income.

197.    The Banking Segment purportedly invested in "prime" residential mortgage loans and "prime" home equity loans and HELOCs that it obtained from the Loan

Production sector of the Company's Mortgage Banking Segment and, to a lesser extent, mortgages issued by third parties.

198.   As demonstrated in the chart below, Defendants significantly increased the Company's loans held-for-investment ("LHI") from 2002 through 2006.

| For the Years-ended (in billions) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Loans Held-For-Investment | $78.3 | $70.1 | $39.9 | $26.4 | $6.1 |

199.   In the Company's 2006 Form 10-K, Defendants represented that the bank loan portfolio of LHI consisted "primarily of Prime Mortgage and Prime Home Equity Loans." Pay-option ARM loans, as alleged herein, constituted a substantial portion of the Company's LHI. The Company's pay-option ARMs were not "prime" loans. As Defendant Mozilo admitted in a September 26, 2006 e-mail to Defendants Sambol and Sieracki, the Company was "flying blind on how these loans will perform in a stressed environment."

### c.    The Capital Markets Segment

200.   The Capital Markets Segment operated an institutional broker-dealer that specialized in underwriting and trading mortgage-backed securities. For the years-ended December 31, 2006, 2005 and 2004, the Capital Market Segment comprised approximately $554 million (13%), $451.6 million (11%) and $479.1 million (13%), respectively, of the Company's pre-tax income.

### 2.     Countrywide's Loan Types

201.   Countrywide's residential loans included:  (i) Prime Mortgage Loans; (ii) Prime Home Equity Loans; and (iii) Nonprime Mortgage Loans (e.g., Alternate-A ("Alt-A") and subprime loans).

202.   With respect to the credit quality of Countrywide's loan portfolio, Defendants made repeated public assurances in the various documents incorporated into the Offering Memorandum that Countrywide's underwriting standards "ensure[d] consistent production of quality mortgages" and "ongoing access to the secondary mortgage market . . . ."  Defendants also represented that the Company's loans were "prudently underwritten."

203.   As demonstrated in the chart below, Countrywide significantly increased its origination of inherently high-risk, nonprime and home equity loans to boost the Company's loan volume and beat the competition, while at the same time decreasing its prime loan originations.

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2003 | 2004 | 2005 | 2006 |
| % Prime Loans | 91.2% | 80.2% | 81.2% | 79.8% |
| % Home Equity Loans | 4.1% | 8.5% | 8.9% | 10.2% |
| % Nonprime Loans | 4.6% | 10.9% | 8.9% | 8.7% |

### a.   Prime Mortgage Loans

204.   Prime Mortgage Loans are purportedly prime, first-lien mortgage loans, secured by the value of the underlying properties.  The MBAA (Mortgage Bankers Association of America) defines prime loans as loans to people who have ample income and high credit scores and who have made a substantial down payment.  Historically, a substantial down payment meant at least 20% of the purchase price.

205.   The most widely accepted measure of creditworthiness in the credit industry is the "FICO" score, developed by the Fair Isaac Corporation.  Under the FICO scoring system, borrowers are assigned a credit score ranging from 300 to 850, with 850 being the most creditworthy.  In determining the borrower's overall creditworthiness, the FICO score primarily takes into account the borrower's payment history, current indebtedness, length of credit history, recently-established credit and types of credit used.  According to Fitch Ratings ("Fitch"), FICO scores are the "best single indicator" of mortgage default risk.  Thus, the lower the FICO score, the greater risk of borrower default.

206.   Defendants affirmed the purportedly high credit quality of Countrywide's loan portfolio in the 2006 Form 10-K by stating that the "majority of [Countrywide's] loan production consists of Prime Mortgage Loans," its loans were "prudently underwritten" and that, for example, some inherently risky loan types, such as pay-options and HELOCs had "average original" FICO scores of 718 and 733, respectively, as of December 31, 2006.  Defendants made similar affirmations in the First Quarter

2007 Form 10-Q, filed just days before the May 2007 Debentures Offering. Those representations were materially false and misleading. For example, as Defendant Mozilo admitted in a June 1, 2006 e-mail to Defendant Sambol and others, 20% of the Company's pay-option ARM loans were issued to borrowers with FICO scores of 700 or less.

### b.    Prime Home Equity Loans

207.    Prime Home Equity Loans, which included HELOCs, are purportedly prime second-lien mortgage loans secured by the difference between the value of the home and the first-lien mortgage. Home equity loans and lines of credit are inherently riskier than traditional prime loans because they are only protected by a second lien.

208.    Prior to and during the Relevant Period, Countrywide generally securitized the prime home equity loans it originated into private-label asset-backed securities with limited recourse through retention of "subordinated interest" assets.

209.    With respect to HELOC securitizations specifically, the Company was obligated to advance money to borrowers at some time in the future when the borrower requested a subsequent draw on their line of credit. The Company was then reimbursed for its advances under HELOCs from the cash flows in the securitization pool. Therefore, the Company's securitization activities resulted in assets, i.e., retained interests, and potential liabilities, i.e., obligations to fund home equity line of credit draws.

210.    Defendants represented to investors in the 2006 Form 10-K, incorporated by reference in the Offering Memorandum, that the average original FICO score for the Company's HELOCs was 733.  As detailed below in Section VI, this representation was materially false and misleading.  Among other things, Defendant Mozilo admitted in an April 17, 2006 e-mail to Defendant Sambol, that these products were "toxic" because borrower FICO scores were "below 600, below 500 and some below 400…."

211.    As discussed further below, in the event of borrower default, home equity loans and lines of credit often end up being a total loss because the first-lien holder takes all of the proceeds from liquidation through the sale of the home that collateralized the loan, leaving the home equity lender with nothing.  Additionally, in the event of borrower default, fewer cash flows are received into the securitization pools to fund the Company's reimbursements, subjecting Countrywide to further risk of loss.

### c.    Nonprime Mortgage Loans

212.    The Company's Nonprime Mortgage Loans consisted primarily of subprime loans and Alt-A loans.  Alt-A loans are defined as loans to creditworthy applicants who have some other defect that makes the loan riskier than a traditional prime loan, including lack of documentation to prove income or assets, or little or no down payment.

213.    According to the Expanded Guidance for Subprime Lending Programs, (the "Expanded Guidance"), issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the

Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS"), "[t]he term 'subprime' refers to the credit characteristics of individual borrowers."

214.   The FDIC defines subprime loans as loans to borrowers with one or more of the following characteristics:  (i) FICO score of 660 or below; (ii) two or more 30-day delinquencies in the past 12 months or one or more 60-day delinquencies in the past 24 months; (iii) judgment, foreclosure, repossession or charge-off in the past 24 months; (iv) bankruptcy in the past five years; or (v) debt service-to-income ratio of 50% or greater.

215.   Consistent with the FDIC definition, and according to the widely-accepted definition of subprime in the mortgage lending industry, borrowers with FICO scores below 660 are considered to be "subprime."  For example, the Expanded Guidance defines subprime loans as loans with a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood[.]"  Similarly, Standard & Poor's Rating Services ("S&P"), one of the principal credit rating agencies, defines subprime as a borrower with a history of delinquency or other credit problems or "a FICO credit score of 659 or below."

216.   As demonstrated in the chart below, and confirmed in internal Company documents, during the three calendar years prior to the Relevant Period, Countrywide significantly increased its origination of subprime loans.

| (in billions) | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Total loan origination | $434.9 | $363.4 | $499.3 | $468.2 |
| Nonprime loan origination | $19.8 | $39.4 | $44.6 | $40.6 |
| Nonprime loan as % of Total | 4.6% | 10.9% | 8.9% | 8.7% |

217.   Countrywide focused on subprime loans because those loans were highly lucrative to the Company.

218.   As reported in an August 26, 2007 New York Times article, according to former employees who worked in different units of the Company (e.g., prime and subprime units), as well as internal Company documents, Countrywide's entire operations, from its computer systems to its incentive pay structure and financing arrangements, were designed to generate maximum profits, no matter the risk.

219.   The August 26, 2007 New York Times article revealed that Countrywide's subprime loans generated the highest fees for the Company because those loans carried interest rates that were typically two or three percentage points higher than traditional, fixed-rate mortgage loans.  In addition, internal Company documents cited in the New York Times article show that Countrywide's profit from subprime loans ranged from 5% on small loans of $100,000 to $200,000, to 3% on loans of $350,000 to $500,000. Moreover, the New York Times article further stated that, according to a former Countrywide employee, profit margins on subprime loans that imposed heavy burdens on borrowers, like high prepayment penalties reached as much as 15% of the loan's

1    value.  Prepayment penalties generated $268 million of Countrywide's revenue in 2006,

2    an increase of $56 million, or 26% from $212 million in 2005.

3        220.   Investors were willing to pay more money for the Company's mortgage

4    securities backed by subprime loans because, as a result of higher interest rates charged

5    on those loans, subprime loans generated a larger cash flow and, thus, higher return on

6    investment.  Subprime loans with prepayment penalties were particularly lucrative for

7    investors because it was too costly for borrowers to repay the loans early and, thus,

8    borrowers were essentially "locked in" to the full term of the loans.  This lock-in

9    guaranteed investors a predictable income stream from the higher interest rates charged

10   for those loans.

11       221.   Defendants encouraged Countrywide employees to engage in aggressive

12   and imprudent lending practices through a highly lucrative commission structure,

13   promising significant financial incentives for employees who sold the most subprime

14   loans.  According to a former Countrywide mortgage sales representative cited in an

15   August 16, 2007 <u>Los Angeles Times</u> article "[t]he whole commission structure in both

16   prime and subprime was designed to reward salespeople for pushing whatever programs

17   Countrywide made the most money on in the secondary market."  This sales

18   representative further disclosed that the higher the interest rate on the loan, the greater

19   the commission.

20       222.   Thus, according to a former Countrywide loan officer responsible for

21   originating loans, who joined Countrywide's subprime unit in 2004 and is cited in the

August 26, 2007 <u>New York Times</u> article, it was not uncommon for a Countrywide loan officer to sell 20 subprime loans per week. This loan officer characterized the subprime market as "a feeding frenzy," explaining that as fast as the loans could be signed, they were sold to investors.

223.   Moreover, according to the above Countrywide loan officer cited in the August 26, 2007 <u>New York Times</u> article, adding a three-year prepayment penalty to a loan generated an extra 1% of the loan's value in commissions. Persuading borrowers to add a home equity line of credit to a loan carried extra commissions of .25% according to the former Countrywide mortgage loan officer. Brokers who peddled subprime loans received commissions of .50% of the loan's value versus .20% for Alt-A loans.

**B.  Defendants Provided Inherently High-Risk Loans to Unqualified Borrowers, Exposing the Company to Significant Credit Losses**

224.   In 2004, Defendants abandoned the Company's stated lending practices and began sacrificing loan quality for quantity by offering high-risk, non-traditional "affordability" loans, primarily to non-creditworthy borrowers, without requiring adequate supporting documentation to verify the borrower's income or collateral on the loan in order to capture a 30% market share. As alleged below in Section X, these systemic changes in Countrywide's underwriting and lending practices came from the top down and pervaded virtually every office of the Company. Such lending practices, which were not disclosed publicly to investors until July 2007, by their very nature, resulted in high-risk loans that were highly likely to fail and cause significant losses to the Company and, ultimately, to investors.

225.   Countrywide's high-risk "affordability" loans primarily consisted of the following loans:  (1) adjustable rate mortgage (ARM) loans; (2) interest-only loans; (3) home equity loans and lines of credit (HELOCs); and (4) pay-option ARMs.

226.   As demonstrated in the chart below, Defendants significantly increased origination of high-risk affordability loans in the years preceding the Relevant Period.

| (in billions) | For the year-ended December 31, | | | |
|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 |
| Total loan originations | $434.9 | $363.4 | $499.3 | $468.2 |
| ARM loans as % of total originations | N/A | 49% | 52.4% | 52.3% |
| Pay-option ARM loans as % of total originations | N/A | 6% | 19% | 14% |
| HELOCs as % of total originations | 4.16% | 8.5% | 8.98% | 10.23% |

227.   Pay-option ARM loans provide the borrower with the "option" to make monthly loan repayments of:  (i) principal and interest; (ii) only the monthly interest accrued on the loan; or (iii) a fraction of the monthly interest accrued on the loan.  If the borrower elects to make the minimum required monthly payment, the difference between the monthly interest accrued and the loan payment (e.g., a portion of the interest accrued) is added to the remaining outstanding principal loan balance, causing the principal to increase so that borrowers owe more than the original principal loan amount. This phenomenon is known in the mortgage lending industry as "negative amortization."

228.   Countrywide primarily focused on originating pay-option ARM loans because such loans were the most profitable.  Specifically, once the introductory

"teaser"-rates on pay-option ARMs expired, the interest rate was typically higher than other types of loans.  Internal Company documents, dated March 2007, and cited in the August 26, 2007 New York Times article, show that Countrywide made more than a 4% gross margin on such loans, as compared to 2% on loans backed by the Federal Housing Administration ("FHA").

229.   Unlike traditional mortgages where a borrower's failure to make the required minimum monthly interest payment would be characterized as a delinquency and considered a precursor to a default, a failure to pay the minimum monthly interest payment on a pay-option ARM loan was considered by Countrywide to be a "positive" event given "negative amortization".

230.   When a borrower "chose" not to pay the full monthly interest due, Countrywide added the interest to the outstanding principal balance of the loan as deferred interest earnings in the Company's financial statements.

231.   Pay-option ARMs come with "negative amortization caps," which limit the amount of missed interest that can be rolled into the principal balance, typically 110 to 125% of the original loan balance.  When a borrower hits that cap, the loan's interest rate is subject to reset and the borrower is required to pay down a portion of the principal, further increasing the likelihood of default on negative amortizing pay-option ARM loans.

232.   When evaluating a borrower's ability to repay a pay-option ARM, Countrywide was required to evaluate the customer's ability to repay the loan on the

much higher, fully amortized rate, rather than the loan's low initial "teaser" rate.  A

fully-amortized rate equals the sum of the current index rate plus the margin applicable

to the loan.

233.   In the 2006 Form 10-K Defendants claimed that Countrywide had

"prudently underwritten" its pay-option ARMs, with the application of a standard under

which borrowers "meet secondary debt-service ratio tests based on their making the fully

amortizing loan payment assuming the loan's interest rate is fully indexed."

234.   However, in a May 2007 letter to the OTS' Chief Counsel from Mary Jane

M. Seebach, Countrywide's Managing Director for Public Affairs (the "May 2007

Letter"), Defendants admitted that Countrywide judged its customers' creditworthiness

for subprime adjustable mortgages on whether they could afford payments at a loan's

low initial "teaser" rate, not at the higher rates that might kick in two or three years later.

In fact, Countrywide disclosed that in the fourth quarter of 2006, approximately 60% of

Countrywide borrowers of subprime adjustable mortgages would not have qualified for

their mortgages based on the higher rates.  Moreover, the May 2007 letter stated that

25% of the pay-option ARM loan borrowers would not have qualified for any mortgage

that Countrywide offered.

235.   Despite Defendants' claims that the Company was primarily a "prime"

lender, the May 2007 Letter stated that "[f]or Countrywide, the percentage of people

using subprime loans to purchase homes almost doubled from 20% in 2002 to 38% in

2006."  Even this admission, however, does not reveal the full extent of Countrywide's

subprime lending.  As Defendants would admit during the July 24, 2007 Conference

Call, Countrywide improperly included in its "prime" category loans to borrowers with

FICO scores as low as 500.

236.   In a July 27, 2007 analyst report discussing Countrywide's disappointing

second quarter 2007 results in the July 24, 2007 Press Release (the "July 27, 2007

Analyst Report"), Stifel, Nicolaus & Co., Inc. ("Stifel") questioned its own "sanguine

views" on the Company's credit exposure.  The July 27, 2007 also Analyst Report

confirmed that the Company's underwriting standards declined from 2005 through late

2006, with only minimal improvement in 2007.

237.   Significantly, the July 27, 2007 Analyst Report further enumerated the

gravity of Countrywide's improper lending practices and expanded definition of "prime"

by stating that almost 20% of Countrywide's prime home equity loans in the first two

quarters of 2007 were actually given to subprime borrowers with FICO scores of less

than 660.  In addition, almost 23% of the prime home equity loans in those quarters had

a CLTV greater than 100%.  In analyst Chris Brendler's view, "the increasing share of

sub-660 FICO, 100%+ CLTV, and second home/non-owner occupied loans [was]

disturbing."  Another startling fact revealed in the July 27, 2007 Analyst Report was that

in the first two quarters of 2007, 78% of Countrywide's home equity loans were reduced

documentation loans.

238.   Countrywide's inherently high-risk loans carried significant additional

undisclosed default risks because Countrywide offered such loans mainly to non-

creditworthy borrowers as "stated income" loans and/or "piggyback" loans. These

additional undisclosed risks further exacerbated the significant default risk embedded in

the Company's affordability loans.

> **1.     Defendants Originated Stated Income,
> Or "No-doc" Loans, Without Requiring Supporting
> Documentation to Verify the Borrower's Income**

239.   Stated income loans are loans in which the borrower provides little or no

documentation to substantiate his or her income and assets and, thus, creditworthiness

and ability to repay the loan. Rather, stated income loans are based upon the borrower's

bare representations about the borrower's ability to repay the loan. As reported in a

September 19, 2007 <u>Los Angeles Times</u> article, such loans were known in the mortgage

lending industry as "liar loans" because "[i]t was widely assumed that many of the

borrowers didn't document their incomes because they were lying."

240.   Countrywide's stated income, or no documentation loan program was

called "Fast & Easy," where borrowers who met certain criteria were allowed

documentation waivers.

241.   Defendants knew or recklessly disregarded that low or no documentation

loans, particularly when provided to subprime borrowers, were more likely to contain

material misrepresentations because those borrowers could not otherwise qualify for a

loan and, thus, were at an increased risk of default. In fact, Defendant Mozilo confirmed

in a June 1, 2006 e-mail to Defendant Sambol and others that he knew that borrower

stated income amounts did "not match up with IRS records."

### 2.   Defendants Provided "Piggyback" Loans Permitting Borrowers to Finance the Entire Home Value

242.   Prior to and during the Relevant Period, Countrywide also originated "piggyback" mortgages, which allowed borrowers to finance up to 100% of a home's value without making a significant down payment or paying for private mortgage insurance.  In the case of piggyback loans, the borrower finances the home purchase through two loans, instead of the traditional combination of a down payment and a first mortgage.  For example, Countrywide would give the borrower one mortgage for 80% of the home's value and a second mortgage (e.g. a HELOC) for the remaining amount of the purchase price, for a combined loan-to-value ("CLTV") ratio of up to 100%.

243.   Piggyback loans are inherently high-risk loans because the borrowers invest little or none of their own money.  The borrowers are also particularly vulnerable to any downturn in the housing market given that they have little or no equity in the property.  Accordingly, the borrowers are more likely to default on the loans than borrowers who paid a down payment of 20% or more and, therefore, have a significant investment in the home.  Moreover, piggyback loans typically carry a much larger interest rate, adding a further risk of default.

244.   According to an October 24, 2007 Wall Street Journal article, a UBS AG survey (the "UBS Survey") reported that Countrywide "allowed borrowers to put down as little as 5% of a home's price and offered 'piggyback mortgages,'" resulting in the borrower financing more than 80% of a home's value without paying for private mortgage insurance.  According to the UBS Survey, "[b]y 2006, nearly 29% of the pay-

74

option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value ratio of 90% or more, up from just 15% in 2004." This meant that the borrower held only 10% or less equity interest in the home and, thus, Countrywide, as the lender, was significantly exposed should the borrower default on the loan.

245.   Prior to and during the Relevant Period, Defendants provided piggyback loans with CLTV ratios as high as 110% to subprime borrowers, in lieu of requiring the borrower to purchase private mortgage insurance. Thus, Countrywide was not insured on these high-risk loans should borrowers default on the loans.

### C.   Countrywide's Substantial Credit and Liquidity Risks

246.   As the largest mortgage lender in the country during the Relevant Period, Countrywide had "significant" financing needs in order to operate and finance its business operations. Thus, the credit quality of the mortgage loans Countrywide originated and then packaged into securities was of paramount importance to the Company's ability to sell its loans to investors and to maintain sufficient liquidity levels.

247.   As discussed below, Countrywide's primary source of credit risk -- the risk of borrower default and the risk that liquidating collateral underlying the loan will raise adequate funds to repay the loan balance -- arose from the Company's continuing investment and/or obligations in the securitized loans retained in the form of credit-enhancing subordinated interests (retained interests) and representations and warranties issued in connection with those securitized loans.

248.   As a result of the Company's imprudent lending practices described above, during the Relevant Period, it became increasingly difficult for Countrywide to sell the loans it originated in the secondary market, thereby forcing the Company into a debilitating liquidity crisis.

### 1.   Countrywide Faced Substantial Liquidity Risks From the Company's Dependence on Financing To Fund Loan Originations and Purchases

249.   In order to fund the billions of dollars of loans that Countrywide originated and purchased for investment, the Company was required to maintain the highest level of liquidity.  Countrywide's 2006 Form 10-K defined "liquidity risk" as the risk that the Company will be "unable to meet [its] obligations as they come due because of an inability to liquidate assets or obtain adequate funding without significantly lowering market prices because of inadequate market depth or market disruptions."  As a result of Countrywide's imprudent lending practices, the Company was subject to significant undisclosed liquidity risks prior to and during the Relevant Period.

250.   Countrywide's short-term financing needs arose primarily from the Company's holding of mortgage loans pending sale, trading activities of its broker-dealers and its warehouse lending business.  The Company typically met its short-term financing needs primarily through issuing unsecured commercial paper, medium-term notes and asset-backed commercial paper in the corporate debt market "[d]ue to their efficiency and low cost."  Thus, according to the 2006 Form 10-K, in order to maintain ongoing access to the public debt markets, "it [was] critical for [Countrywide] to

maintain an investment-grade credit rating."  Any downgrade in the Company's credit

rating below "investment-grade" or risk of such a downgrade would have likely required

Countrywide to resort to an alternative, more costly source of financing, such as bank

lines of credit.

251.   Countrywide's long-term financing needs arose primarily from investments

in the Company's mortgage loan portfolio, MSRs and retained interests.  Prior to and

throughout the Relevant Period, Countrywide relied heavily upon the secondary market

to meet the Company's long-term capital requirements.  Because Countrywide depended

upon the secondary market to finance its operations, the credit quality of the Company's

loan portfolio was critical to its ability to sell those assets and maintain liquidity.

### 2.   Countrywide's Credit Risk

#### a.   Credit Risk From Subordinated Retained Interests

252.   In addition to originating high-risk loans, Countrywide exposed itself to

even greater credit risk by retaining interests in the loans the Company securitized

(retained interests).

253.   According to the Company's 2006 Form 10-K, the Company's sales and

securitizations of prime residential loans were "generally structured without recourse."

Thus, the majority of Countrywide's credit risk lay with prime home equity and

nonprime loan securitizations.

254.   The Company's prime home equity and nonprime loans were structured

with recourse through the retention of subordinated retained interests, meaning

Countrywide was in a first loss position.  Under its first loss position, the Company's

entire future cash flows accruing from the underlying loans related to the subordinated retained interests were subject to absorption of losses due to credit risk. According to relevant accounting principles, Countrywide was required to state its subordinated retained interests at fair value, and adjust the carrying value of its retained interest assets on a quarterly basis for any impairment losses that occurred.

255. Retained interests typically become impaired when borrowers of the underlying loans in the securitization pools are delinquent and/or default on their loans, thereby causing the value of the securities to decline.

256. Impairment also occurs when borrowers fail to fulfill their repayment obligations relating to draws on the borrowers' HELOCs. Specifically, Countrywide incurs losses when delinquencies or defaults exceed a specified threshold or duration set forth in the contractual terms of the securities, a phenomenon known as "rapid amortization." In the case of rapid amortization, reimbursement of the Company's advances for subsequent draws on HELOCs become subordinated to the claims of all other parties to the securitization and the Company receives reimbursement (from liquidation of the underlying collateral) only after other parties in the securitization have received all of the cash flows to which they are entitled. Rapid amortization status has the effect of extending the time period for which the Company's advances are outstanding and, thus, left Countrywide vulnerable to the risk of incurring credit losses when borrowers did not repay the funds advanced on the draw.

257.   Because Countrywide was in a first loss position, the Company was at risk to absorb a disproportionately high percentage of losses realized on the securitized mortgage pools underlying the subordinated retained interests.

258.   In the documents incorporated by reference into the Offering Memorandum, Defendants claimed that the Company managed credit risk through "underwriting standards, which include assessing both a borrower's quality and the adequacy of collateral" and purportedly limited the risk of incurring credit losses by "structuring [Countrywide's] operations to ensure consistent production of quality mortgages."

### b.   Credit Risk From Representations and Warranties

259.   In connection with loans Countrywide sold in the form of asset-backed securities, the Company was also subject to credit losses arising from representations and warranties made to investors concerning Countrywide's underwriting standards for loan origination.

260.   The Company's representations and warranties included, among other representations:  (i) Countrywide's ownership of the loan; (ii) the loan's compliance with any applicable loan criteria established by the buyer (e.g., loan balance limits, property type, delinquency status); and (iii) the loan's compliance with applicable local, state and federal laws.  Moreover, Countrywide's representations and warranties were generally not subject to stated limits.

261.   Estimated losses for representations and warranties during the Relevant Period were recorded upon the sale of the loans as an adjustment to gain or loss on sale of loans and securities (reducing net income) and a corresponding liability.  According to the 2006 Form 10-K, such credit losses were determined by evaluating lifetime credit losses, default rates and loss severities, which were based upon historical experience developed from the mortgage loan servicing portfolio, and purportedly adjusted for current market factors.

262.   In the event of an actual breach of a representation or warranty, or if a borrower defaulted early in the term of the loan, the investor/purchaser could require Countrywide to repurchase the mortgage loans or indemnify the investor, resulting in a loss to Countrywide.  Thus, Countrywide was at risk to fully absorb losses on the underlying loans.  If the Company was required to repurchase the loans, it classified them as LHI (loans held for investment) on its balance sheet and subsequently reduced the carrying value of such investments by future estimated losses recorded in the Company's offsetting allowance for loan losses.

## V.   COUNTRYWIDE'S MAY 2007 DEBENTURES OFFERING

263.   On May 16, 2007, Countrywide announced that it had priced the issuance of $2 billion Series A and $2 billion Series B Floating Rate Convertible Senior Debentures for sale by the Joint Book Running Managers:  Lehman Brothers Inc. ("Lehman"); Citigroup Global Markets Inc. ("Citigroup"); and Bank of America Securities LLC ("BofA Securities").

264.   The Debentures were sold pursuant to the Offering Memorandum to qualified institutional buyers ("QIBs") under SEC Rule 144A.   QIBs are defined by SEC Rule 144A as institutional investors that in the aggregate own or invest on a discretionary basis at least $100 million in securities and broker/dealers that in the aggregate own or invest on a discretionary basis at least $10 million in securities.   See 17 C.F.R. § 230.144.

265.   The Offering Memorandum stated, among other things, that "Countrywide Financial Corporation is offering" the Debentures at issue in this action.   The cover page further stated in large bold print that the Debentures were "Fully and Unconditionally Guaranteed by Countrywide Home Loans, Inc." (the issuer's primary mortgage banking subsidiary).   Moreover, the Offering Memorandum specifically stated that the proceeds received from the Offering, which were estimated at "approximately $3.96 billion" after expenses, would be used to repurchase "approximately $863 million" of Countrywide's common stock, as well as for "general corporate purposes."

266.   The statements contained in the Offering Memorandum and those contained in the documents incorporated by reference therein (signed by the Individual Defendants) were issued by and attributable to the Defendants.

267.   The Offering Memorandum described the Debentures and set forth the terms of the Offering.   In this regard, the Offering Memorandum stated that the Debentures were senior unsecured obligations of Countrywide and were to bear interest at a floating rate equal to three-month LIBOR, reset quarterly, minus 3.5% for the Series

A Debentures, and 2.25% for the Series B Debentures.  Interest payments were to be made at quarterly intervals commencing July 15, 2007.  Both series of Debentures had stated maturity dates of 2037.

268.   Pursuant to the terms of the Offering Memorandum under the section entitled "Conversion Rights", the Debentures were convertible into Countrywide common stock under certain events prior to maturity such that for each $1,000 principal amount of the Debentures converted, the holder would receive cash and common stock at an initial conversion rate of 19.0734 shares of common stock for the Series A Debentures and 17.1003 shares for the Series B Debentures, representing an initial conversion price of $52.43 and $58.48 per share, respectively.

269.   The conversion terms of the Debentures caused the Debentures to trade during the Relevant Period in correlation to Countrywide common shares, in that any appreciation or diminution in the NYSE listed prior of Countrywide common stock would render the Debentures more or less valuable due to the conversion feature.  In addition to Defendants' materially false and misleading statements identified below in Sections VI and VII, Plaintiffs justifiably relied on the prices of Countrywide common stock, which reflected all available material information concerning Countrywide and its businesses.

270.   The Offering Memorandum also explicitly incorporated by reference certain documents that Countrywide filed with the SEC:

We incorporate by reference the documents listed below and any

future filings we make with the SEC under Sections 13(a), 13(c), 14,

or 15(d) of the Securities Exchange Act of 1934 . . . :

Annual Report on Form 10-K for the year ended December 31, 2006.

Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

271.   As alleged in detail below, the documents incorporated by reference into the Offering Memorandum, and, therefore, the Offering Memorandum, itself, contained materially false and misleading statements and omissions of material fact concerning Countrywide's lending and underwriting practices prior to and throughout the Relevant Period and misstated Countrywide's financial position.

272.   As a result of Defendants' misrepresentations and omissions of material facts concerning the true financial status of Countrywide, as detailed herein, Plaintiffs purchased Debentures at artificially inflated prices during the Relevant Period.  In response to the gradual emergence of the truth regarding Countrywide's operations and financial condition, the prices of the Debentures fell precipitously, causing Plaintiffs to sustain significant damages.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

273.   As discussed above, prior to and during the Relevant Period, Defendants knew that the Company was offering high-risk mortgage loans, primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the

borrower's income or collateral on the loan.  In many cases these loans were for amounts equal to 100% of the value of the home.

274.   Notwithstanding Countrywide's known imprudent lending practices prior to and throughout the Relevant Period, Defendants made numerous material misrepresentations and omissions, discussed below, that artificially inflated the prices of the Debentures at the time that they were first offered, and continued to cause prices of the Debentures to be artificially inflated until the previously misrepresented and omitted material facts were fully disclosed at the end of the Relevant Period.

A.    **Material Misrepresentations and Omissions Of Material Fact In The 2006 Form 10-K**

275.   On March 1, 2007, Countrywide filed the Company's 2006 Form 10-K. Defendants Mozilo and Sieracki signed the 2006 Form 10-K, which was incorporated by reference into the Offering Memorandum.

276.   As alleged below, the 2006 Form 10-K contained numerous categories of materially false and misleading information.  The 2006 Form 10-K also falsely represented that Countrywide's financial statements were prepared in conformity with GAAP.

1.    **Countrywide's Loan Quality**

277.   In the 2006 Form 10-K, Defendants represented that Countrywide's prime loan portfolio was comprised of loans to "prime credit quality" borrowers:

> Prime Mortgage Loans -- These are prime credit quality first-lien mortgage loans secured by single-family residences.
>
> Prime Home Equity Loans -- These are prime credit quality second-lien mortgage loans, including home equity lines of credit, secured by single-family residences.

278.   Defendants also represented in the 2006 Form 10-K that the majority of Countrywide's mortgage loan production for the year ending December 31, 2006 consisted of "prime" mortgages, as follows:

| Product | (in millions) |
|---|---|
| Prime Mortgage | $374,029 |
| Prime Home Equity | $47,876 |
| Nonprime Mortgage | $40,596 |

279.   Defendants further claimed in the 2006 Form 10-K that the Company's access to the secondary mortgage market as a source for long-term capital was safe because the Company produced and sold "quality mortgages[:]"

> Our strategy is to ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary

85

mortgage market standards.  We make significant

investments in personnel and technology to ensure

the quality of our mortgage loan production.

280.   The above statements in the 2006 Form 10-K, and explicitly incorporated into the Offering Memorandum, were materially false and misleading when made because Defendants misrepresented and/or failed to disclose, among other things, that: (i) a material amount of loans sold to investors were not "prime" quality loans -- rather, a substantial portion of purported "prime" home equity loans and pay-option ARMs were provided to borrowers with FICO scores below 660; (ii) Defendants misclassified subprime loans as "prime" loans in the Company's publicly filed financial statements; (iii) as a result of the Company's imprudent lending standards, the Company's loans sold in the secondary market did not actually meet secondary mortgage market standards, let alone exceed them; and (iv) Countrywide violated its own stated underwriting and lending policies.  As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 544-46, and 576-611, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

281.   Defendants also failed to disclose the true creditworthiness of the borrowers to whom Countrywide provided loans.  Specifically, by reporting only the "average" FICO score, rather than the actual score, Defendants concealed that a material portion of

borrowers in the Company's purported "prime" loan portfolio actually had subprime credit scores.

282.    With respect to the inherently risky loan types at issue in this action, the 2006 Form 10-K stated that the average original FICO scores for pay-option ARMs and HELOCs, purportedly "prime" quality loans, were 718 and 733, respectively, as of December 31, 2006.  This representation was materially misleading when made.  As Defendant Mozilo admitted in a June 1, 2006 e-mail to Defendant Sambol and others "at least 20% or more of [Countrywide's] pay option loans [were] at a FICO of 700 or less. It is clear that the lower FICO borrowers are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

283.    The above statements in the 2006 Form 10-K, and explicitly incorporated into the Offering Memorandum, concerning borrower credit scores in the Company's purported "prime" loan portfolio were also materially false and misleading when made because, Defendants misrepresented and/or failed to disclose, among other things, that: (i) Countrywide improperly classified loans to unqualified borrowers whose credit scores were as low as 500 as "prime" loans; (ii) although pay-option ARM loans were only meant for the most creditworthy borrowers, Countrywide offered such loans to unqualified borrowers with little, or no, income documentation; (iii) as a result, Countrywide's "prime" loans were not prime at all; and (iv) the Company had significantly greater exposure to subprime loans than represented to investors.  As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88,

439-42, 449, 452, 544-46, and 576-611, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

## 2.    Countrywide's Credit and Underwriting Practices

284.    In the 2006 Form 10-K, Defendants claimed that "[u]nderwriting guidelines and investment objectives are adjusted based on management's assessment of the results of performance monitoring." Defendants further represented that Countrywide employed "prudent" lending practices and underwriting standards in originating various loan types, in part, so the Company could sell them in the secondary market:

> Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

285.    The above statements concerning Countrywide's lending and underwriting practices were materially false and misleading when made because: (i) the Company's loans were not of salable quality; (ii) Defendants significantly increased production of subprime loans held-for-sale that they knew did not meet secondary market standards;

88

(iii) Defendants approved loans that did not meet Countrywide's stated underwriting standards by, among other ways, overriding low FICO scores; (iv) Countrywide's mortgage underwriting was in violation of mandatory Interagency Guidance; and thus (v) the Company's loan portfolio did not meet investor or rating agency requirements. As alleged above in ¶¶ 203, 206, 210, 215-18, 221-238, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 544-46, and 576-611, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

286.    These statements were also materially false and misleading when made because as alleged below in ¶¶ 598-600 Defendants knew at the time they filed the 2006 Form 10-K that Countrywide had an undisclosed practice of granting "exceptions" to approve loans to borrowers who did not meet the Company's stated underwriting standards.

287.    In the 2006 Form 10-K, the Company also misleadingly characterized its underwriting policies and procedures for determining who Countrywide should extend loans to.  In this regard, Defendants claimed that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." Defendants further claimed:

> Our credit policy establishes standards for the determination of acceptable credit risks.  Those standards encompass borrower and collateral

89

quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting.

\* \* \*

. . . We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

288.   The 2006 Form 10-K similarly assured investors that, with respect to Countrywide's Banking Segment: "Banking Operations manages credit risk through the