establishment of underwriting standards, which include assessing both a borrower's quality and the adequacy of collateral securing the loan."

289.   The above statements concerning borrower quality and repayment capacity were materially false and misleading when made because Countrywide:  (i) originated a significant amount of non-traditional, high-risk loans with little or no documentation (e.g., approximately 80% of pay-option ARM loans and home equity loans were low doc loans in 2006); (ii) provided inherently risky loans to borrowers, regardless of their credit score, in order to generate more fees and secure market share; (iii) as a result of the above, did not adequately consider either an applicant's creditworthiness and/or ability to repay the loan in providing mortgage loans; (iv) violated the Company's own underwriting and lending policies; and (v) violated mandatory Interagency Guidance relating to underwriting its high-risk loans.  As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 544-46, and 576-611, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

290.   Countrywide also purportedly customized the Company's underwriting standards to the specific non-traditional loans it generated.  With respect to pay-option ARM loans, arguably the riskiest non-traditional loan type, Defendants claimed in the 2006 Form 10-K that such loans were "prudently underwritten."  There was no reasonable or good faith basis for this statement.  Among other things, in a September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo recognized that

pay-option ARMs posed a risk to the Company and that Countrywide was "flying blind on how these loans will perform in a stressed environment." Further, as the Company's Managing Director for Public Affairs admitted in the May 2007 Letter to the OTS' Chief Counsel, the loans were underwritten based upon the borrowers' ability to pay the introductory "teaser" rate, rather than the rates that would apply shortly thereafter. This letter further revealed that: (i) 60% of the borrowers for these products would not have qualified based upon the higher rates that dominated the life of the loan; and (ii) 25% of such borrowers would not have qualified for "any other product" that the Company offered.

291. The 2006 Form 10-K also assured investors that the Company's underwriting standards for pay-option ARMs conformed to secondary market standards:

> Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of the funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed.

292. With respect to piggyback or second loans, Defendants misrepresented in the 2006 Form 10-K that "[w]here a proposed loan's combined loan-to-value ratio is

92

higher than a specified level, which is usually 80% for conventional loans, we generally require the borrower to supplement the collateral with primary mortgage insurance." The foregoing statements concerning piggyback or second loans misrepresented and concealed material facts.  Among other things, Defendant Mozilo confessed in an April 17, 2006 e-mail to Defendant Sambol and others:  "In all of my years in the business I have never seen a more toxic product . . . the FICOs are below 600, below 500 and some below 400 compounded by the fact that these are 100% loans which must always be written off in the event of foreclosure."

293.   The above statements concerning the quality of pay-option ARM and piggyback loans were also materially false and misleading when made because:  (i) the pay-option ARM loans were not "prudently underwritten" (i.e., the loans were provided to borrowers with subprime characteristics and without requiring documents verifying income); (ii) the pay-option ARM loans were not of salable quality; (iii) Countrywide admittedly did not evaluate the borrowers' ability to repay pay-option ARM loans on the "fully indexed" interest rate, but rather, used the lowest, introductory rate; (iv) Countrywide admittedly did not require primary mortgage insurance and, instead offered piggyback loans in lieu of private mortgage insurance; and (v) Countrywide violated mandatory Interagency Guidance relating to underwriting its high-risk loans.  As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 544-46, and 576-611, Defendants knew and/or acted with deliberate

recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 3.    Countrywide's Loans Held for Investment

294.    In the 2006 Form 10-K, Defendants represented that the Company's "investment criteria" for Countrywide's LHI resulted in a "high quality investment portfolio" and the Company's LHI were properly reported at fair value.

295.    The 2006 Form 10-K reported gross LHI for the period-ended December 31, 2006 of $78.3 billion and represented that the Company's policy for valuing LHI considered estimated credit losses:

> Loans Held for Investment
>
> Loans are classified as held-for-investment based on management's intent and ability to hold the loans for the foreseeable future or to maturity. Loans held for investment are carried at amortized cost reduced by a valuation allowance for estimated credit losses incurred in the portfolio as of the balance sheet date.

296.    In the 2006 Form 10-K, Defendants also represented that Countrywide "reviews its portfolio of loans held for investment for concentrations of loans that might contain disproportionate credit risk" and the Company's LHI were properly adjusted to reflect such "credit losses incurred as of the balance sheet date." The 2006 Form 10-K

94

also represented that Countrywide "manage[d] mortgage credit risk principally by securitizing substantially all mortgage loan that [it] produced, and by retaining only high credit quality mortgages in [its] loan portfolio."

297.   In making the foregoing statements regarding LHI, Defendants misrepresented and omitted material facts concerning known risks that the Company faced.  As Defendant Mozilo proclaimed in a May 18, 2006 e-mail to Defendants Sambol and Sieracki:  "as for pay-options the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and as result [sic] causing mortgagors to default due to the substantial increase in their payments."  During the Relevant Period, pay-option ARMs comprised a substantial portion of the Company's LHI.

298.   Defendants' statements concerning the valuation of Countrywide's LHI were also materially false and misleading when made because:  (i) the Company's LHI were not stated at fair value due to Countrywide's failure to adequately consider rising delinquencies and defaults on the loans underlying Countrywide's LHI loan portfolio; and, accordingly (ii) the Company's LHI were significantly overstated during the Relevant Period.  Thus, as alleged in Section IX below, contrary to Defendants' Relevant Period statements, Countrywide's financial statements were not prepared in accordance with GAAP.  As alleged above in ¶¶ 198-99, 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 382-88, 439-42, 449, 452, 488-507, 544-46, 576-611, and

95

613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 4.   Countrywide's Allowance for Loan Losses

299.   According to the 2006 Form 10-K, in the Company's allowance for loan losses, the Company's "critical" accounting policy factored credit losses into the reserve calculation:

Credit Quality and Loan Impairment

The Company provides for incurred losses on loans with an allowance for loan losses. The allowance for loan losses is a valuation allowance established to provide for estimated incurred credit losses in the portfolio of loans held for investment as of the balance sheet date. The allowance for loan losses is evaluated on a periodic basis by management and is based on a variety of factors, including historical default and loss rates for similar loans originated by the Company estimates of collateral value for individually evaluated loans and evaluations of the effect of current economic and market conditions . . . .

A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. The Company's loan portfolio is comprised primarily of large groups of homogeneous loans made to consumers that are secured by residential real estate.

* * *

Once a loan is acquired and included in the Company's portfolio of loans held for investment, Countrywide assesses loan credit quality and estimates its allowance requirement based on whether the loan is individually evaluated or part of a pool of homogeneous loans:

Homogeneous loans, such as mortgage loans and repurchased loans, are evaluated based on the loans' present collection status (delinquency, foreclosure and bankruptcy status). Our estimate of the required allowance for these loans is

97

developed by estimating both the rate of default of the loans and the amount of loss in the event of default.

300.    Defendants further represented in the 2006 Form 10-K that the Company's "allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles" and that the Company "continually assess[ed] the credit quality of our portfolios of loans held for investment to identify and provide for losses incurred." The 2006 Form 10-K reported an allowance for loan losses and related provision for loan losses of $236.7 million and $233.8 million, respectively, for the year-ended December 31, 2006. As was later revealed during the July 24, 2007 and October 26, 2007 conference calls and in the Company's 2007 Form 10-K, filed after the Relevant Period, Defendants' methodology for calculating loan loss reserves was inadequate and, therefore, did not justify such assertions.

301.    Defendants' statements concerning the adequacy of the Company's reserves were materially false and misleading when made because Countrywide's reserve methodology and calculation ignored:  (i) the Company's change in lending practices beginning in 2004 to offer non-traditional, high-risk loans; (ii) the Company's significant increase in production of subprime loans; (iii) the significant decline in home prices; and (iv) drastic increases in loan delinquencies and defaults. As alleged above in ¶¶ 198-99, 203, 206, 210, 215-18, 221-38, and 240-58 and below in ¶¶ 382-88, 439-442, 449, 452, 488-507, 544-46, 576-611, and 613-60, Defendants knew and/or acted with

deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

302.   As a result of the above misstatements, the Company's allowance and provision for loan losses were understated and net income was overstated during the Relevant Period.  Accordingly, contrary to the foregoing representations, the Company's financial statements were not prepared in accordance with GAAP, as described in more detail below in Section IX.

### 5.   Countrywide's Valuation and Impairment of Retained Interests in Loans Sold

303.   Defendants represented in the 2006 Form 10-K that Countrywide valued the Company's retained interest in securitizations by "allocating the carrying value of the underlying mortgage loans between securities or loans sold and the interests [the Company] continue[s] to hold, based on their relative fair values" using a "discounted cash flow model and extensive analysis of current market data . . . including "mortgage prepayment speeds, discount rates, and for retained interests containing credit risk, the net lifetime credit losses."  The 2006 Form 10-K also stated that the Company's retained interests were backed by "quality mortgages."

304.   For the year-ended December 31, 2006, the 2006 Form 10-K reported total retained interests of $3.04 billion.  With respect to the Company's retained interests, Defendants also reported in the 2006 Form 10-K as follows:

| Interests retained in securitization accounted for as available-for-sale securities: | December 31, 2006 (in thousands) |
|---|---|
| Prime home equity line of credit transferor's interest | $144,346 |
| Prime home equity residual securities | $40,766 |
| Interests retained in securitization accounted for as trading securities: | |
| Prime home equity residual securities | $737,808 |
| Prime home equity line of credit transferor's interest | $553,701 |

305.   With respect to impairment of retained interests, the 2006 Form 10-K represented that "[c]redit risk is an integral consideration in the valuation of retained interests."

306.   Defendants' statements concerning retained interests and HELOCs above were materially false and misleading when made because the Company admitted during the July 24, 2007 conference call that Countrywide overstated the value of retained interests by intentionally failing to consider the increased risk from the following in estimating their fair value:  (i) production of inherently high-risk loans; (ii) rising delinquencies and defaults on those underlying loans; (iii) borrower credit risk; and (iv) current market data regarding severely depressed home values.

307.   Defendants' statements were also materially false and misleading because Defendants failed to disclose that:  (i) Countrywide's purported "prime" home equity loans and HELOC portfolio was not really of "prime" quality because the Company had

provided such loans to subprime borrowers; and (ii) the Company provided home equity loans to borrowers without requiring documentation to verify borrower asset and income levels. As alleged above in ¶¶ 193-95, 203, 206, 210, 215-18, 221-38, and 240-58 and below in ¶¶ 382-88, 439-42, 449, 452, 508-18, 544-46, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

308.   Accordingly, Countrywide's retained interests and earnings were overstated throughout the Relevant Period, in violation of GAAP, as described in more detail below in Section IX.

### 6.     Countrywide's Valuation and Impairment of MSRs

309.   According to the 2006 Form 10-K, the valuation of Mortgage Servicing Rights (MSRs) is "based on the present value of cash flow streams that are closely linked to the expected life of the underlying loans." In calculating the fair value of its MSRs, Countrywide stated in the 2006 Form 10-K that the Company valued MSRs using a "discounted cash flow model and extensive analysis of current market data," based on cash flow assumptions and prepayment assumptions that take into account market factors and historical performance.

310.   In addition, Defendants claimed in the 2006 Form 10-K that "[c]hanges in the value of [MSR] assets are reflected in current period earnings for MSRs and retained interests accounted for as trading securities."

311.   In Countrywide's 2006 Form 10-K, Defendants further stated the Company records impairment on its MSRs when recovery of the value is unlikely:

> For purposes of performing that MSR impairment evaluation, the Company stratified its servicing portfolio on the basis of certain risk characteristics including loan type (fixed-rate or adjustable-rate) and note rate.
>
> ***
>
> Management periodically reviewed the various impairment strata to determine whether the value of the impaired MSRs in a given stratum was likely to recover.   When management deemed recovery of the value to be unlikely in the foreseeable future, a write-down of the MSRs in the stratum to the estimated recoverable value was charged to the valuation allowance.

312.   Misrepresenting the viability of the MSR valuation model, Defendants also contended in the 2006 Form 10-K that the model satisfied the Company's model validation policies:

> The cash flow model and underlying prepayment and interest rate models used to value

the MSRs are subjected to validation in accordance with the Company's model validation policies. This process includes review of the theoretical soundness of the models and the related development process, back testing of actual results to model predictions, benchmarking to commercially available models and ongoing performance monitoring.

313.   For the year-ended December 31, 2006, Countrywide reported MSRs of $16.2 billion and no impairment of MSR assets.  Instead, the Company recorded an increase in the fair value of MSRs of $432 million for 2006.

314.   The statements concerning Countrywide's valuation and impairment of MSRs were materially false and misleading when made because, in estimating impairment and the fair value of MSRs, Countrywide ignored rising delinquencies and defaults on the loans underlying the Company's MSR portfolio that resulted from Countrywide's origination of non-traditional, inherently risky loans.  As a result of the above increased delinquencies and defaults, the Company's MSR portfolio was significantly overvalued because Countrywide would never be able to collect the amounts due on the underlying loans.  As alleged above in ¶¶ 191-95, 203, 206, 210, 215-18, 221-38, and 240-58 and below in ¶¶ 439-42, 449, 452, 508-23, 576-611, and

613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that

their statements were materially false and misleading at the time that they were made.

315.   In addition, by failing to value Countrywide's MSRs properly throughout

the Relevant Period, Countrywide overstated the value of its MSRs and understated net

income, in violation of GAAP, as detailed below in Section IX.  As a result of the

Company's inability to collect on the underlying loans, the Company was experiencing

significant undisclosed liquidity problems during the Relevant Period.

### 7.    Countrywide's "Representations and Warranties"

316.   With respect to Countrywide's liability under the representations and

warranties made in connection with the sale of loans to the secondary market, the 2006

Form 10-K stated:

> . . . In the event of a breach of such
>
> representations and warranties, we may be
>
> required to either repurchase the mortgage loans
>
> with the identified defects or indemnify the
>
> investor or insurer.
>
> ***
>
> We attempt to limit our risk of incurring
>
> these losses by structuring our operations to ensure
>
> consistent production of quality mortgages and

servicing those mortgages at levels that meet or exceed secondary mortgage market standards.

317.   The 2006 Form 10-K also stated that the Company properly considered losses arising from breaches of representations and warranties in setting reserves:

Other Mortgage Loans Held for Investment

Other loans held for investment are held in our Mortgage Banking Segment and include loans we have repurchased—either to remedy a violation of a representation or warranty made in a loan sale, to minimize the cost of servicing a severely delinquent loan insured or partially guaranteed by the FHA or VA or in connection with a clean-up call.  We record such loans at fair value when they are repurchased and any resulting loss is charged against the liability we established when the loans were sold. . . . Subsequent losses that may result from deteriorations in the credit quality of the loans are included in our provision for loan losses.

318.   Defendants further claimed in the 2006 Form 10-K that the Company calculates its liability for representation and warranty obligations based upon lifetime credit losses, as follows:

<u>Valuation of Liabilities Incurred in Sale of Loans</u>

> We incur liabilities in our loan sales and securitizations through representations and warranties we make or through other recourse provisions, such as corporate guarantees. . . When credit risk is retained through liabilities incurred in the sale or securitization of loans, the lifetime credit losses are estimated as follows and are discounted at a risk-free rate of return.

319.   Defendants further represented that "[o]ur process for estimating lifetime credit losses benefits from the extensive history and experience we have developed from our mortgage loan servicing portfolio."

320.   For the year-ended December 31, 2006, the 2006 Form 10-K reported total liability for representations and warranties and a related provision for losses on representations and warranties of $390.2 million and $290.4 million respectively, as a component of the income statement's gain on sale of loans and securities.

321.   The statements concerning Countrywide's liabilities for representations and warranties were materially false and misleading when made because the Company ignored the following in estimating such liabilities:  (i) the increased credit risk associated with the production of inherently high-risk loans; (ii) rising delinquencies and

defaults on these underlying non-traditional loans; (iii) borrower credit risk; and (iv) current market data regarding severely depressed home values.

322.    Defendants' statements were also materially false and misleading because they were already in violation of numerous undisclosed representations and warranties made in connection with the loans sold, including, among others:  (i) Countrywide's ownership of the loan; (ii) the loan's compliance with any applicable loan criteria (e.g., loan balance limits, property type, delinquency status) established by the buyer; and (iii) the loan's compliance with applicable local, state and federal laws.  In addition, unbeknownst to investors, Countrywide was subject to stiff repayment penalties that required Countrywide to repurchase loans after only 30 days of delinquency.  As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, 240-45, and 259-62 and below in ¶¶ 416, 450-51, 524-31, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

323.    Thus, Countrywide's liability for representations and warranties and its provision for related losses were understated and retained interests and net income were overstated, as reported in the 2006 Form 10-K, in violation of GAAP, as detailed below in Section IX.

### 8.    Countrywide's Liquidity

324.    Defendants represented in the 2006 Form 10-K that the Company had implemented a Liquidity Management Plan (the "LMP") to "ensure that [the Company]

maintain[s] adequate, appropriate and cost-effective sources of liquidity under all market conditions."

325.   The 2006 Form 10-K further detailed the key elements of the LMP:

> We diversify our financing programs, credit providers, dealers and debt investors to reduce reliance upon any one source of liquidity.  Finally, we assess all sources of financing based upon their reliability, recognizing that certain of our financing programs are sensitive to temporary market disruptions and therefore may not always be available to us.

326.   The above statements concerning Countrywide's liquidity risk and risk management were materially false and misleading when made because Defendants failed to disclose that the Company did not:  (i) adequately diversify financing programs in order to sufficiently mitigate liquidity risk; (ii) have sufficient liquidity to meet downturns in the mortgage markets and fulfill its financial obligations; and (iii) implement safeguard mechanisms to at least ensure sufficient contingent liquidity.

327.   The above statements were further materially false and misleading because, as Defendants disclosed in the Second Quarter 2007 Form 10-Q, Defendants were experiencing serious liquidity problems by the third quarter of 2006 as a result of rising loan delinquencies and defaults in connection with Countrywide's origination of non-

traditional, high-risk loans.  As alleged above in ¶¶ 198-99, 203, 206, 210, 215-18, 221-38, and 240-262 and below in ¶¶ 372, 403-04, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 9.    Countrywide's Internal Controls

328.    Defendants claimed in the 2006 Form 10-K to ensure that the Company's underwriting standards were met through various control procedures:

> . . . We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology.  We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.
>
> We supplement our loan origination standards and procedures with a post-funding quality control process.  Our Quality Control Department is responsible for completing loan

audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and, if necessary, a fraud investigation. We also employ a pre-and post-funding proprietary loan performance evaluation system. This system helps to identify fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

329. The above statements regarding Countrywide's control procedures were materially false and misleading because the Company's proprietary system did not: (i) ensure that loan origination standards were met; or (ii) improve the consistency of underwriting standards. As admitted in McMurray's August 6, 2007 e-mail, the Company had "long followed a guiding principal of 'matching' (products, guidelines, etc.) and no brokering." As a result of the Company's matching strategy, no loan was too risky for Countrywide, and any putative underwriting guidelines were subverted to sales.

330.    Similarly, in his April 13, 2006 e-mail, to defendants Sambol and Sieracki, Defendant Mozilo admitted that he had "observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus a pricing of those loan [sic]." Moreover, Countrywide originated "exception" loans in violation of the Company's stated underwriting standards. As alleged above in ¶¶ 203, 206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 555-67, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

331.    Defendants further misrepresented in the 2006 Form 10-K that the Company maintained adequate controls over Countrywide's financial statements and operations as follows:

(1) <u>Evaluation of Disclosure Controls and Procedures</u>

We have conducted an evaluation, with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures . . . as of the end of the period covered by this annual report as required by paragraph (b) of Rules 13a-15 and 15d-15 under the Exchange Act. Based on their evaluation, the Chief Executive Officer and Chief

Financial Officer have concluded that our disclosure controls and procedures were effective in ensuring that material information relating to the Company, including our consolidated subsidiaries, is made known to the Chief Executive Officer and Chief Financial Officer by others within those entities during the period in which this annual report on Form 10-K was being prepared.

(2) <u>Management's Report on Internal Control Over Financial Reporting</u>

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

\* \* \*

In making its assessment of internal control over financial reporting, management used the criteria established in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2006.

332.   The 2006 Form 10-K also included certifications signed by Defendants Mozilo and Sieracki, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that the Company's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

333.   In this regard, the 2006 Form 10-K contained a certification signed by Defendant Mozilo, which stated:

I, Angelo R. Mozilo, certify that:

1.   I have reviewed this annual report on Form 10-K of Countrywide Financial Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

\*\*\*

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.     Any fraud, whether or not material, that involves

management or other employees who have a significant role in the

registrant's internal control over financial reporting.

   334.   The 2006 Form 10-K contained a separate certification signed by Defendant

Sieracki, which contained a verbatim reproduction of Defendant Mozilo's certification

statements above.

   335.   Moreover, the 2006 Form 10-K contained certifications signed by

Defendant Mozilo, which stated in pertinent part that:

   In connection with the Annual Report on

   Form 10-K of Countrywide Financial Corporation

   . . . for the period ended December 31, 2006 as

   filed with the Securities and Exchange

   Commission on the date hereof (the "Report"), I,

   Angelo R. Mozilo, Chief Executive Officer of the

   Company, certify, pursuant to 18 U.S.C. Section

   1350, as adopted pursuant to Section 906 of the

   Sarbanes-Oxley Act of 2002, that:

   1.     The Report fully complies with the requirements of

   Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

336.   The 2006 Form 10-K also contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendant Sieracki.

337.   The above certifications and statements concerning Countrywide's internal controls and the accuracy and completeness of the 2006 Form 10-K were materially false and misleading when made because Countrywide's internal controls were ignored and/or severely deficient and, thus, allowed the Company to:  (i) provide high-risk loans to unqualified borrowers, often without the required documentation necessary to evaluate the borrower's true credit risk and ability to repay the loan; (ii) maintain inadequate reserves for loan losses; and (iii) understate liabilities and losses and overstate assets and net income.  Accordingly, Defendants did not maintain a system of adequate controls as represented in the 2006 Form 10-K, in violation of GAAP, as detailed below in Section IX.  As alleged above in ¶¶ 203, 206, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 555-67, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 10.   Countrywide's Purported Risk Factors

338.   In its 2006 Form 10-K, Countrywide disclosed certain boilerplate risk factors that "may" impact the Company's future financial and operating results.  These risk factors were materially incomplete and therefore, false and misleading when made because they only warned of possible impacts to the Company when, in fact, Defendants knew that these purported risk factors were already impacting Countrywide.  With regard to credit losses, the Company stated:

> We may experience credit losses due to downward trends in the economy and in the real estate market.
>
> Our profitability in our Mortgage Banking, Banking and Capital Markets Segments is impacted by the ability of our customers to repay their loans.   These loans are underwritten in accordance with prescribed guidelines . . . . worsening economic and real estate market conditions could negatively impact the value of the credit subordinated securities we retain and increase our liabilities under our corporate guarantees and representations and warranties.

Likewise, worsening economic conditions increase the risk that our borrowers will not be able to repay our portfolio loans, and worsening real estate market conditions increase the risk that the value of the properties securing our loans will be insufficient to repay amounts owing to us in the event our borrowers default on the loans. Another factor that may contribute to higher delinquency and default rates is the increase in monthly payments on adjustable rate mortgage loans. Any increase in prevailing market interest rates may result in increased payments for borrowers who have adjustable rate mortgage loans. Moreover, with respect to hybrid mortgage loans after their initial fixed rate period, and with respect to mortgage loans with a negative amortization feature which reach their negative amortization cap, borrowers may experience a substantial increase in their monthly payment even without an increase in prevailing market interest rates.

339.   The above statements concerning the Company's risk of credit losses were materially false and misleading when made because Defendants knew, but failed to disclose, that these purported risks had already occurred as a result of Countrywide's undisclosed imprudent lending practices (described in Section IV above), which caused severe losses in the Company's loan portfolio given drastically rising borrower delinquencies and defaults.  Defendants were further aware that the Company was experiencing increased losses from piggyback loans because those loans were insufficiently collateralized, in part, as a result of deteriorating housing market conditions.  Thus, this purported risk concerning potential credit losses had already become a reality.

340.   For example, in his April 4, 2006 e-mail to Defendant Sambol and others, Defendants Mozilo acknowledged that because over 70% of pay-option ARM borrowers "have opted to make the lower payment it appears that it is just a matter of time that we be faced with a substantial amount of resets and therefore much higher delinquencies." Moreover, the known risks associated with the Company's pay-option ARMs were so great that Mozilo advised in a June 1, 2006 e-mail that the Company should be looking to sell off as many of these products as possible and "take a careful look at our reserves and assume the worst."

341.   With regard to Countrywide's reliance on the accuracy and completeness of information provided by loan applicants, the Company disclosed the following risk factor in its 2006 Form 10-K:

119

In deciding whether to extend credit or enter into other transactions with customers and counterparties, we may rely on information furnished to us by or on behalf of customers and counterparties, including financial statements and other financial information. We also may rely on representations of customers and counterparties as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors.

\*\*\*

Our financial condition and results of operations could be negatively impacted to the extent we rely on customer information that is not complete or accurate.

342.   The above statements concerning Defendants' reliance on borrower representations were materially false and misleading when made because Defendants already knew that certain loan documentation was falsified. For example, Defendant Mozilo stated in a June 1, 2006 e-mail to Defendant Sambol and others that "the majority of pay options being originated by us, both wholesale and retail, are based upon stated income. There is also some evidence that the information the borrower is

providing us relative to their income does not match up with IRS records."  In addition,

Defendants knew but did not disclose that Countrywide's employees encouraged and

assisted loan applicants in reporting falsely inflated income levels to qualify for certain

loans and, thus, the Company actively manipulated such information in order to facilitate

unwarranted loan approvals and boost loan sale volumes.  As alleged above in ¶¶ 203,

206, 210, 215-18, 221-38, and 240-45 and below in ¶¶ 384-88, 439-42, 449, 452, 555-

67, 576-611, and 613-60, Defendants knew and/or acted with deliberate recklessness in

disregarding that their statements concerning purported risk factors were materially false

and misleading at the time that they were made.

### B.   Material Misrepresentations and Omissions Of Material Fact In The First Quarter 2007 Form 10-Q

343.   On May 9, 2007, the Company filed First Quarter 2007 Form 10-Q with the

SEC.  Defendants Sambol and Sieracki signed the First Quarter 2007 Form 10-Q, which

was incorporated by reference into the Offering Memorandum.

344.   The First Quarter 2007 Form 10-Q made the same types of materially false

and misleading statements as those contained in the 2006 Form 10-K concerning

Countrywide's:  (i) loan quality; (ii) credit and underwriting policies and practices; (iii)

allowance for loan loss reserves; (iv) valuation and impairment of retained interests; (v)

impairment on MSRs; (vi) representations and warranties; (vii) liquidity; (viii) internal

controls; and (ix) risk factors discussed above in ¶¶ 275-342.

345.   The First Quarter 2007 Form 10-Q also falsely represented that

Countrywide's financial statements were prepared in conformity with GAAP, a

representation that was materially false and misleading when made for the reasons alleged below in Section IX.

### 1.    Countrywide's Loan Quality

346.   In the First Quarter 2007 Form 10-Q, Defendants represented that the overwhelming majority of Countrywide's mortgage loan production for the quarter ending March 31, 2007 consisted of "prime" mortgages, as follows:

| Product | (in millions) |
|---|---|
| Prime Mortgage | $96,544 |
| Prime Home Equity | $10,539 |
| Nonprime Mortgage | $7,881 |

347.   Referring to Countrywide's portfolio of mortgage loans originated or purchased for investment, the First Quarter 2007 Form 10-Q stated that "[w]e assess a loan's quality by considering the borrower's credit profile and the quality of collateral securing the loan."

348.   Also, the First Quarter 2007 Form 10-Q reported only the misleading "Average original FICO score[s]," rather than the actual FICO score distribution, which would have alerted investors of the true extent of risk contained in the Company's loan portfolio.

349.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the quality of Countrywide's loan

portfolio and borrower creditworthiness were materially false and misleading when made for the reasons stated above in ¶¶ 280 and 283.

### 2.    Countrywide's Credit and Underwriting Practices

350.    In the First Quarter 2007 Form 10-Q, Defendants stated the following concerning Countrywide's credit risk management:

> We actively manage credit risk to maintain credit losses within levels that achieve our profitability and return on capital objectives while meeting our expectations for consistent financial performance.

351.    With respect to the Company's underwriting standards and risk management relating to pay-option ARMs, the First Quarter 2007 Form 10-Q explained:

> We manage the credit risk relating to pay-option ARM loans through a variety of methods, including active borrower communications both before and after funding, through our underwriting standards.  Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests

123

based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed.

352.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 285-86, 289, and 292-93.

### 3.   Countrywide's LHI and Allowance for Loan Losses

353.   In the First Quarter 2007 Form 10-Q, Countrywide reported that its LHI for the quarter ended March 31, 2007 was $75.2 billion, net of allowance for loan losses.

354.   Also in the First Quarter 2007 Form 10-Q, Defendants falsely assured investors that Countrywide's allowance for credit losses, which included the allowance for loan losses, was adequate.  In this regard, Defendants represented that the Company's "investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels."

355.   With respect to the Company's evaluation of one of its "critical accounting policies," its allowance for loan losses, the First Quarter 2007 Form 10-Q stated:

The provision for loan losses and the related allowance for loan losses are affected by many factors, including economic conditions (for example, housing prices, interest rates and unemployment rates), the borrower's credit profile,

the loan's payment requirements, loan seasoning and prepayments and the level of purchased credit enhancement.

356.   In addition, Countrywide stated the Company's loan loss reserves and provision for loan losses as of March 31, 2007 were $374.4 million and $151.9 million, respectively.  These amounts were dramatically understated.

357.   A substantial portion of the Company's LHI consisted of pay-option ARMs, which Defendants knew were poorly underwritten and experiencing heightened defaults. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 297-98 and 301-02.

### 4.   Countrywide's Retained Interests and Related Impairment of Retained Interests in Loans Sold

358.   The First Quarter 2007 Form 10-Q stated the following purported fair values for the Company's retained interest assets:

|  | March 31, 2007 (in thousands) |
|---|---|
| Interests retained in securitization accounted for as available-for-sale securities: |  |
| Prime home equity line of credit transferor's interest | $101,686 |
| Prime home equity residual securities | $25,842 |
| Interests retained in securitization accounted for as trading securities: |  |

| Prime home equity line of credit transferor's interest | $679,389 |
| Prime home equity residual securities | $591,434 |

359.   The First Quarter 2007 Form 10-Q also reported impairment of retained interests and provision for impairment of $429.6 million and $284.7 million, respectively for the quarter-ended March 31, 2007.  Moreover, the First Quarter 2007 Form 10-Q stated that the $429.6 million impairment included a $135.3 million charge related to subordinated interests on prime home equity lines of credit securitizations and a $231.0 million charge related to nonprime residual interests.  The First Quarter 2007 Form 10-Q further stated that the charges "were driven by increased estimates for future losses on the loans underlying these securities as well as increased market yield requirements for nonprime securities."

360.   With respect to total credit losses realized for the first quarter of 2007 related to securitized loans, Defendants stated:  (i) $85.0 million purportedly related to nonprime and prime securitizations; (ii) $42.9 million related to repurchased or indemnified loans; and (iii) $36.3 million for credit losses related to prime home equity securitizations with retained residual interest.

361.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading for the reasons stated above in ¶¶ 306-08.  In addition, Defendants' statements were materially false and misleading when made because the Company did not properly evaluate

estimated credit losses in determining the fair value of subordinated interests, as alleged below in Section IX.

### 5.    Countrywide's Valuation and Impairment of MSRs

362.   In reporting on the value of Countrywide's MSRs for the first quarter of 2007, one of the Company's "critical accounting policies," the First Quarter 2007 Form 10-Q reported MSRs of $17.4 billion, an increase of $179 million for the quarter-ended March 31, 2007.

363.   The Company further claimed in the First Quarter 2007 Form 10-Q, that the Company expected "to incur no significant declines in value of MSRs other than recovery of [its] investment through the realization of cash flows."

364.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 314-15.  In addition, there was no reasonable basis for the statements in light of the unprecedented default levels in the downward spiraling housing market.

### 6.    Countrywide's "Representations and Warranties"

365.   As in the 2006 Form 10-K, Defendants made identical misrepresentations in the First Quarter 2007 Form 10-Q concerning Countrywide's liability under its representations and warranties for the sale of loans into the secondary market:

> . . . In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans

127

with the identified defects or indemnify the investor or insurer.

\*\*\*

We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards.

366.  The Company disclosed its stated policy for recording representation and warranty liability as follows:

We make provisions for losses that may arise from breaches of representations and warranties when we record the sale of these loans and we adjust our estimates for losses on these loans quarterly. We record such loans at fair value when they are repurchased and any resulting loss is charged against the liability we established when the loans were sold.

367.  In the First Quarter 2007 Form 10-Q, Defendants also falsely claimed that "[e]xpected future credit losses are considered in the determination of the fair value of the subordinated interests."

368.   For the period-ended March 31, 2007, the First Quarter 2007 Form 10-Q reported a total liability resulting from breaches of representations and warranties of $365.3 million.

369.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 321-23.

### 7.   Countrywide's Liquidity

370.   With respect to Countrywide's liquidity and capital resources, the First Quarter 2007 Form 10-Q stated that:

> . . . nonprime loans and related securities became much less liquid.  However, such assets represent only a small portion of our total assets. The substantial majority of our assets continue to experience ample liquidity in the marketplace.  As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.

371.   Defendants further assured investors in the First Quarter 2007 Form 10-Q that the Company had adequate financing:

. . . We establish reliable sources of liquidity sized to meet a range of potential future funding requirements.   We currently have $94.4 billion in available sources of short-term liquidity, which represents a decrease of $2.0 billion from December 31, 2006.  We believe we have adequate financing capacity to meet our currently foreseeable needs.

372.   Defendants knew and/or recklessly disregarded that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 326-27. The above statements concerning Countrywide's liquidity risk and risk management were also materially false and misleading when made because, as Defendants admitted in the Second Quarter 2007 Form 10-Q, Countrywide was already facing liquidity constraints as of the third quarter of 2006.  Thus, Defendants did not have a reasonable basis for their putative belief that Countrywide had adequate financing capacity as of the first quarter of 2007.

### 8.   Countrywide's Internal Controls

373.   With respect to the Company's internal controls and procedures, the First Quarter Form 10-Q stated that:

. . . The Chief Executive Officer and Chief Financial Officer have concluded that our

disclosure controls and procedures were effective in ensuring that information required to be disclosed by the Company, including our consolidated subsidiaries in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, by others within those entities during the period in which this quarterly report on Form 10-Q was being prepared.

374.   The First Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as contained in the 2006 Form 10-K (¶¶ 333-36), which were materially false and misleading and/or omitted material facts.  Specifically, like the 2006 Form 10-K certifications, the First Quarter 2007 Form 10-Q certifications falsely represented that the quarterly report did not contain any misstatements or omissions, and that the Company had implemented effective internal disclosure controls and procedures to ensure that material information regarding the Company was known.

375.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced certifications were materially false and misleading when made for the reasons stated above in ¶ 337.

### 9.   Countrywide's Purported Risk Factors

376.   The First Quarter 2007 Form 10-Q also incorporated by reference the same risk factors contained in the 2006 Form 10-K and described above in ¶¶ 338 and 341. Defendants knew and/or acted with deliberate recklessness in disregarding that the risk factors in the First Quarter 2007 Form 10-Q were materially false and misleading when made for the same reasons stated above in ¶¶ 339-40 and 342.

## VII.   DEFENDANTS' PARTIAL DISCLOSURES OF PREVIOUSLY MISREPRESENTED AND/OR CONCEALED MATERIAL FACTS AND CONTINUING MATERIAL MISREPRESENTATIONS AND OMISSIONS

377.   Beginning on July 24, 2007, Defendants gradually disclosed previously misrepresented and/or omitted material facts concerning the Company's imprudent lending practices and financial condition.  As Defendants made partial corrective disclosures during the remainder of the Relevant Period, the Debentures' value declined in a series of material steps.  Specifically, the Series A Debentures dropped from $963.72 per debenture on July 23, 2007 to $760.45 per debenture by the end of the Relevant Period on November 21, 2007, and the Series B Debentures fell from $963.83 per debenture on July 23, 2007 to $721.12 per debenture on November 21, 2007.

378.   Each partial disclosure of previously misrepresented and/or omitted material facts removed a portion of the artificial inflation in the price of Countrywide's Debentures caused by Defendants' material misrepresentations and/or omissions and directly caused Plaintiffs to suffer damages.

## A.    The July 24, 2007 Press Release and Conference Call

379.   As with their Debenture purchases prior to July 24, 2007, Plaintiffs' purchases of the Debentures during the period from July 24, 2007 through November 21, 2007 were made at artificially inflated prices caused by Defendants' material misrepresentations and omissions.  As alleged below, although the value of the Debentures declined upon each partial disclosure of the truth, the prices of the Debentures remained artificially inflated until the Company's true financial condition became known on November 21, 2007 -- the end of the Relevant Period.

380.   The July 24, 2007 Press Release announced the Company's Second Quarter 2007 financial results, and the Company conducted a conference call that same day (the "July 24, 2007 Conference Call") to discuss the results with analysts.  In the July 24, 2007 Press Release, the Company substantially lowered its 2007 earnings estimate to between $2.70 and $3.30 per share of common stock from its previous estimate of between $3.50 and $4.30 per share.  Countrywide also unexpectedly announced that the Company had taken a $417 million impairment charge on its "investments in credit-sensitive retained interests" as a result of "softening home prices . . . and [rising] delinquencies and defaults."

381.   The July 24, 2007 Press Release stated in relevant part:

> [The  $417  million  impairment  charge]
> included $388 million, or approximately $0.40 in
> earnings per diluted share based on a normalized

tax rate, of impairment on residual securities collateralized by prime home equity loans. The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future defaults and loss severities on the underlying loans.

382.   Countrywide also reported in the July 24, 2007 Press Release a $293 million charge to the Company's provision for losses on LHI in the second quarter, driven primarily by a charge of $181 million on prime home equity loans held-for-investment.

383.   During the July 24, 2007 Conference Call, Defendants partially disclosed previously misrepresented and/or concealed material facts. With respect to the provision for losses on LHI, in a supplemental presentation (the "July 24, 2007 Presentation") to the July 24, 2007 Conference Call, Defendants admitted that Countrywide changed its policy for recognizing charge-offs because the Company's prior methodology for determining allowances for loan losses was unreliable and failed to properly consider losses that were probable as a result of the Company's reckless lending practices. Specifically, Defendants admitted that the Company changed its reserve methodology to "accelerate the timing of charge-offs" of LHI, resulting in an increase to charge-offs of approximately $30 million in the second quarter of 2007.

384.   In the July 24, 2007 Conference Call, Defendants made a series of admissions with respect to the Company's underwriting practices and accounting for loan losses.  Specifically, Defendants revealed that Countrywide used a broad definition of "prime" loan, including in its statement disclosing impairment charges in "credit-sensitive retained interests," that actually encompassed borrowers with FICO scores as low as 500, well below industry standards.

385.   In this regard, Countrywide's Senior Managing Director and Chief Risk Officer, John McMurray stated that the definition of prime "covers a very vast spectrum" and referred to "prime loan[s] with FICOs in the low 500s."  This was the first time Countrywide disclosed to investors that its definition of "prime" loan was inconsistent with the industry-wide definition.  McMurray further indicated that "a prime loan with FICOs in the low 500s is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO."

386.   In addition, during the July 24, 2007 Conference Call, McMurray made partial disclosures concerning Countrywide's lending practices, including an admission that the Company improperly provided low or no documentation loans to borrowers, which, in part, led to the inevitable increase in delinquencies and defaults.  In this respect, McMurray stated: "The takeaway is . . . documentation matters: the less documentation, the higher the serious delinquency, all else equal."  Notably, the July 24, 2007 Presentation materials showed that as of the end of the second quarter of 2007,

80% of Countrywide's pay-option ARM loans in the Company's portfolio were low documentation loans.

387.   McMurray also admitted on the July 24, 2007 Conference Call that the higher CLTV reduced documentation loans in the home equity portfolio "are disproportionately contributing to charge-offs and delinquencies." According to McMurray, many of those charge-offs and delinquencies "stem from the higher concentration of piggyback financing that we did and that . . . we have in the port[folio] . . . ."

388.   Countrywide further revealed inadequacies in its underwriting guidelines and internal controls during the July 24, 2007 Conference Call. In particular, Kevin Bartlett, the Company's Chief Investment Officer ("CIO"), stated that the Company has "made many changes to [Countrywide's] product offerings, pricing, underwriting guidelines and processes in order to improve the quality and secondary market execution of our production." Defendants also disclosed that the Company's automated underwriting system needed to be "recalibrated."

389.   In response to Countrywide's initial partial disclosures during the July 24, 2007 Conference Call regarding the impairment charge, the Company's previously undisclosed highly reckless lending and underwriting practices, and other adverse facts, the Debentures' value declined significantly:  the Series A Debentures fell $23.49 per debenture, from $963.72 per debenture on July 23, 2007 to $940.23 per debenture on July 26, 2007.  The Series B Debentures fell $20.46 per debenture, from $963.83 on July

23, 2007 to $943.37 per debenture on July 26, 2007.  This represented a 5.2% decline in the price of the Series A Debentures, and a 4.2% decline in the price of the Series B Debentures since the Offering date.

390.   As alleged below, despite the partial disclosures during the July 24, 2007 Conference Call, the representations in the July 24, 2007 Press Release remained materially false and misleading and omitted materials facts concerning, among other things, Countrywide's:  (i) loan quality and underwriting guidelines; (ii) reported financial results and accounting practices; (iii) exposure to losses based upon the representations and warranties that the Company made in connection with loans sold on the secondary market; and (iv) liquidity.  These continuing misrepresentations and omissions of material fact caused the Debentures' prices to remain artificially inflated.

**1.    Continuing Misrepresentations and Omissions Regarding Countrywide's Loan Quality and Underwriting Practices**

391.   In the July 24, 2007 Press Release, the Company claimed that it was tightening its credit guidelines, particularly related to subprime and prime home equity loans and other subprime product offerings.  Countrywide also represented that it had eliminated several of the Company's riskiest loan types, including adjustable-rate products.

392.   The foregoing statements in the July 24, 2007 Press Release regarding the tightening of credit guidelines and elimination of certain high-risk loan products were materially false and misleading because, as Defendants would begin to admit in the October 26, 2007 Press Release and Conference Call:  (i) Countrywide did not do a

"wholesale revamping and tightening" of programs and guidelines until the third quarter of 2007; and (ii) Countrywide had not entirely eliminated high-risk loans like subprime home equity loans, subprime Hybrid ARMs and reduced documentation loans with a CLTV greater than 90%.  Indeed, Countrywide continued to originate high-risk loans throughout the second and third quarters of 2007.  As alleged above in ¶¶ 280, 283, 285-86, 289, and 292-93, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 2. Continuing Misrepresentations and Omissions Regarding Countrywide's Reported Financial Results and Accounting Practices

393.   With respect to the Company's reported financial results and related accounting practices, the July 24, 2007 Press Release reported the following false and misleading financial results for the quarter-ended June 30, 2007:  (i) LHI (net of allowance of $512.9 million) - $74.1 billion; (ii) MSRs at fair value - $20.1 billion; and (iii) Retained Interests - $2.7 billion.  These reported financial results were materially false and misleading when made because the LHI, MSR, and retained interest figures were each overstated given Countrywide's failure to adequately consider rising delinquencies and defaults on the inherently high-risk loans underlying these portfolios.

394.   In response to a question during the July 24, 2007 Conference Call on whether Defendants used a mark-to-market methodology or a mark-to-model methodology in valuing retained interests, Kevin Bartlett (CIO) responded:

> Well, it is a bit of a combination of both.
>
> [T]he assets are carried at market value, and the
>
> way we do that is we approximate it by using
>
> models that many in the industry would use as
>
> well.  We use . . . discount rates speeds and loss
>
> assumptions that we believe the market would
>
> employ.

Bartlett then stated that the Company was "comfortable" with its valuation methods despite the lack of liquidity in the market.

395.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the Company's second quarter 2007 reported financial results and accounting practices were materially false and misleading for the reasons stated above in ¶¶ 297-98, 301-02, 306-08, and 314-15.  The above-referenced statements were also materially false and misleading when made because as alleged below in Section IX, the Company's liabilities and allowance for loan losses were understated as a result of Countrywide's failure to fully recognize known losses in the Company's loan portfolio.

### 3.    Continuing Misrepresentations and Omissions Regarding Countrywide's Liquidity

396.   With respect to the Company's liquidity risks, Countrywide stated in the July 24, 2007 Press Release that the challenging market environment would allow Countrywide to further leverage its strong liquidity position, as follows:

Notwithstanding current environmental factors and their near-term impact on earnings, management believes that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which management believes will enhance the Company's long-term earnings growth prospects. Countrywide expects to leverage the strength of its capital and liquidity positions, superior business model, and best-in-class workforce to emerge in a superior competitive position coming out of the current housing down cycle.

397. The Company further claimed in the July 24, 2007 Press Release that integration of its business lines would enhance its access to capital:

. . . the ongoing integration of the Company's bank and mortgage company is expected to enhance its business model through operational efficiencies, reduced funding costs, and enhanced liquidity among other competitive advantages.