398.   Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 326-27.  Defendants' statements during the July 24, 2007 Conference Call concerning Countrywide's strong liquidity position were also materially false and misleading when made because Countrywide was, in fact, facing liquidity constraints at that time, which would be disclosed only days later on August 9, 2007.  Thus, Defendants still had not fully disclosed the true extent of the Company's credit and liquidity risk exposure as a result of years of reckless mortgage lending and underwriting practices.

**B.     The August 2, 2007 Press Release
         and August 6, 2007 Form 8-K**

399.   In an attempt to restore investor confidence, the Company issued the August 2, 2007 Press Release, entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition."  In the August 2, 2007 Press Release, Defendant Sieracki reassured investors that the Company's financial position remained strong, stating that "[o]ur mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank."  Sieracki also stated in relevant part:

> . . . Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today.  We place major emphasis on the

adequacy, reliability and diversity of our funding

sources.

400.   A few days later, Countrywide filed the August 6, 2007 Form 8-K with the SEC in order to further reinforce its liquidity assurances made in the August 2, 2007 Press Release.  Defendant Sieracki signed the August 6, 2007 Form 8-K.  The August 6, 2007 Form 8-K contained Countrywide's "Liquidity Sources" schedule as of June 30, 2007, which reported that the Company's net available liquidity was $186.5 billion.

401.   Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 326-27 and 398.  Defendants' statements in the August 2, 2007 Press Release and the August 6, 2007 Form 8-K were also materially false and misleading when made because Countrywide was, in fact, facing severe liquidity constraints and unknown prospects for continued liquidity at that time, which would be disclosed only days later on August 9, 2007.

402.   In response to the materially false and misleading assurances of stability set forth in the August 6, 2007 Form 8-K, the price of the Series A Debentures rose $12.44 per debenture to $918.28 per debenture on August 7, 2007, and the price of the Series B Debentures rose $18.04 per debenture to $907.22 per debenture on August 7, 2007.

**C.     Continuing Misrepresentations and Omissions of Material Fact In The Second Quarter 2007 Form 10-Q**

403.   Only three days later, on August 9, 2007, Countrywide filed its Form 10-Q for the second quarter of 2007 (the "Second Quarter 2007 Form 10-Q") with the SEC,

which was incorporated by reference into the Offering Memorandum.  Defendants

Sambol and Sieracki signed the Second Quarter 2007 Form 10-Q.  In the Second Quarter

2007 Form 10-Q, Defendants disclosed for the first time that the Company was facing

liquidity funding issues, directly contradicting the Company's statements made just days

before.

404.   Shedding additional light on the Company's true liquidity risk, the Second

Quarter 2007 Form 10-Q stated that:

> In the third quarter [of 2006] through the
>
> filing date of the Form 10-Q, funding liquidity in
>
> the financial sector was constrained primarily due
>
> to changes in the secondary mortgage market
>
> investor demand.  Various mortgage lenders have
>
> experienced   operating   difficulties   and   have
>
> extended asset-based commercial paper facilities
>
> or filed for bankruptcy protection.  These events
>
> have further constrained funding liquidity in the
>
> sector.
>
>                          *    *    *
>
> We believe we have adequate funding
>
> liquidity to accommodate these marketplace
>
> changes in the near term; however, the secondary

market and funding liquidity situation is rapidly

evolving and the potential impact on the Company

is unknown.

405.   Despite the partial disclosures during the Second Quarter 2007 Form 10-Q,

Defendants continued to make materially false and misleading statements concerning

Countrywide's:  (i) loan quality; (ii) credit and underwriting practices; (iii) valuation and

impairment of MSRs; (iv) representations and warranties; and (v) internal controls.

These continuing misrepresentations and omissions of material fact caused the

Debentures prices to remain artificially inflated.

### 1.   Countrywide's Loan Quality

406.   In the Second Quarter 2007 Form 10-Q, Defendants once again represented

that the majority of Countrywide's mortgage loan production for the quarter ending June

30, 2007 consisted of "prime" mortgages:

| Product | (in millions) |
|---------|---------------|
| Prime Mortgage | $113,846 |
| Prime Home Equity | $10,596 |
| Nonprime Mortgage | $5,721 |

407.   Referring to Countrywide's portfolio of mortgage loans originated or

purchased for investment, as with the First Quarter 2007 Form 10-Q, the Second Quarter

2007 Form 10-Q similarly stated that "[w]e assess a loan's quality by considering the

borrower's credit profile and the value of collateral securing the loan."

408.   The Second Quarter 2007 Form 10-Q also misleadingly reported only the "Average original FICO score[s]," rather than the actual FICO score distribution, which would have alerted investors of the heightened risk contained in the Company's loan portfolio.

409.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the quality of Countrywide's loan portfolio and borrower creditworthiness were materially false and misleading when made for the reasons stated above in ¶¶ 280 and 283.

### 2.     Countrywide's Credit and Underwriting Practices

410.   In the Second Quarter 2007 Form 10-Q, Defendants stated the following concerning Countrywide's credit risk management:

> We actively manage credit risk to maintain
> expected credit losses within levels that achieve
> our profitability and return on capital objectives.

Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning Countrywide's risk management were materially false and misleading when made for the reasons stated above in ¶¶ 285-86, 289, and 292-93.

### 3.     Countrywide's Valuation and Impairment of MSRs

411.   In reporting on the value of Countrywide's MSRs -- one of the Company's "critical accounting policies" -- the Second Quarter 2007 Form 10-Q reported MSRs of $20 billion, an increase of $2.6 billion for the quarter-ended June 30, 2007.

412.   The Company further claimed in the Second Quarter 2007 Form 10-Q that it expected "to incur no significant declines in the value of MSRs other than recovery of [its] investment through the realization of cash flows."

413.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 314-15.  In addition, the above-referenced statements were materially false and misleading when made because at the time, there was no reasonable basis to believe that the value of MSRs would not further decline in light of the known downturn in the mortgage market and the escalating default levels.

### 4.   Countrywide's "Representations and Warranties"

414.   Defendants made similar misrepresentations in the Second Quarter 2007 Form 10-Q concerning Countrywide's liability under the representations and warranties made in connection with loans sold to the secondary market as in the 2006 Form 10-K and the First Quarter 2007 Form 10-Q:

> . . . In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer.
>
> ***

146

> We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards.

415.   The Company disclosed its stated policy for recording representation and warranty liability as follows:

> We make provisions for losses that may arise from breaches of representations and warranties when we record the sale of these loans and we adjust our estimates for losses on these loans quarterly.   We record repurchased loans at fair value when they are repurchased and any resulting loss is charged against the liability.

416.   Defendants' discussion of representation and warranty liabilities misrepresented and omitted material facts.   Among other things, an August 6, 2007 e-mail that McMurray authored in connection with the Second Quarter 2007 Form 10-Q Sarbanes-Oxley certifications revealed that: "delinquencies and defaults will likely increase and there will likely be more loans 'eligible' for repurchase or indemnification."   McMurray's observations were particularly applicable to poorly underwritten pay-option ARMs and HELOCs that Countrywide had off-loaded based

upon the directions in Defendant Mozilo's June 1, 2006 and September 26, 2006 e-mails.

417.   In the Second Quarter 2007 Form 10-Q, Defendants also falsely claimed that "[e]stimated credit losses over the expected lifetime of the security are considered in the valuation of [the Company's] subordinated interests."

418.   For the period-ended June 30, 2007, the Second Quarter 2007 Form 10-Q reported a total liability resulting from breaches of representations and warranties of $431.8 million.

419.   Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 321-23.

### 5.   Countrywide's Internal Controls

420.   With respect to the Company's internal controls and procedures, the Second Quarter 2007 Form 10-Q stated that:

> The Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by the Report.

421.   The Second Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as contained in the 2006 Form 10-K (¶¶ 333-36). Specifically, like the 2006 Form 10-K certifications, the Second Quarter 2007 Form 10-

148

Q certifications falsely represented that the quarterly report did not contain any misstatements or omissions, and that the Company had implemented effective internal disclosure controls and procedures to ensure that material information regarding the Company was known.

422.   Defendants knew and/or acted with deliberate recklessness in disregarding that these representations were materially false and misleading when made for the reasons stated above in ¶ 337.

### 6.   Countrywide's Risk Factors

423.   The Second Quarter 2007 Form 10-Q incorporated by reference the same risk factors contained in the 2006 Form 10-K and described above in ¶¶ 338 and 341. Defendants knew and/or acted with deliberate recklessness in disregarding that the risk factors in the Second Quarter 2007 Form 10-Q were materially false and misleading when made for the same reasons stated above in ¶¶ 339-40 and 342.

424.   In response to the disclosures of previously misrepresented and/or concealed material facts in the Second Quarter 2007 Form 10-Q, the Series A Debentures fell another $31.05 per debenture, from $927.54 per debenture on August 8, 2007 to $896.49 per debenture on August 14, 2007, and the Series B Debentures fell another $12.54 per debenture, from $918.13 per debenture on August 8, 2007 to $905.59 per debenture on August 14, 2007.  This represented a 9.6% decline in the price of the Series A Debentures, and an 8.1% decline in the price of the Series B Debentures since the Offering date.

149

425.   Only days later on August 15, 2007, several analysts downgraded Countrywide as a result of the Company's liquidity issues first disclosed in the Second Quarter 2007 Form 10-Q.  Notably, Merrill Lynch downgraded Countrywide to "sell" from "buy" because of concerns that the Company could be forced into bankruptcy due to an inability to access liquidity to fund its operations.  As a result of the downgrades, the Series A Debentures fell another $48.40 per debenture, from $896.49 per debenture on August 14, 2007 to $848.09 per debenture on August 15, 2007, and the Series B Debentures fell another $75.26 per debenture, from $905.59 per debenture on August 14, 2007 to $830.33 per debenture on August 15, 2007.  This represented a 14.5% decline in the price of the Series A Debentures, and a 15.8% decline in the price of the Series B Debentures since the Offering date.

**D.    The August 16, 2007 Press Release**

426.   As a result of Countrywide's increasing liquidity crisis, the Company announced on August 16, 2007 that it drew its entire $11.5 billion emergency credit facility in order to "supplement[] its liquidity funding position" (the "August 16, 2007 Press Release").  Defendant Sambol stated in the August 16, 2007 Press Release that Countrywide was further tightening the Company's underwriting standards for loans that are not eligible to be sold in the secondary market to Fannie Mae and Freddie Mac, and thereby admitted that the Company's prior statements regarding its supposedly adjusted underwriting standards were materially false and misleading because Countrywide's mortgage underwriting standards sill exposed the Company to significant credit risk.

427.    The August 16, 2007 Press Release also continued to misrepresent Countrywide's inadequate liquidity at the time.  By announcing its draw down of the credit facility, Countrywide falsely reassured investors that the Company would have sufficient capital resources to meet further market downturns.  In fact, Countrywide was facing a severe liquidity crisis that would be fully revealed at the end of the relevant period.

428.    In response to disclosures concerning Countrywide's previously misrepresented credit quality and liquidity (as the Company would thereafter report with greater specificity), and after temporary support in the trading prices of the Debentures due to the availability of additional credit lines, the Series B Debentures fell another $10.97 per debenture, from $830.33 per debenture on August 15, 2007 to $819.36 per debenture on August 16, 2007.  This represented a 16.9% decline in the price of the Series B Debentures since the Offering date.

429.    Demonstrating that Countrywide's liquidity crisis was even deeper than Defendants conceded, on August 22, 2007, just six days after the Company announced the $11.5 billion liquidity boost, Countrywide announced that it also received a $2 billion strategic equity investment from BofA.  In particular, BofA invested $2 billion in the form of non-voting convertible preferred securities with a 7.25% annual yield, with the hope that the investment "will be a step toward a return to a more normal liquidity in the mortgage markets."  The announcement of Bank of America's capital infusion gave the Debentures a temporary boost in price.  The Series A Debentures increased from

$883.78 per debenture on August 22, 2007 to close at $914.87 on August 23, 2007 and the price of the Series B Debentures increased from $864.25 on August 22, 2007 to close at $904.24 on August 23, 2007.

**E.     The September 7, 2007 Press Release**

430.   On September 7, 2007, Countrywide issued a press release detailing the Company's "plan of action to address changing market conditions" (the "September 7, 2007 Press Release"). In the September 7, 2007 Press Release, Countrywide announced workforce reductions of up to 10,000 to 12,000 positions, or 20% of its workforce, over the next three months following the date of the press release. This announcement came only six weeks after McMurray's statements during the July 24, 2007 Conference Call that the purported "growth in the sales force . . . at a one to two-year high" was a "leading indicator" that the Company held a "strong capital position."

431.   The September 7, 2007 Press Release was materially false and misleading as it continued to misrepresent the true extent of Countrywide's liquidity crisis at the time. Contrary to its reassurance that the Company was taking remedial steps to address its financial condition, the truth was that Countrywide could not contain the losses stemming from its poorly underwritten mortgage loan portfolio. Countrywide knew at the time of the September 7, 2007 Press Release that the Company had a severe liquidity crisis that would place it on the brink of bankruptcy.

432.   Following the September 7, 2007 Press Release, the Series A Debentures fell another $5.73 per debenture, from $896.30 per debenture on September 7, 2007 to

$890.57 per debenture on September 11, 2007, and the Series B Debentures fell another $4.62 per debenture, from $872.88 per debenture on September 7, 2007 to $868.26 per debenture on September 11, 2007. This represented a 10.2% decline in the price of the Series A Debentures, and an 11.9% decline in the price of the Series B Debentures since the Offering date.

### F.    The October 24, 2007 Form 8-K

433.   After the market closed on October 24, 2007, Countrywide filed a Form 8-K with the SEC announcing the sudden departure of Henry G. Cisneros, former secretary of Housing and Urban Development, from the Company's Board of Directors. In addition to Michael E. Dougherty and Kathleen Brown, Cisneros was the third member of Countrywide's Board to resign during 2007. Such resignations were unusual for the Countrywide Board of Directors as only one other Board member had resigned between 2003 and 2006.

434.   Also after the market closed on October 24, 2007, The Wall Street Journal published an article entitled "Countrywide's New Scare -- 'Option ARM' Delinquencies Bleed Into Profitable Prime Mortgages," detailing pay-option ARM loans (the "October 24, 2007 Wall Street Journal article"). According to the October 24, 2007 Wall Street Journal article, pay-option ARM loans that were classified as "prime" when they were originated, were defaulting at a rapid pace. In this regard, the October 24, 2007 Wall Street Journal article revealed for the first time that Countrywide had given pay-option

ARM loans to "riskier and riskier borrowers" even though such loans were created as "a niche product targeted mainly to people with very strong credit."

435.   Notably, those were the same loan products over which Defendant Mozilo expressed clear concerns in a June 1, 2006 e-mail to Defendant Sambol, among others, noting that such loans were ripe for escalating defaults.  Mozilo knew that such loans would cause the Company financial difficulties and advised that "we should take a careful look at our reserves now and begin to assume the worst."

436.   In response to this news, revealing Defendants' misrepresentations and omissions of material fact concerning Countrywide's loan origination and underwriting standards, the Series A Debentures fell another $15.86 per debenture, from $866.02 per debenture on October 24, 2007 to $850.16 per debenture on October 25, 2007, and the Series B Debentures fell another $12.59 per debenture, from $840.47 per debenture on October 24, 2007 to $827.88 per debenture on October 25, 2007.  This represented a 14.3% decline in the price of the Series A Debentures, and a 16% decline in the price of the Series B Debentures since the Offering date.

**G.    The October 26, 2007 Press Release and Conference Call**

437.   On October 26, 2007, Countrywide issued a press release (the "October 26, 2007 Press Release"), announcing the Company's third quarter 2007 financial results and conducted a conference call (the "October 26, 2007 Conference Call") with analysts discussing the Company's disappointing results.

438.   Specifically, in the October 26, 2007 Press Release, Countrywide reported the Company's first quarterly loss in 25 years of $1.2 billion, or $2.85 per share. The significant issues during the third quarter included a $1 billion write-down of Countrywide's loans and mortgage-backed securities purportedly as a result of disruptions in the capital markets during the third quarter. In addition, the Company increased its loan loss provision to $934 million in the third quarter, compared to only $293 million in the prior quarter and $38 million in the third quarter of 2006, to provide additional reserves for losses in the Company's home equity and pay-option ARM loans.

439.   In the October 26, 2007 Press Release, the Company claimed that during the quarter it had "significantly tightened its loan program underwriting guidelines, and began the process of right-sizing operations for today's lower volume mortgage market." During the October 26, 2007 Conference Call, Defendant Sambol further admitted that the tightening focused primarily on limiting higher LTV loans, loans to lower FICO score borrowers and reduced documentation loans, "particularly when these risk factors exist in combination." Sambol also stated that the Company "instituted very significant enhancements into operating controls as well" during the third quarter. These changes were obviously made to address significant deficiencies in those controls.

440.   In the "3Q 2007 Earnings Supplemental Presentation," discussed during the October 26, 2007 Conference Call (the "October 26, 2007 Presentation"), Defendants admitted that Countrywide continued to originate some of the riskiest types of loans throughout the second and third quarters of 2007, in direct contradiction to Defendants'

statements in the July 24, 2007 Press Release that the Company had ceased originating risky loans, including adjustable-rate products.

441.   In this regard, the October 26, 2007 Presentation disclosed that Countrywide originated both "Prime Home Equity" loans and "Hybrid ARMs" to subprime borrowers with FICO scores of less than 660 during the second quarter of 2007, and continued to originate these high-risk loans with reduced documentation and CLTVs greater than 90% during the third quarter of 2007.

442.   With respect to "Pay-Option ARMs," the Defendants also disclosed in the October 26, 2007 Presentation that Countywide continued to originate these loans to subprime borrowers with FICO scores of less than 660 and even continued to offer the loans with reduced documentation and CLTVs greater than 80% during the second and third quarters of 2007.   Throughout the Relevant period, Defendants knew that these loans presented unacceptable and undisclosed risks.   For example, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others acknowledged that borrowers with FICO scores of 700 or less "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

443.   The October 26, 2007 Press Release also disclosed that the Company increased this provision for "representations and warranties" liabilities to $291 million, compared to only $79 million in the second quarter of 2007 and $41 million in the third quarter of 2006.   Defendants further stated that the increased provision was the result of

"increased expectations of further representation and warranty claims on loans sold and securitized resulting from higher levels of expected future defaults."

444.   The statements in the October 26, 2007 Press Release regarding the representations and warranties continued to be materially false and misleading because, as Countrywide would reveal in its Third Quarter 2007 Form 10-Q, Countrywide's lending practices continued to violate, among other things:  (i) applicable loan criteria; (ii) applicable local, state and federal laws; and (iii) the Company's obligation to repurchase loans that resulted in early payment defaults.

445.   Also in the October 26, 2007 Press Release, Countrywide made knowingly false claims that the Company would return to profitability in the fourth quarter of 2007. Specifically, Defendant Mozilo stated in the October 26, 2007 Press Release that the Company "laid the foundation for a return to profitability in the fourth quarter." Expanding upon his assurances, Mozilo claimed:

> Countrywide has responded decisively and taken the steps we believe are necessary to address the current challenging market environment.
>
> *   *   *
>
> "[O]ver the longer term, we believe that the prospects for the U.S. housing and mortgage markets, as well as Countrywide, remain very attractive."

157

446.   As a result of Defendants' assurances regarding the Company's future profitability, the Series A Debentures increased $57.86 per debenture to $908.02 per debenture on October 26, 2007, and the Series B Debentures increased $44.94 per debenture to $872.82 per debenture on October 26, 2007.

447.   Defendants' claims that Countrywide was poised to return to profitability in the fourth quarter of 2007 were materially false and misleading when made because, as Defendants admitted during the October 26, 2007 Presentation, the Company was still originating high-risk affordability loans throughout the third quarter of 2007, despite the severe deterioration in the credit and real estate markets.  As a result of Defendants' continued imprudent lending practices throughout the first three quarters of 2007, Defendants knew that the Company was experiencing and would continue to suffer from the most significant increase in loan delinquencies and foreclosures to date.  Thus, Defendants' statements regarding future profitability had no reasonable basis.

## H.    The Third Quarter 2007 Form 10-Q

448.   On November 9, 2007, Countrywide filed its Form 10-Q for the third quarter of 2007 (the "Third Quarter 2007 Form 10-Q") with the SEC.  Defendants Sambol and Sieracki signed the Third Quarter 2007 Form 10-Q.  In addition, the Third Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as in the 2006 Form 10-K (¶¶ 333-36), which Defendants knew and/or acted with deliberate recklessness in disregarding were materially false and misleading when made for the reasons stated above ¶ 337.  The Third Quarter 2007 Form 10-Q contained

a series of disclosures directly related to Countrywide's prior misrepresentations and omissions.

449.   The Third Quarter 2007 Form 10-Q reiterated Defendant Sambol's admissions during the October 26, 2007 Conference Call regarding Countrywide's eleventh-hour "wholesale revamping and tightening" of the Company's lending and underwriting guidelines.  In particular, Defendants admitted in the Third Quarter 2007 Form 10-Q that Countrywide "significantly changed [its] underwriting standards" in the third quarter of 2007.  The Third Quarter 2007 Form 10-Q further disclosed that the decline in loan production during the third quarter was largely attributable to the tightening of underwriting standards:

> The tightening of underwriting and loan program guidelines included reductions in the availability of reduced documentation loans and loans on investor-owned properties and reduction in the maximum loan-to-value or combined loan-to-value ratio.  The impact of these changes was most significant to Nonprime Mortgage, Prime Home Equity and non-conforming prime mortgage loans.

450.   Also in the Third Quarter 2007 Form 10-Q, Countrywide disclosed for the first time the specific nature of the representations and warranties the Company provided

to investors when it sold loans.  This information was material as Countrywide previously acknowledged it had obligations to purchase loans that were sold if Countrywide breached any of those representations or warranties.  Specifically, it was revealed in the Third Quarter Form 10-Q that these representations and warranties included: "the loan's compliance with any applicable loan criteria (e.g., loan balance limits,  property type, delinquency status) established by the buyer," and "the loan's compliance with applicable local, state and federal laws."

451.   Countrywide further disclosed for the first time in the Third Quarter 2007 Form 10-Q that, with respect to its representations and warranties, Countrywide agreed to repurchase a loan when there was an early payment default:

> Market conditions and credit-rating agency requirements may also impact representations and warranties and the other provisions we may agree to in loan sales.  For example, in some transactions, such as sales of nonprime and second-lien loans, we may agree to repurchase a loan if a payment default occurs within a specified period of time (e.g., 30 days) after sale.

452.   Countrywide also disclosed for the first time the percentage of holders of its pay-option ARM loans that were not even making full interest payments.  Specifically, the Third Quarter 2007 Form 10-Q stated: "[d]uring the nine months ended September

30, 2007, 76% of borrowers elected to make less than full interest payments, an increase from 66% during the nine months ended September 30, 2006." In his April 4, 2006 e-mail to Defendant Sambol and others, Defendant Mozilo noted that "more than 70% of pay-option ARM borrowers had elected to make lower payment selections, Mozilo further noted that this trend portended "much higher delinquencies" that could cause countrywide to "face both financial and regulatory consequences." Nevertheless, the percentage of borrowers not even making full interest payments was not disclosed by the Company in its prior publicly disseminated statements during the Relevant Period.

453. Countrywide also disclosed the same significant decline in the reported fair value of its MSRs that it had represented only one quarter earlier were not expected to experience any significant decline.

> We recorded decreases in the fair value of the MSRs in the quarters ended September 30, 2007 and 2006 of $830.9 million and $1,125.1 million, respectively, primarily as a result of decreasing mortgage rates during both quarters which increased expected future prepayment speeds.

454. In marked contrast, Countrywide had reported significant increases in the fair value of its MSRs for the quarters ended June 30, 2007 and March 31, 2007, of $1,327.4 million and $978.3 million, respectively.

455.   In an attempt to bolster its financial condition, the Company also reported in the Third Quarter 2007 Form 10-Q that Countrywide had secured additional cash during the quarter to finance its operations by, among other things, negotiating $13 billion in repurchase facilities.  Further, despite reporting a loss for the quarter of $1.2 billion, Countrywide reiterated its commitment to return to profitability in the fourth quarter of 2007.  Thus, Defendants continued to conceal the full financial consequences of Countrywide's lending practices from investors.

456.   Following these representations as well as Countrywide's securing of additional funds, which helped reassure purchasers of the Debentures regarding the Company's financial condition, the Series A Debentures softly retreated in price by $2.52 per debenture, from $860.85 per debenture on November 9, 2007 to $858.33 per debenture on November 12, 2007.  Similarly, the Series B Debentures fell $4.78 per debenture, from $837.52 per debenture on November 9, 2007 to $832.74 per debenture on November 12, 2007.  This represented a 13.5% decline in the price of the Series A Debentures, and a 15.5% decline in the price of the Series B Debentures since the Offering date.

I.     The November 13, 2007 Press Release

457.   On November 13, 2007, Countrywide issued a press release (the "November 13, 2007 Press Release") announcing the Company's operational report for the first month of the fourth quarter, October 2007.  In the November 13, 2007 Press

Release, Countrywide reported a massive 43.2% increase in delinquencies and a 54.7% increase in foreclosures in the Company's loan portfolio as compared to October 2006.

458.   In response to Countrywide's disconcerting operational results, which were caused by its misrepresented and concealed lending and underwriting standards, the Series A Debentures fell another $29.96 per debenture, from $863.46 per debenture on November 13, 2007 to $833.50 per debenture on November 16, 2007.  The Series B Debentures similarly fell another $33.61 per debenture, from $837.21 per debenture on November 13, 2007 to $803.60 per debenture on November 16, 2007.  This represented a 16% decline in the price of the Series A Debentures, and a 18.5% decline in the price of the Series B Debentures since the Offering date.

## J.   Countrywide Rumored as Headed for Bankruptcy

459.   Beginning on November 19, 2007, various news agencies, including Bloomberg News, Reuters and The New York Times, began reporting that Countrywide faced imminent bankruptcy because the Company continued to face higher delinquencies and foreclosures, which would force it to recognize more losses in coming quarters.  Investors in Countrywide's credit default swaps (financial instruments offered to bondholders to insure against default) began demanding upfront payment to take on the risk that the nation's biggest home lender might not pay its debts.

460.   Similarly, a November 19, 2007 article entitled "Liquidity Concerns Plague Countrywide," appearing on *TheStreet.com*, reported, among other things, that "[i]nvestors are getting mixed messages from Countrywide itself.  The firm reported a

greater-than-expected $1.2 billion loss in the third quarter, but management said it would return to profitability in the fourth quarter." This article further noted that Mozilo's statements to the Company's investors were inconsistent with concerns expressed to legislators: "[t]o investors, he says the company will return to profitability. To Washington lawmakers, Mozilo says the worst is not over as he argues that the government has not done enough to stem the tide of defaults and home price depreciation that's led his mortgage business to face its current funding problems."

461.    These disclosures revealed that the Company was in far more financial distress than previously reported. Thus, on November 21, 2007, the Series A Debentures dropped from a closing price of $806.82 per debenture on November 19, 2007 to a closing price of $760.45 per debenture on November 21, 2007. The Series B Debentures similarly fell from $789.65 per debenture on November 19, 2007 to $721.12 per debenture on November 21, 2007, the last day of the Relevant Period. This represented a 23.3% decline in the price of the Series A Debentures and a 26.8% decline in the price of the Series B Debentures since the Offering date.

## VIII.  POST-RELEVANT PERIOD EVENTS

### A.    Federal and State Investigations Into Defendants' Conduct

462.    On October 18, 2007, it was reported that the SEC began an informal investigation of Countrywide stock sales by Defendant Mozilo, executed pursuant to his Rule 10b5-1 plans. Since 2004, Defendant Mozilo has sold his personal Countrywide shares through such prearranged selling programs. The pace of the sales, however, began to increase dramatically in October 2006 when he put a new program in place. As

noted herein, Defendant Mozilo manipulated his 10b5-1 plans after expressing concern with, among other things, the Company's underwriting standards and portfolio of LHI.

463.   On June 4, 2009, the SEC filed the SEC Action charging Mozilo with insider trading and each of the Individual Defendants with securities fraud.  The Court denied Defendants' Motion to Dismiss the SEC's Complaint, and the SEC Action is scheduled for trial in October 2010.

464.   The Illinois Attorney General has also investigated Countrywide as part of the state's "expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford."  Lisa Madigan, the Illinois Attorney General, subpoenaed documents in September 2007 from Countrywide relating to its loan origination practices.  Deborah Hagan, Chief of the Consumer Protection Division of the Illinois Attorney General's office, stated that Countrywide's brokers were "pushing mortgages with low 'teaser' interest rates, which reset after the first month to much higher payments."  The Illinois Attorney General's Office filed and ultimately settled a lawsuit against Countrywide and others in connection with these lending practices.

465.   The Attorneys General of California, North Carolina, and Florida, among others, have also investigated Countrywide's lending practices, particularly the Company's aggressive lending to unqualified borrowers.  As a result of these and other investigations, and various lawsuits arising out of them, Countrywide consented to a

broad foreclosure relief and loan modification program throughout the United States addressing the high-risk loans originated by the Company.

466.   On March 7, 2008, the House Committee on Oversight and Government Reform (the "House Committee") held a hearing on excessive CEO pay and the mortgage crisis at which Defendant Mozilo was a witness (the "March 7, 2008 Congressional Hearing").  Prior to the hearing, Countrywide provided internal Company documents related to Mozilo's compensation and severance packages.  After reviewing the Company's e-mails, Board minutes and other internal documents, the House Committee voiced concerns about the terms and negotiation of Mozilo's compensation agreements as well as his stock sales since October 2006.  The House Committee also questioned whether the actions of Mozilo and the Board advanced the interests of Countrywide.

467.   On June 7, 2010, the Federal Trade Commission ("FTC") announced a $108 million settlement with Countrywide to redress allegedly illegal mortgage servicing fees the Company charged to borrowers during the Relevant Period.  The FTC complaint asserted that Countrywide formed subsidiaries to systematically charge struggling borrowers inflated fees for default related services on pay-option ARMs and other high-risk loans which exceeded the actual cost of those services.  Among other things, the FTC alleged that Countrywide deliberately imposed marked-up fees for property inspections, title reports, foreclosure trustees, and property preservation

services that were neither reasonable nor appropriate to protect Countrywide's interest in the properties or loans.

468.   The FTC also alleged that Countrywide made false statements in bankruptcy court filings regarding amounts owed in the pre and post-petition periods by borrowers who filed for Chapter 13 bankruptcy protection.  In addition to the monetary settlement, Countrywide entered into a comprehensive Consent Judgment and Order with the FTC which prohibits the Company from further engaging in unlawful business practices related to the Company's mortgage servicing rights.

**B.     Bank of America Agrees to Purchase Countrywide and the Company Continues to Suffer Under the Weight of its Misrepresented Imprudent Lending**

469.   On January 11, 2008, Bank of America ("BOA") announced a definitive agreement to purchase Countrywide in an all-stock transaction for the fire-sale price of $4 billion, or $7.16 per share.  Under the terms of the announced agreement, Countrywide shareholders would receive .1822 of a share of BOA common stock in exchange for each share of Countrywide common stock.  The deal closed on July 1, 2008.

470.   On January 29, 2008, Countrywide announced disappointing fourth quarter and year-end 2007 financial results.  The Company reported a $422 million loss, or $0.79 per share.  Countrywide further announced the Company's first annual net loss in more than 30 years of $704 million, or $2.03 per share.  The credit-related costs impacting the Company's fourth quarter 2007 results included a $1.9 billion increase in

reserves from credit losses and a $690 million impairment charge primarily related to the Company's home equity loan securitizations.  Countrywide also reported an impairment loss of $394 million as a result of the decline in fair value of its LHI portfolio.

471.   On February 4, 2008, S&P placed its "Strong" residential loan, subprime, subordinate-lien and special servicer rankings assigned to Countrywide on "CreditWatch Negative."  S&P stated that the ratings reflected the increased scrutiny of Countrywide's servicing practices by various federal and state enforcement agencies.

472.   On February 23, 2008, The Wall Street Journal reported criticism of BOA's choice to appoint Defendant Sambol to lead the combined consumer mortgage business (the "February 23, 2008 Wall Street Journal article").  According to the February 23, 2008 Wall Street Journal article, BOA's choice is "raising some eyebrows" considering Sambol reportedly "brushed aside warnings . . . that [Countrywide's] lending standards were too lax" and "was 'willing to cut corners to get market share.'"  Sambol retired soon after the merger between Bank of America and Countrywide was completed.

## IX.   DEFENDANTS' GAAP AND INTERNAL CONTROL VIOLATIONS

473.   As alleged above, during the Relevant Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP. Defendants Mozilo and Sieracki also repeatedly signed sworn certifications regarding Countrywide's compliance with GAAP and the adequacy of the Company's internal controls, which were materially misleading, as these sworn certifications misrepresented that Countrywide maintained an adequate system of financial reporting.

474.   The SEC requires that publicly-traded companies such as Countrywide present their financial statements in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.

475.   SEC regulation S-X (17 C.F.R. § 210.4-01 (a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP "will be presumed to be misleading, despite footnotes or other disclosures." Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.01-01(a).

476.   The responsibility for preparing financial statements (which include the footnotes to the financial statements) in conformity with GAAP and Generally Accepted Auditing Standards ("GAAS") rests with corporate management, as set forth in Section 110.03 of the American Institute of Certified Public Accountants ("AICPA") Auditing Standards:

> The financial statements are management's responsibility. . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process,

summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and related assets, liabilities and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility.

477. Each of the improper accounting practices in which the Company engaged, as well as Defendants' misrepresentations and omissions, standing alone, was a material breach of GAAP, Company policy, and/or SEC regulations.

478. As discussed below, Countrywide's 2006 Form 10-K, First Quarter 2007 Form 10-Q, Second Quarter 2007 Form 10-Q and Third Quarter 2007 Form 10-Q (collectively, the "False and Misleading Financial Statements") violated GAAP by misrepresenting that Countrywide: (i) engaged in prudent underwriting and lending practices and produced quality loans that were salable in the secondary market; (ii) adequately reserved for losses on LHI; (iii) recorded the Company's subordinated retained interest assets and mortgage servicing rights at "fair value;" (iv) adequately accrued for losses resulting from breaches of representations and warranties; and (v)

maintained sufficient internal controls over its financial statement reporting process to ensure the Company's financial statements were reported in compliance with GAAP.

479.   In addition, the False and Misleading Financial Statements violated GAAP because they failed to adequately disclose the risks associated with Countrywide's imprudent lending and underwriting practices.

**A.   Defendants Misstated the Company's Allowance for Loan Losses and Earnings by Failing to Reserve for Losses Arising From Probable Delinquencies and Defaults**

480.   GAAP, specifically AICPA Statement of Position ("SOP") No. 01-6, Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others ("SOP 01-6"), requires that loans held for investment (LHI) be carried at amortized cost, and reduced by an allowance for estimated loan losses which have occurred in the portfolio:

> Loans and Trade Receivables Not Held For Sale. Loans and trade receivables that management has the intent and ability to hold for the foreseeable future or until maturity or payoff should be reported in the balance sheet at outstanding principal adjusted for any chargeoffs, the allowance for loan losses (or the allowance for doubtful accounts), and any deferred fees or costs on originated loans, and any unamortized

premiums   or   discounts   on   purchased   loans.

(Footnotes omitted).

481.   A loan is impaired, according to Statement of Financial Accounting Standards ("FAS") 114, <u>Accounting by Creditors for Impairment of a Loan</u> "when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement," which includes both the contractual interest payments and contractual principal payments.  FAS 114, ¶ 8.

482.   When an entity determines that a loss has occurred and, as a result, an asset is impaired, FAS No. 5, <u>Accounting for Contingencies</u> ("FAS 5") requires the entity to record an allowance for estimated losses and a corresponding charge against income if, as of the balance sheet date, the losses are both "probable" and "reasonably estimable." FAS 5, ¶¶ 8, 22.

483.   Specifically, with respect to loss contingencies relating to the collectability of receivables, FAS 5 states that an accrual shall be made even though particular receivables that are uncollectible may not be identifiable, as follows:

The assets of an enterprise may include receivables that arose from credit sales, loans, or other transactions.   The conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case

172

a contingency exists. . . Losses from collectible receivables shall be accrued when both conditions [losses are probable and estimable] in paragraph 8 are met.  Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables.  If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

484.   In the 2006 Form 10-K, Defendants admitted that "[o]ur senior management is actively involved in the review and approval of our allowance for loan losses," yet falsely represented in the 2006 Form 10-K that, with respect to Countrywide's allowance for loan losses, "[w]e continually assess the credit quality of our portfolios of loans held for investment to identify and provide for losses incurred."

485.   As alleged herein, during the Relevant Period, Countrywide originated and held investments in inherently risky loans (e.g., interest-only, home equity and pay-option ARM loans) provided primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan in order to report escalating loan volume and make Countrywide appear more profitable.

486.   Countrywide's imprudent lending practices, coupled with rapidly declining home values, caused a dramatic increase in the Company's delinquencies and defaults

during the Relevant Period.  As demonstrated in Defendants Mozilo's April 4, May 18, June 1, and September 26, 2006 e-mails discussed herein, Defendants were well-aware of these problems.  Defendants, however, failed to adequately accrue for these known losses in the False and Misleading Financial Statements, as set forth below, and falsely represented that "our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles."

487.   As discussed below, Defendants violated GAAP by failing to consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors:  (i) the Company's undisclosed, improper lending practices of providing high-risk loans largely to subprime borrowers without requiring supporting documentation or collateral; (ii) significant declines in home values; and (iii) rising delinquencies and defaults resulting from the Company's imprudent lending practices.  Losses caused by the above factors were not only probable, they had already occurred.

> **1.    Defendants Violated GAAP by Failing to Adequately Increase Countrywide's Allowance For Loan Losses Resulting From the Company's Shift to Origination of High-Risk Loans and Declining Home Values**

488.   Prior to the Relevant Period, Defendants materially increased the Company's loans held for investment through production of the undisclosed, inherently high-risk loans, particularly pay-option ARMS and HELOCs, in order to increase revenue and earnings.

489.   As demonstrated in the chart below, Defendants more than doubled Countrywide's LHI from 2003 to 2006, almost 70% of which consisted of pay-option ARM loans, home equity lines of credit (HELOCs) and nonprime loans.

| (in billions) | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|
| Loans HFI, gross | $78.3 | $70.1 | $39.8 | $26.4 |
| Pay Option ARM loans | $32.9 | $26.1 | $4.7 | N/A |
| Pay-option ARMs % of LHI | 42.0% | 37.2% | 11.8% | N/A |
| HELOCs | $20.2 | $15.0 | $11.4 | N/A |
| HELOCs as % of LHI | 25.8% | 21.4% | 28.6% | N/A |
| Nonprime Loans | $0.1 | $0.1 | $0.02 | N/A |
| Nonprime Loans as % of LHI | .13% | .14% | .50% | N/A |

490.   According to Countrywide's own stated reserve methodology in the 2006 Form 10-K and First Quarter 2007 Form 10-Q, in calculating the Company's reported allowance for loan losses, Defendants failed to adequately consider Countrywide's shift to originating inherently high-risk affordability loans that comprised a significant portion of the Company's LHI portfolio.  Rather, Defendants, by their own admission, performed analyses based upon "historical default and loss rates for similar loans originated by the Company . . . ."

491.   In addition, Defendants misstated the Company's allowance for loan losses in the False and Misleading Financial Statements by failing to adequately accrue for losses that occurred as a result of rapidly declining home values beginning in late 2005. Such declining home values were insufficient to cover the principle balances of loans, in particular, loans that financed 90% or more of the home's original value.  Thus, as

Defendant Mozilo's 2006 e-mails referenced herein demonstrate, Defendants knew losses related to home price declines were "probable."

492.   As set forth in the chart below, Defendants maintained Countrywide's allowance for loan losses at a constant rate of approximately 0.3% through 2006.  Even in the first and second quarters of 2007, when Defendants began to increase reserves, those reserves were woefully inadequate because, as discussed above, Defendants admittedly were still originating high-risk loans to subprime borrowers with FICO scores of less than 660 during the second and third quarters of 2007.

| Quarter | LHI ($000s) (gross) | Allowance For Loan Losses ($000s) | Allowance For Loan Losses as % of LHI |
|---------|---------------------|-----------------------------------|----------------------------------------|
| 2Q07 | $74,569,443 | $512,094 | 0.69% |
| 1Q07 | $75,551,461 | $374,367 | 0.50% |
| 4Q06 | $78,346,811 | $261,054 | 0.33% |
| 3Q06 | $81,004,695 | $207,987 | 0.26% |
| 2Q06 | $79,991,180 | $183,581 | 0.23% |
| 1Q06 | $74,279,882 | $172,271 | 0.23% |

493.   Defendants' failure to adequately consider in the Company's allowance for loan losses, estimated losses from the material increase in such high-risk loans and drastically declining home values, caused Countrywide's allowance for loan losses and related provisions for loan losses in the False and Misleading Financial Statements to be understated and net income to be overstated, in violation of GAAP.

494.   In the second quarter of 2007, Countrywide was forced to change its reserve methodology to properly consider changes in underwriting standards and declining home

values, thereby admitting the Company's prior reserve methodology was unreliable. Specifically, under the new reserve methodology, the Company's Annual Report on Form 10-K for period ending December 31, 2007, filed with the SEC on February 29, 2008 (the "2007 Form 10-K") disclosed that the Company adjusted reserves:

> [T]o reflect our assessment of environmental factors not yet reflected in the historical data underlying our loss estimates, such as trends in real estate values, local and national economical trends, changes in underwriting standards and changes in the regulatory environment.

495.    Despite the change in Countrywide's methodology for estimating its allowance for loan losses, however, the Second Quarter 2007 Form 10-Q was still materially false and misleading because, as discussed above, the Company continued to originate high-risk affordability loans to subprime borrowers until at least the third quarter of 2007.

**2.    Defendants Violated GAAP by Failing to Adequately Increase the Allowance for Loan Losses for Rising Delinquencies and Defaults**

496.    As Countrywide continued to increase the Company's investment in high-risk loans (see chart in Section IX.A.1. above), delinquencies and pending foreclosures from loan defaults rose drastically.

497.   Specifically, as demonstrated in the chart below, overall delinquencies increased significantly prior to and during the Relevant Period, particularly in Countrywide's non-prime loans:

|  | **Year-ending December 31,** | | | |
|---|---|---|---|---|
|  | **2007** | **2006** | **2005** | **2004** |
| Total Delinquencies | 6.96% | 5.02% | 4.61% | 3.83% |
| Nonprime | 27.29% | 19.03% | 15.20% | 11.29% |
| Prime Home Equity | 5.92% | 2.93% | 1.57% | .79% |
| Pay-option ARMs delinquent 90 days or more | 5.7% | .65% | .10% | .02% |

498.   Pending foreclosures from loan defaults similarly increased prior to and throughout the Relevant Period, as demonstrated in the chart below.

|  | **Year-ending December 31,** | | | |
|---|---|---|---|---|
|  | **2007** | **2006** | **2005** | **2004** |
| Total Pending Foreclosures | 1.04% | .65% | .44% | .42% |
| Nonprime Foreclosures | 5.54% | 3.53% | 2.03% | 1.74% |
| Prime Home Equity Foreclosures | .12% | .12% | .06% | .03% |

499.   As disclosed in the 2006 Form 10-K, Countrywide's allowance for loan losses methodology had a liberal charge-off policy, which did not provide for any quantitative or objective criteria for charging-off uncollectible loans.  Rather, the Company's allowance for loan losses policy provided management with sole discretion in determining when to charge-off uncollectible loans in Countrywide's financial statements.  Specifically, the Company's allowance for loan loss policy allowed

Defendants to manipulate and defer the timing of when the Company recorded charge-offs for uncollectible loans to "when management believes the loss is confirmed."

500.   This liberal and highly discretionary allowance for loan loss and charge-off policy allowed Defendants to conceal the true risk exposure of the Company's loan quality and manipulate the timing of reported earnings and delinquency statistics in the False and Misleading Financial Statements.  Accordingly, the stated reserve policy and reported reserves contained in the False and Misleading Financial Statements were predicated on a reserve policy and reserves that were unreliable.

501.   GAAP does not permit the establishment of allowances that are not supported by appropriate analyses.  *See* Audit and Accounting Guide ("AAG") -- Depository and Lending Institutions:  Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies ("AAG -- Depository and Lending Institutions").  The SEC, in Staff Accounting Bulletin No. 102, describes the common elements that should be included in any allowance for loan loss methodology, including consideration of:  (i) "all known relevant internal and external factors that may affect loan collectability;" (ii) "modif[ication] for new factors affecting collectability;" (iii) "the particular risks inherent in different kinds of lending;" and (iv) "current and reliable data." Defendants' loan loss reserve methodology was inconsistent with both the GAAP and SEC guidelines.

502.   As shown above, notwithstanding dramatically rising delinquencies and defaults, prior to and throughout the Relevant Period, Defendants maintained the

Company's allowance for loan losses at a constant rate as a percentage of assets held-for-investment of approximately 0.3% through 2006.  As discussed above, even though Defendants increased the Company's reserves in 2007, the Company's reserves were still woefully inadequate as a result of Countrywide's continuing imprudent lending practices.

503.   By failing to properly factor rising delinquencies and necessary charge-offs in the Company's allowance for loan losses reported in the False and Misleading Financial Statements and providing management with sole discretion to control the timing of charge-offs, the Company's reserves and the provision for loan losses reported in the False and Misleading Financial Statements were materially understated and net income was overstated, in direct violation of GAAP.

504.   Moreover, Defendants admitted in Countrywide's 2007 Form 10-K that the Company's prior allowance for loan loss methodology was unreliable and, accordingly, changed its allowance for loan loss policy to adopt a 180-day charge-off standard, as follows:

> Loan losses are charged against the allowance when management believes the loss is confirmed.   We make an initial assessment of whether a charge-off is required on our mortgage loans no later than the 180th day of delinquency.

This change limited management's prior discretion by implementing quantitative and objective criteria for charging-off uncollectible loans.

505.   Defendants also disclosed in the 2007 Form 10-K that the Company changed the Company's reserve policy to take into account loans that are "expected to migrate to 90 or more days past due within the twelve-month period," rather than the prior policy of considering only loans that have already become 90 days past due.

506.   In addition, as a result of Defendants' undisclosed imprudent lending practices, Defendants, in a move that was long overdue, disclosed in the 2007 Form 10-K that the Company added a new component to the Company's allowance for loan losses methodology to account for instances where Countrywide modified terms of contractual loan obligations to avoid borrower defaults:

> We classify these loans as troubled debt restructurings.   Troubled debt restructurings may include changing repayment terms, reducing the stated interest rate, reducing the loan's principal balance or accrued interest, or extending the maturity date of the loan.   Upon completion of a troubled debt restructuring, we establish a valuation allowance to recognize the impairment of the loan.

507. According to Defendants, the new reserve policy, implemented beginning in the second quarter of 2007, accelerated the recording of loan losses that would otherwise have been recorded in future quarters. The Company's allowance for loan losses for the second quarter of 2007, however, was still grossly inadequate, because Defendants continued to originate inherently high-risk loans to subprime borrowers until at least the third quarter of 2007.

**B.    Defendants Misstated Earnings by Failing to Timely Record Impairment on Retained Interests and MSRs**

508. The Company materially overstated credit-sensitive subordinated retained interest assets, MSRs, net gain on sale of loans and net income, while at the same time understating the Company's liability for future draw obligations on securitization of HELOCs in the False and Misleading Financial Statements. Countrywide did this by failing to record known impairment losses on the underlying loans resulting from Defendants' failure to consider the true deterioration in the Company's loan portfolio, as well as the inherent unreliability of Countrywide's methodology for calculating impairment losses.

**1.    Subordinated Retained Interests and Liability For Future Draw Obligations on HELOCs**

509. Under GAAP, specifically FAS 140, subordinated retained interests must be reported at fair value on the balance sheet at the time of the sale or securitization. The fair value of the Company's subordinated retained interests were impacted by estimated credit losses over the expected lifetime of the securities.

510.   FAS 140, as amended by FAS 156, <u>Accounting for Servicing of Financial Assets</u> ("FAS 156"), provides guidance on recording interest retained at the time of sale or securitization.  In the event retained interests are subordinated by more senior interests, as was often the case with Countrywide, FAS 140, as amended by FAS 156, requires that such subordinated interests be considered when determining the fair value of retained interests:

> If the retained interests that continue to be held by a transferor are subordinate to more senior interests held by others, that subordination may concentrate most of the risks inherent in the transferred assets into the interests that continue to be held by a transferor and shall be taken into consideration in estimating the fair value of the retained interests.  FAS 140, ¶ 59, as amended by FAS 156.

511.   The ongoing value of retained interests is governed by FAS No. 115, <u>Accounting for Certain Investments in Debt and Equity Securities</u> ("FAS 115").  FAS 115 requires that investments classified as either trading or available-for-sale, such as Countrywide's retained interests, be measured at fair value and that an entity review the fair value of available-for-sale securities for "other than temporary" impairment on a quarterly basis.

512.    According to FAS 115, as amended by FAS 130, <u>Reporting Comprehensive Income</u> and FAS 133, <u>Accounting for Derivative Instruments and Hedging Activities,</u> "other than temporary" impairment occurs "if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition." Thus, subordinated retained interests are impacted by, among other things, estimated credit losses from delinquencies and loan defaults. If it is determined that impairment has occurred, under FAS 115, the cost basis of the retained interest must be written down to fair value with a corresponding charge against earnings.

513.    As demonstrated in the chart in Section IX.A.2 above, the performance of Countrywide's non-traditional, high-risk affordability loans (e.g., pay-option ARM loans, home equity loans, HELOCs, stated income loans) that served as collateral to the Company's retained interests deteriorated rapidly. Defendants, however, failed to adequately consider losses from rising delinquencies and defaults in determining the Company's credit loss assumptions used to measure the fair value of subordinated retained interests in the False and Misleading Financial Statements.

514.    Defendants also improperly relied upon historical loan performance, which did not reflect the impact of the Company's undisclosed imprudent lending practices (e.g., stated income and piggyback loans) in analyzing its assumptions to determine whether retained interests were impaired in the False and Misleading Financial Statements. Notably, the actual delinquency and default statistics, discussed in the chart

in Section IX.A.2, were significantly higher than the credit loss assumptions used in the Company's fair valuation of its retained interests.

515.   For example, as demonstrated in the chart below, total actual delinquencies in 2005 were more than double the weighted average net lifetime credit loss assumptions used in determining the fair value of retained interests.  Even worse, in 2006 when home values were declining at the highest rate in decades, and the Company was originating high-risk loans, Defendants decreased the Company's credit loss assumptions used to determine the fair value of retained interests at the time of sale/securitization.

| | Year-ending December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2005 | 2004 |
| Total Delinquencies | 6.96% | 5.02% | 4.61% | 3.83% |
| **Key Assumptions Used in Determining Fair Value Of Retained Interests at the Time of Securitization** | | | | |
| Weighted-average net lifetime credit losses | 2.4% | 1.9% | 2.0% | 2.7% |
| **Key Assumptions Used in Determining Fair Value of Retained Interests at Certain Dates** | | | | |
| Weighted-average net lifetime credit losses | 10.9% | 2.7% | 1.7% | N/A |

516.   In the second quarter of 2007, Countrywide changed its approach to valuing retained interests to consider the credit quality of, and losses occurring in, the Company's underlying loan portfolio, as it was required to do pursuant to relevant GAAP.  As a result of this change in approach, the Company increased its credit loss

assumption used to determine the fair value of the existing retained interest portfolio four-fold.

517.   Despite the Company's purported change in approach to valuation of retained interests, Countrywide's retained interest assets were still grossly overstated in the second quarter of 2007, given Countrywide's continued origination of high-risk loans.

518.   In addition, Defendants failed to fully consider the Company's imprudent lending practices and resulting increased delinquencies and defaults, as well as monumentally declining home prices in estimating the Company's liability for subsequent draw obligations on HELOCs that were in rapid amortization status as a result of persistent borrower delinquencies and defaults.  GAAP required the Company to report such liabilities at "fair value."  Defendants, however, failed to adequately increase liabilities for losses that occurred on HELOCs in the False and Misleading Financial Statements, in violation of GAAP.

## 2.   Mortgage Servicing Rights

519.   As discussed above, when Countrywide sold mortgage loans, it generally received cash from the sale and retained the right to service the underlying loans, which arose from contractual agreements between Countrywide and the purchasers of its loans. Under these contractual arrangements, Countrywide performed its mortgage servicing functions (i.e., collecting and remitting loan payments) in exchange for servicing fees received from the monthly payments made by borrowers.

520.    Under GAAP, specifically FAS 140, as amended by FAS 156, Countrywide was requested to report mortgage servicing rights at fair value on the balance sheet at the time of sale.  FAS 140, ¶¶ 10-11, 13, as amended by FAS 156.  FAS 140 further requires that subsequent to the sale/securitization of the loans, an entity may measure such asset using either the amortization method or the fair value measurement method.  According to Countrywide's filings with the SEC, Countrywide elected to account for its MSRs under the fair value measurement method, beginning January 1, 2006.  Under the fair value measurement method, servicing assets are measured at fair value at each reporting date and changes in fair value are reported in earnings in the period in which the changes occur.  FAS 140, ¶13A, as amended by FAS 156.

521.    In the False and Misleading Financial Statements, the Company disclosed that the fair value of its MSRs was derived from the net positive cash flows associated with the servicing contracts, which incorporate prepayment and discount rate assumptions.  Because net cash flows used to estimate the fair value of MSRs are directly impacted by borrower delinquencies and defaults on the underlying loans, the fair value of MSRs is dependent upon the credit quality of the underlying loans.

522.    As demonstrated above in the chart in Section IX.A.1., Countrywide significantly increased origination of high-risk affordability loans prior to and during the Relevant Period, primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan.  These

undisclosed imprudent lending practices exposed Countrywide to significant credit losses from borrower delinquency and defaults.

523.   Defendants, however, failed to properly consider the impact of losses arising from such increased delinquencies and defaults in estimating the fair value of Countrywide's MSR assets in the False and Misleading Financial Statements.  Instead, Countrywide held the assumptions the Company used to value MSRs constant until the third quarter of 2007, when the Company shocked investors with its announcement of an $830.9 million reduction in the value of MSRs, thereby admitting that its prior valuations were inflated.

### C.   Defendants Misstated Liabilities and Earnings by Failing to Adequately Accrue for Losses Resulting From Breaches of Representations and Warranties

524.   Countrywide also retained credit risk in the form of liabilities arising from the representations and warranties the Company made to purchasers of its loans.  Such representations and warranties included, among others, the representation that the loans complied with applicable loan criteria, such as delinquency status and loan limits, as well as compliance with applicable laws.

525.   GAAP, specifically, FAS 140, required Countrywide to recognize liabilities incurred in the sale/securitization of a financial asset at fair value.  Specifically, FAS 140, as amended by FAS 156, provides:

> Upon completion of a transfer of financial
>
> assets that satisfies the conditions to be accounted

for as a sale (paragraph 9), the transferor (seller) shall:

\*       \*       \*

(c)     Initially measure at fair value assets obtained and liabilities incurred in a sale (paragraphs 68-70) or, if it is not practicable to estimate the fair value of an asset or a liability, apply alternative measures . . . ; and

(d)     Recognize in earnings any gain or loss on the sale.

FAS 140, ¶ 11, as amended by FAS 156.

(Footnotes omitted)

526.   The fair value of the Company's liability for representations and warranties was based on the key assumptions of default rates and loss severity (i.e., the value of the liability was impacted by loan delinquencies and defaults).

527.   Thus, at the time of securitization, Countrywide was required to estimate potential claims by investors against the Company for breaches of representations and warranties made in connection with the sale of those securities.  In the event a subsequent breach of a representation and/or warranty occurred after securitization, the Company was required to either repurchase the loan or indemnify the investor and recognize a corresponding liability and charge against income (as a component of gain or loss on the sale of securities) for investor claims when those losses were "probable" and "estimable."