528.   In the False and Misleading Financial Statements, Defendants failed to adequately consider known representations and warranty breaches and related losses resulting from Countrywide's undisclosed improper lending practices that were both "probable" and "reasonably estimable" (the two criteria under FAS 5).  For example, as discussed above, Defendants admitted in the May 2007 Letter to the OTS that Countrywide evaluated borrower capacity to repay the loan at the low, introductory "teaser" interest rate, rather than the fully-amortized interest rate.

529.   In addition, Defendants were aware at the time of securitization that the terms of the Company's high-risk loans violated applicable loan criteria because such loans were provided to borrowers with low credit scores who made little or no down payment.  Moreover, as reflected in Defendant Mozilo's 2006 e-mails referenced below in ¶¶ 576-90, Defendants knew that the loans the Company was selling and/or repackaging into securities for sale had higher instances of delinquency and default given Countrywide's undisclosed lending criteria and, thus, it was highly probable Countrywide would have to cure imminent breaches of its representations and warranties.

530.   Defendants reported in the Company's Third Quarter 2007 Form 10-Q that Countrywide had increased its provision for representations and warranties by an alarming $291.5 million to account for increased liability from breached representations and warranties.  The $291.5 million third quarter 2007 charge represented a 611.0% increase from the $41.0 million reported in the same quarter in the prior year.  Notably,

of the $291.5 million provision, the Company reported $177.3 million, or 60% related to prime loans and $67.1 million related to nonprime loans.  This disparity demonstrated the true extent of the Company's exposure to losses in its purported "prime" loan portfolio as a result of the improper lending practices described above.

531.    Defendants' failure to timely record liabilities and related losses resulting from known breaches of representations and warranties that were "probable" and "estimable," caused the Company's liabilities and loss on sale of loans to be understated and net income to be overstated in the False and Misleading Financial Statements, in violation of GAAP.  Defendants' fraud also served to conceal the true credit quality and financial performance of Countrywide's loan portfolio.

**D.    Defendants' Failure to Disclose the True Risk Arising from the Company's Inherently High-Risk Loan Practices Violated GAAP and SEC Regulations**

532.    The undisclosed improper lending practices that Countrywide engaged in prior to and during the Relevant Period violated of the most fundamental principles of financial reporting articulated by GAAP and SEC Regulations.  Specifically, in addition to the accounting violations noted above, the Company presented its financial statements in a manner that also violated at least the GAAP provisions set forth below.

533.    Defendants violated the concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Statement of Financial

Accounting Concepts ("FASCON") No. 1, <u>Objectives of Financial Reporting by Business Enterprises</u> ("FASCON 1"), ¶ 34)).

534.   Defendants violated the concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASCON 1, ¶ 40).

535.   Defendants violated the concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASCON 1, ¶ 50).

536.   Defendants violated the concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASCON 1, ¶ 42).

537.   Defendants violated the concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as

well as relevant is a notion that is central to accounting (FASCON No. 2, <u>Qualitative Characteristics of Accounting Information</u>, ("FASCON No. 2"), ¶¶ 58-59)).

538.   Defendants violated the concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2, ¶ 79).

539.   Defendants violated the concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  (FASCON 2, ¶¶ 95, 97).

540.   Defendants violated the concept that footnote disclosures in financial statements is "essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance" with GAAP.  (FASCON 5, <u>Recognition and Measurement in Financial Statements of Business Enterprises</u>, ¶ 7).

541.   In addition, SEC Regulation S-K required Countrywide to disclose in the <u>Management's Discussion and Analysis of Financial Condition and Results of Operations</u> ("MD&A") section of its periodic filings with the SEC "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303.

542.   Regulation S-K also required Defendants to disclose in the Company's MD&A section, a discussion of "significant economic changes," "unusual or infrequent

events or transactions" and "known trends or uncertainties," such as major changes in lending practices, significantly increasing delinquencies and loan defaults and rapid declines in the market (e.g., declining home values) that would materially affect the Company's financial statements:

543.   In violation of these principles, during the Relevant Period, Defendants reassured investors that the Company was producing "quality" loans, employing "prudent underwriting practices" and otherwise was not affected by the current subprime market decline because the Company's subprime exposure was purportedly minimal.

544.   As alleged herein, Defendants knew of the heightened risk of default in a variety of their poorly underwritten products, particularly pay-option ARMs and piggyback loans.  For example, Defendant Mozilo conceded in an April 4, 2006 e-mail to Defendant Sambol and others that pay-option ARM delinquency data:

> [c]ould portend serious problems with this product.  Since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies.  We must limit this product to high FICOs otherwise we could face both financial and regulatory consequences.

545.   Defendant Mozilo's April 17, 2006 e-mail likewise noted that the Company's "sub-prime second business" presented "financial and reputational risks," which led Mozilo to conclude "[i]n all my years in the business I have never seen a more toxic product."

546.   Similarly, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others noted that the "majority of pay options being originated by us, both wholesale and retail, are based upon stated income." Mozilo further acknowledged that the information that borrowers provided concerning income "does not match up with IRS records." For this reason, Mozilo advised off-loading these loans and taking "a careful look at our reserves and begin[ing] to assume the worst." Mozilo reiterated those concerns in his September 26, 2006 e-mail to Defendants Sambol and Sieracki noting that the Company's pay-option portfolio presented palpable credit risk.

547.   While Defendants clearly knew that escalating defaults in the loans that Countrywide originated and/or held as LHI would directly harm Countrywide and its access to the secondary mortgage markets, Defendants failed to disclose these known trends and uncertainties in the Company's 2006 Form 10-K or any of the quarterly filings during the Relevant Period. Such disclosures should have been made in the MD&A disclosures of their filings. The SEC has made clear that MD&A disclosures are designed to (i) give the investor the opportunity to see the company through the eyes of management; (ii) enhance the overall financial disclosure and provide true context within which financial information should be analyzed; and (iii) provide information

about the quality of, and potential variability of a Company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

548.   Under Item 303 of Regulation S-K, disclosure of known trends or uncertainties is required if either:  (i) the trend or uncertainty is reasonably likely to occur; or (ii) if management cannot determine whether the trend or uncertainty is reasonably likely to occur, disclosure must be made unless it is not reasonably likely that the trend or uncertainty will have a material effect on the registrant's financial condition or results of operations.  According to the SEC, "reasonably likely" is a lower threshold than "more likely than not" and means less than a 50% likelihood of occurrence.

549.   In addition to the above principles concerning financial statement disclosure, GAAP also provides specific guidance on required disclosures concerning loss contingencies and exposure to risk, including credit risk.  Specifically, FAS 5 requires disclosure of loss contingencies that have been recorded in the financial statements, or, a reasonable possibility that a loss may have been incurred, in order for the financial statements to not be misleading.

550.   Additionally, AICPA Statement of Position No. 94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"), requires disclosure of risks and uncertainties existing as of the date of those financial statements in the following areas: (a) nature of operations; (b) use of estimates in the preparation of financial statements;

(c) certain significant estimates; and (d) current vulnerability due to certain concentrations.

551.   With respect to the above areas, SOP 94-6 ¶ 21 requires disclosure of an entity's current vulnerability from concentration of risks and uncertainties, where:

    a.    The concentration exists at the date of the financial statements.

    b.    The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

    c.    It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

552.   FASB Staff Position ("FSP") SOP 94-6-1, <u>Terms of Loan Products That May Give Rise to a Concentration of Credit Risk</u> ("FSP SOP 94-6-1"), issued in December 2005, tailored the guidance in SOP 94-6, described above, to specific disclosure requirements for entities that originate, hold, guarantee, service or invest in loan products whose terms may give rise to a concentration of credit risk.  In this regard, SOP 94-6-1 states, in relevant part:

> The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a concentration of credit risk . . . either as an individual product type or as a group of products with similar features . . . Possible shared characteristics on which

197

significant   concentrations   may   be   determined

include, but are not limited to:

    a.    Borrowers subject to significant payment increases

    b.    Loans with terms that permit negative amortization

    c.    Loans with high loan-to-value ratios.

553.   In violation of SOP 94-6 and SOP 94-6-1, Defendants failed to disclose in the False and Misleading Financial Statements the Company's true credit risk, and exposure to significant losses from its deteriorating loan portfolio and imprudent lending practices.

554.   Accordingly, as described above, Defendants failed to disclose the Company's improper lending practices in either Countrywide's MD&A section or in the footnotes to the False and Misleading Financial Statements, reflecting known trends in the Company's loan portfolio, as well as the concentration of credit risk and loss contingencies.  Defendants' failure to make such disclosures violated the most basic principles of financial reporting under GAAP and SEC Regulations.

**E.**   **Defendants' Internal Control Violations**

555.   During the Relevant Period, Defendants falsely represented in the False and Misleading Financial Statements that Countrywide had "extraordinary compliance and controls in place."

556.   In addition, during the Relevant Period, Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby

allowing the Company to, among other things, significantly relax its lending standards to provide inherently risky loans (e.g., pay-option ARM and piggyback loans) primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrowers' income or collateral on the loans.  The Company's imprudent lending practices resulted in dramatically rising delinquencies and defaults during the Relevant Period.

557.   As a result of Defendants' failure to maintain effective internal control over financial reporting, they were able to mask the significant undisclosed risk in the Company's loan portfolio in the False and Misleading Financial Statements by misclassifying subprime loans as prime loans, and by manipulating and deferring the timing of when Countrywide recorded losses resulting from delinquent and/or defaulting loans.

558.   As the SEC has explained, internal controls are fundamental and critical for a public company "to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).  Specifically, the SEC requires a public company to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).  Indeed, a lack of fundamental internal controls, as here, under GAAP constitutes a "material weakness" that should immediately be disclosed to investors.

559.   The Individual Defendants were also subject to a series of requirements regarding the Company's internal controls over financial reporting.

560.   Generally accepted auditing standards ("GAAS") set forth the role of a company's management in an audit of that company's financial statements.  As noted above, Auditing Standard ("AU") § 110, Responsibilities and Functions of the Independent Auditor ("AU § 110"), states that management's responsibility includes establishing and maintaining internal controls "that will, among other things, record, process, summarize, and report transactions (as well as events and conditions consistent with management's assertions embodied in the financial statements."  AV § 110.03 (Footnotes omitted).

561.   The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the Company's internal control over financial reporting.

562.   Additionally, Section 404 of the Sarbanes-Oxley Act of 2002 required Defendants to assess and report on the effectiveness of the Company's internal control over financial reporting, as described in Public Company Accounting Oversight Board (the "PCAOB") Auditing Standard ("AS") No. 2, An Audit of Internal Control over Financial Reporting Performed in Conjunction With an Audit of Financial Statements ("AS 2"), as follows:

Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to

assess the effectiveness of the company's internal

control over financial reporting as of the end of the

company's most recent fiscal year and to include

in the company's annual report to shareholders

management's conclusion, as a result of that

assessment, about whether the company's internal

control is effective.

See AS 2, Section B.

563.   AS 2 defines internal controls over financial reporting as those policies and procedures that:

1.   Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

2.   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and;

3.   Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of

the company's assets that could have a material affect on the financial
statements.

*See id.*

564.   The Company's most senior executive management, comprised in
substantial part of the Individual Defendants herein, embraced a "tone at the top" of
generating loans regardless of the borrowers' creditworthiness or adequacy of collateral
in order to maximize profits and personal compensation.  The purported control
environment created by the Individual Defendants focused on loan volumes rather than
loan quality, resulting in the ineffective internal controls described in detail herein.  Such
imprudent lending practices created a control environment contributing to the
Company's failure to properly recognize and record losses resulting from, and the
undisclosed risks inherent in, such improper lending practices.  These practices
ultimately culminated in the Company recording billions of dollars of losses from
delinquencies and defaulting loans in 2007.

565.   Furthermore, Defendants' failure to identify such control deficiencies (e.g.,
material weaknesses) existing at the Company rendered Management's Report on
Internal Control over Financial Reporting in the False and Misleading Financial
Statements materially false and misleading, and contributed to the Company's issuance
of materially false and misleading financial statements in violation of GAAP.

566.   As Defendants would admit in the second quarter of 2007, however, the
Company's utter lack of internal controls allowed Defendants to conceal the true risks in

the Company's loan portfolio by, among other ways, misclassifying subprime loans as prime loans. In addition, Defendants conceded in the second and third quarters of 2007 that Countrywide's underwriting guidelines and internal controls were wholly inadequate and, accordingly, the Company "made many changes to [Countrywide's] product offerings, pricing, underwriting guidelines, and processes, in order to improve the quality and secondary market execution of [its] production."

567.    Defendants' representations during the Relevant Period concerning the Company's internal controls over loan underwriting and financial reporting violated the foregoing auditing standards and rendered the Company's financial statements materially false and misleading.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

568.    As alleged herein, each of the Defendants acted with scienter in that each Defendant knew or acted with deliberate recklessness in disregarding that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

569.    Each of the Individual Defendants also had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Countrywide and thus controlled the information disseminated

to the investing public in the Company's press releases, SEC filings and communications with analysts. As a result, each Individual Defendant could falsify the information that reached the public about the Company's business and performance.

570. In the SEC Action, counsel for Defendant Mozilo publicly filed a document entitled "Countrywide Financial Corporation Disclosure Controls and Procedures" (the "Disclosure Guidelines"), which were effective as of April 2004. The Disclosure Guidelines confirmed certain responsibilities that the Individual Defendants had with respect to publicly disclosing the Company's financial information during the Relevant Period.

571. Among other things, the Disclosure Guidelines established a Disclosure Committee, which included Defendant Sieracki during the Relevant Period. The Disclosure Committee reported to Defendant Mozilo and others during the Relevant Period. The Disclosure Guidelines also required Countrywide "to disclose on a timely basis any information that would be expected to affect the investment decision of a reasonable investor or to alter the market price of the Company's securities."

572. With regard to financial reporting, the Disclosure Guidelines provided that the Individual Defendants were responsible for reviewing and commenting on drafts of Countrywide's: (i) earnings releases; (ii) periodic filings on Forms 10-Q; and (iii) annual reports on Forms 10-K.

573. Throughout the Relevant Period, each of the Individual Defendants acted intentionally or with deliberate recklessness in participating in and orchestrating the

fraudulent schemes alleged herein to conceal the true nature and extent of the Company's loss exposure. Such actions and Defendants' misrepresentations and omissions related thereto artificially inflated the Debentures' value and allowed Countrywide to pursue its aggressive growth strategy and maintain its high credit rating, and allowed the Individual Defendants to profit from their improper insider sales and massive incentive-based compensation. The scienter of the Individual Defendants may be imputed to Countrywide as the Individual Defendants were among Countrywide's most senior officers and were acting within the scope of their employment when engaging in the misconduct alleged herein.

A.    **Internal Company Documents Demonstrate The Individual Defendants' Knowledge of the Risks That Countrywide's Overly Aggressive and Poorly Underwritten Loans Posed to the Company**

574.   During the Relevant Period, the Individual Defendants acted intentionally or with deliberate recklessness in disregarding the impact that the inherently risky loans the Company was providing to non-creditworthy borrowers – often without obtaining supporting documentation needed to verify the borrower's income or collateral on the loan – had on the accuracy of the Company's public statements.

575.   Defendants also knew that Countrywide had amassed a significant portion of impaired high-risk loans on the Company's balance sheet that posed severe threats to Countrywide's financial performance and liquidity throughout the Relevant Period.

576.   Certain internal communications in which the Individual Defendants discussed, among other things, the risks that Countrywide's undisclosed lending

practices posed to the Company, are now publicly available.  As set forth in ¶¶ 577-91 below, these communications support a strong inference that the Individual Defendants acted intentionally or with deliberate recklessness when making the public statements that Plaintiffs allege herein were materially false and misleading.

577.   For example, on March 28, 2006 Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki, among others, following a meeting held earlier that day during which Defendants discussed numerous failures surrounding the origination of subprime loans that Countrywide sold to HSBC.  Countrywide was later obligated to repurchase these loans from HSBC based upon the loans' poor performance.

578.   According to Defendant Mozilo's March 28, 2006 e-mail, the Company's piggyback loans, which enabled borrowers to finance 100% of the value of their homes, were "the most dangerous product in existence and there can be nothing more toxic." Based upon the Company's pattern of ignoring its own weak underwriting guidelines, Defendant Mozilo noted that these loans were experiencing early payment defaults, and that the Company should be looking to "reduce the loans of this type on our balance sheet."  Defendant Mozilo further warned that the Company needed to make sure that it was "originating these loans in a manner which takes us out of harms [sic] way and that loans are sold in a manner to avoid further and unnecessary exposure to the Company."

579.   On April 4, 2006, Defendant Mozilo sent an e-mail to Defendant Sambol and others addressing recent delinquency rate statistics for Countrywide's pay-option ARM products.  Upon review of this information, Defendant Mozilo conceded that

"[t]his is important data that could portend serious problems with this product . . . it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies . . . we could face both financial and regulatory consequences."  As with the Company's poorly underwritten HELOCS, Defendants knew that Countrywide's pay-option ARMs were issued to borrowers who simply could not afford the products, making widespread defaults and resulting financial consequences inevitable.

580.   Continuing to note concerns for Countrywide's financial health based upon the risky loan products that the Company underwrote, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki on April 13, 2006 acknowledging "unacceptable conduct" including "serious disregard for process, compliance with guidelines and irresponsible behavior" in connection with Countrywide's origination of subprime "piggyback" second mortgages.

581.   Mozilo's April 13, 2006 e-mail also noted that these loans required further attention to ascertain "our future expectations as to losses" based upon the "losses incurred to date."  Defendant Mozilo acknowledged that he was seeking "concrete assurances that we are not facing a continuous catastrophe" because, among other things, he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of the loans originated versus the pricing of those loan [sic]."

582.   Defendant Mozilo was particularly concerned with Countrywide's practice of extending HELOCS to borrowers with poor credit, which he knew, but failed to disclose, was occurring at a dangerously high rate.  On April 17, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki noting that Countrywide's subprime "piggyback" second mortgages were the most "toxic product[s]" that he had ever confronted and that the FICO scores for borrowers were "below 600, below 500 and some below 400," which Mozilo recognized would likely lead to "financial and reputational risks."  Mozilo further noted, "[w]ith real estate values coming down and interest rates rising this product will become increasingly worse."  For this reason, Mozilo requested a review of, among other things, "the compensation to the sales force in light of the overwhelmi[n]g hits taken by the Company on this product."

583.   On May 18, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki regarding efforts to reduce risk at the Company.  In this e-mail, Defendant Mozilo recognized that HELOCS and pay-option ARM loans presented a known risk of losses to the Company because of the heightened risk of default.  In this regard, Defendant Mozilo stated, "[w]ith interest rates continuing to rise unabated [HELOCS] will become increasingly toxic in that mortgagors will be and are facing substantially higher payments then [sic] when the loan was originated.  We should attempt to efficiently off loan [sic] this product … the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and as

result [sic] causing mortgagors to default due to the substantial increase in their payments."

584.   On May 19, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki following up on the concerns he expressed the day before over Countrywide's portfolio of poorly underwritten loans.  Specifically, Defendant Mozilo stated, "I believe the payoptions [sic] continue to present a longer term problem unless rates are reduced dramatically from [the current] level and there are no indications, absent another terrorist attack, that this will happen.

585.   In addition to their knowledge that Countrywide's riskiest loans were extended to borrowers with substandard credit, the Individual Defendants also knew that the Company relied upon stated income, or no documentation, underwriting in connection with making these loans.  A June 1, 2006 e-mail from Defendant Mozilo to Defendant Sambol and others confirms not only the extent of no-documentation loans, but also that the Individual Defendants knew borrowers were providing affirmatively false information on their mortgage applications.  In this regard, Defendant Mozilo admitted, "the majority of pay options being originated by us, both wholesale and retail, are based upon stated income.  There is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

586.   In his June 1, 2006 e-mail, Defendant Mozilo also expressed concerns over the heightened risks of default in the Company's pay-option ARM portfolio based upon the poor credit scores of Countrywide's borrowers.  Specifically, Defendant Mozilo

observed that "at least 20%" of Countrywide's pay-option ARM loans were written to borrowers with a FICO score of "700 or less" and that the "lower FICO borrowers are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

587.   Based upon these known risks, Defendant Mozilo warned that "since we know or can reliably predict what's going to happen in the next couple of years it is imperative that we address the issue now."   Among other things, Defendant Mozilo urged, "we should comb the assets to assess the risks that we face on FICOs under 700 and determine if we can sell them out of the bank and replace them with higher quality paper."   Mozilo concluded the e-mail by advising, "we should take a careful look now at our reserves and begin to assume the worst."

588.   On September 26, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki expressing his escalating concerns over the risks that Countrywide's portfolio of pay-option ARMs posed to the Company's financial health. Defendant Mozilo admitted that Countrywide had "no way, with any reasonable certainty, to assess the real risk of holding these loans" and that the Company was "flying blind on how these loans will perform in a stressed environment."

589.   Based upon these concerns over the Company's pay-option ARM portfolio, Defendant Mozilo urged the other Individual Defendants to "sell all newly originated products and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port."   Defendant Mozilo made clear that, in his opinion, the time was

right for the Company to start dumping these products because "pay options are currently mispriced in the secondary market and that spread could disappear quickly if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of a negative investor occurrence."

590.   As alleged herein, despite his grave concerns over the impact that Countrywide's pay-option ARM portfolio would have upon the Company, Defendant Mozilo adopted a stock trading plan on October 27, 2006 that enabled him to sell a staggering 350,000 shares per month.  Defendant Mozilo then deliberately increased his selling activity to as much as 580,000 shares per month as market conditions worsened and Countrywide's misrepresented and undisclosed exposure grew.

591.   An August 6, 2007 e-mail from McMurray to Defendant Sieracki and others sent in connection with preparing the Sarbanes-Oxley certification for Countrywide's financial statements for the second quarter of 2007 reveals that the Company's loans were not "prudently underwritten" as claimed in, among other statements, the 2006 Form 10-K or the 2007 First Quarter Form 10-Q.  Instead, McMurray's e-mail stated that Countrywide had "long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering."  In other words, the Company would "match" any loan that a competitor was offering and would not broker out any prospective loan as being too risky for Countrywide to extend.

592.   As discussed further below, these facts demonstrate that the Individual Defendants knew or acted with deliberate recklessness in disregarding that the

Company's public statements – particularly in the 2006 Form 10-K and First Quarter 2007 Form 10-Q – concerning the quality of Countrywide's loan portfolio and credit risk exposure and, therefore, financial outlook, were materially false and misleading when made to investors.  Despite their knowledge of the heightening risks in Countrywide's loan portfolio, Defendants deliberately concealed this information.  Because Defendants never materially decreased the Company's portfolio of poorly underwritten loans, the risks to Countrywide noted throughout 2006 only intensified during the Relevant Period.

**B.   The Individual Defendants Knew That Countrywide Had Substantially Loosened its Lending Standards to Provide High-Risk Affordability Loans to Sub-Prime Borrowers**

593.   The Individual Defendants caused the Company to originate the inordinately risky loan products, largely to unqualified borrowers, in order to generate higher fees and meet Defendant Mozilo's aggressive growth strategy of increasing market share to an unprecedented 30%.

594.   According to the August 26, 2007 New York Times article, a former financial executive at Countrywide explained that "[t]o the extent that more than 5 percent of the market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it."  This former Countrywide financial executive characterized this practice as "the proverbial race to the bottom."  An August 6, 2007 e-mail from McMurray confirms that Countrywide "has long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering.  The Countrywide menu is a composite of what has been offered in the industry."

212

595.   On February 23, 2008 <u>The Wall Street Journal</u> reported that Defendant Sambol pushed to offer loans requiring no money down and minimal proof of income for people with weak credit.  These loans to non-creditworthy borrowers multiplied the undisclosed risk to the Company's already high-risk affordability loans.  According to the February 23, 2008 <u>Wall Street Journal</u> article, when told by Countrywide's risk managers that the Company's underwriting standards were too lax, Defendant Sambol reportedly brushed aside such warnings, stating that being too cautious would turn Countrywide into a "nice, little boutique."

596.   The Individual Defendants were aware that Countrywide was originating and approving a substantial amount of high-risk loans, particularly to unqualified borrowers, without requiring any documentation verifying income or collateral on the loans.  Indeed, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others admitted that "[t]here is some evidence that the information the borrower is providing us relative to their income does not match up with IRS records."  As a result of these undisclosed imprudent lending practices, Countrywide began experiencing significant losses from borrower defaults and delinquencies.

597.   The Individual Defendants knew that Countrywide originated loan products without conducting adequate underwriting, which exposed the Company to materially greater losses through at least the following ways, prior to and during the Relevant Period:  (i) internal Company reports describing exceptions to the Company's underwriting and lending practices and detailing the particular loan types and borrower

characteristics; (ii) Countrywide's practice of unconditionally approving non-qualifying, subprime loans in order to meet mandatory Company loan volume approval requirements; (iii) the Individual Defendants' duties as officers of the Company and as members of committees responsible for monitoring and managing credit risk and valuing loan assets and related allowance for loan losses; and (iv) market factors indicating declining home prices and drastic increases in subprime borrower defaults.

### 1. The "Exception Processing System" Revealed Countrywide's Significant Credit Risk Exposure From Production of High-Risk Affordability Loans

598.   A power-point presentation document, entitled "Countrywide CMD Structured Loan Desk," filed publicly in *United States v. Partow*, No. 06-CR-00104 HRH (D. Alaska) (the "Countrywide Presentation Document"), summarized the "objectives" of the Company's Exception Processing System.  The Countrywide Presentation Document demonstrates that Countrywide routinely originated and approved loans through the Exception Processing System that violated the Company's lending and underwriting standards throughout the Relevant Period.

599.   Specifically, the Countrywide Presentation Document lists the "objectives" of the Exception Processing System, which included, among other objectives, the Company's goal to:  (i) [a]pprove virtually every borrower and loan profile with pricing add on when necessary; (ii) identify alternative program to meet borrower needs; (iii) leverage FSLI [Full Spectrum Lending] for all subprime opportunities; and (iv) process and price exceptions on standard products for high-risk borrowers.

600.   Moreover, according to the Countrywide Presentation Document, the Exception Processing System permitted exceptions for, among other factors, borrower credit scores, loan-to-value ratio and loan amounts.

### 2.   The Individual Defendants Knew That Countrywide Unconditionally Approved High-Risk Affordability Loans to Non-Qualified Borrowers to Materially Boost the Company's Loan Volume

601.   Mark Zachary ("Zachary"), a former Countrywide Regional Vice President during 2006 and 2007 responsible for managing Countrywide's CWKB Home Loans Houston Division ("CWKB"), filed a complaint in the United States District Court for the Southern District of Texas captioned *Mark Zachary v. Countrywide Financial Corp., et al.,* Civil Action No. 08-CV-00214.  CWKB was a 50-50 joint venture between Countrywide and KB Home Loans.  Among other things, Zachary alleges that to further increase production of subprime loans, Countrywide had a practice where executives at the highest levels of CWKB instructed employees, such as Zachary, to unconditionally approve 10% of the backlog of inventory of loan applications each day so builders could start constructing homes.

602.   Yet, when Zachary reviewed such applications, credit scores and borrower information provided on an internal report called the Homes Not Authorized ("HNA") report, as well as other internal Company reports, these documents did not support loan approval.  Zachary learned that such loans were being approved without underwriter review.  These approvals lacking underwriter review were known as "Shadow Approvals."

215

603.   Zachary alleges that he began questioning Countrywide executives in September 2006 regarding the Company's underwriting and appraisal procedures. During a May 2007 conference call, Zachary brought his concerns to the attention of executives in Countrywide's Employee Relations Department and Risk Management Department.

604.   Zachary alleges that, to further increase its loan volume, Countrywide also had a practice of putting borrowers into "stated income" or "no income, no asset" verification loans in order to artificially inflate the borrowers' income to allow the borrowers to afford more expensive homes. Defendants were able to conceal this fraud because no written proof was required to verify the accuracy of the borrowers' income.

605.   Zachary alleges that in some instances, the loan officer would tell applicants what income amount was required to qualify for a certain loan amount. Since no documentation verifying income was required, the borrowers could lie about their income and obtain loans at higher loan amounts. Zachary alleges that he brought these issues to the attention of his superiors in November 2006. According to Zachary, some loan officers even assisted loan applicants in falsifying their loan applications. Moreover, Zachary recalled that on at least one occasion, a potential borrower known to Zachary complained that a loan officer filled in an income amount that the buyer did not meet.

### 3.    Countrywide Failed To Comply With Underwriting Regulations Issued By Federal Bank Regulatory Agencies

606.    During the Relevant Period, Countrywide failed to comply with mandatory federal bank regulatory guidance governing underwriting standards for the inherently high-risk, non-traditional loans that Countrywide was originating -- in particular, pay-option ARM loans, stated income loans and piggyback mortgage loans.

607.    Defendants were required to adhere to the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("Interagency Guidance") issued by the Federal Reserve Board, and the OTS.  The Interagency Guidance provided specific guidelines requiring that an institution originating pay-option ARM loans analyze a borrower's repayment capacity including "an evaluation of the ability to repay the debt at final maturity at the fully-indexed rate, assuming a fully-amortizing repayment schedule." The guidance also contained steps which must be taken with respect to loans that have additional risk-layering features, such as reduced documentation programs and simultaneous second liens, such as Countrywide's stated income and piggyback loans.

608.    Despite Countrywide's clear obligation to follow the Interagency Guidance when originating its inherently high-risk loans, Defendants originated pay-option ARM loans to the riskiest borrowers based on the lower, introductory teaser interest rates, rather than the fully-indexed, fully amortized rates.

609.    On July 10, 2007, the federal bank regulatory agencies issued their final interagency statement to address issues related to certain subprime mortgage products

and lending practices ("the Interagency Statement").  The Interagency Statement

supplemented the Interagency Guidance that Countrywide failed to follow.

610.   The Interagency Statement highlighted areas fraught with risks, including,

among others, "the following lending practices of concern:  (1) initial payments based on

an introductory interest rate that is substantially lower than the fully-indexed rate; (2)

very high or no limits on payment or interest-rate increases; (3) limited documentation

of a borrower's income; and (4) substantial prepayment penalties and/or prepayment

penalties that extend beyond the initial interest rate adjustment period."

611.   As of July 2007, even after the final Interagency Statement was issued,

Countrywide's product list stated that the Company was still originating loans of as

much as $500,000 to non-creditworthy borrowers as long as the loan represented no

more than 70% of the appraised value on the subject property.  These loans were made

even if the borrower had a credit score as low as 500, had been 90 days late on a current

mortgage payment twice in the last 12 months, had filed for personal bankruptcy

protection, or had faced foreclosure or default notices on his or her property.

612.   Despite Defendants' false public assurances set forth in Sections VI and VII

above, Defendants' intentionally violated the Interagency Guidance and Interagency

Statement and actively concealed such violations during the Relevant Period.

**4. The Individual Defendants Closely Monitored Countrywide's Lending Practices and Credit Risk Exposure During the Relevant Period**

613. During the Relevant Period, the Individual Defendants were directly involved in managing all aspects of Countrywide's core business operations, including: (i) setting the Company's loan origination, lending and underwriting guidelines; (ii) managing Countrywide's credit and liquidity risk; (iii) setting reserves for loan losses; and (iv) ensuring adequate internal controls.

614. The Individual Defendants managed the Company's business operations through their duties as the highest-level officers of the Company. Additionally, the Individual Defendants served on numerous committees of the Countrywide Board of Directors that were responsible for overseeing, monitoring and strategizing about the Company's business activities and credit risk management.

615. Each of the Countrywide Board committees described below reported its findings directly to the Company Board, of which Defendants Mozilo and Sambol were members during the Relevant Period. These committees included the: (i) Credit Committee; (ii) Asset/Liability Committee; (iii) Earnings Forecasting Committee; (iv) Finance Committee; and (v) Audit and Ethics Committee.

616. Accordingly, the Individual Defendants, who were the most senior officers of the Company directly responsible for Countrywide's lending practices, credit risk management and investments were each intimately involved in the Company's day-to-day operations and, thus, were aware of the Company's high-risk lending and

underwriting practices that violated the Company's own underwriting and lending guidelines.

### a.    Credit Committee

617.    According to the 2006 Form 10-K, "Management's Credit Committee comprised of our Chief Risk Officer and other senior executives, has primary responsibility for setting strategies to achieve our credit risk goals and objectives."

618.    In particular, the Credit Committee Charter mandates that the Credit Committee perform specific duties and responsibilities.  Among other duties and responsibilities, the Credit Committee shall "review, assess and monitor the Company's policies and activities" with respect to "(1) credit risk management activities, including the credit risk management strategies, policies, controls, systems and methodology of the Company and its subsidiaries; (2) methodology of loan loss reserves and adequacy of loan loss reserve levels; and (3) actual and projected credit losses in all of the Company's activities and across all of its portfolios."

619.    The Credit Committee reported to the Company's Board of Directors, of which Defendants Mozilo and Sambol were members.  Accordingly, Defendants were aware of the Company's significant credit risk resulting from the Company's inherently risky loans, prior to and during the Relevant Period.

### b.    Asset/Liability Committee

620.    The Company's Asset/Liability Committee (the "ALCO Group"), "comprised of several of [the Company's] senior financial executives, ultimately

determine[d] the valuation of . . . retained interests" and was chaired by Defendant Sieracki and Kevin Bartlett, Countrywide's CIO.

621.   The ALCO Group had two sub-committees:  the (i) Pipeline and (ii) Portfolio Risk Management sub-committees.  Kevin Bartlett, stated during the September 13, 2006 Investor Forum that he attended "all of [the Portfolio Management subcommittee] meetings," which met daily.  During the subcommittee meetings, the committee members made "day-to-day, tactical hedging decisions" concerning the Company's credit risk.

622.   According to the 2006 Form 10-K, incorporated into the Offering Memorandum by reference, "[o]ur senior management is actively involved in the review and approval of our allowance for loan losses" and "senior financial management exercises extensive and active oversight" of the process.

623.   As reflected in an August 6, 2007 e-mail authored by John McMurray, Defendants Sambol and Sieracki attended special ALCO meetings during the summer of 2007 to discuss, among other things, HELOC and subprime valuations.

624.   Thus, the Individual Defendants were clearly aware throughout the Relevant Period, of Countrywide's credit risk exposure and actively reviewed the Company's allowance for loan losses on a regular basis.

### c.   Earnings Forecasting Committee

625.   Countrywide also maintained an Earnings Forecasting Committee that met on a weekly basis. Kevin Bartlett stated during the September 13, 2006 Investor Forum that:

> the primary purpose of this group is [to] look at . . . [the Company's] financial forecasts for the current quarter, the remaining quarters for the year and for the next entire year. We update those forecasts weekly, and the primary benefit is that we size the macro-hedge, a component of our operation. So we get a sense of how production is performing, how the total company is going to perform in different environments.
>
> *   *   *
>
> We employ an integrated approach, it's comprehensive. Our tolerance levels are set by the Board, and then management makes tactical decisions inside those tolerances to make modifications to our activities. It's based on sophisticated modeling. And as I mentioned on a

previous slide it's supported by an experienced management team.

626.   Moreover, with respect to liquidity, executive management reviewed, at least monthly, the Company's compliance with liquidity requirements:

> To ensure compliance with the LMP, CHL, CSC, and Countrywide Bank are required to maintain adequate contingent liquidity regardless of conditions and to diversify funding sources. Each business unit has detailed metrics which are appropriate to its business line.   The metrics are compared with actual performance positions and reported to executive management monthly.

627.   Accordingly, the Individual Defendants actively monitored the Company's liquidity needs and compliance on at least a monthly basis and, thus, were aware of liquidity issues as they arose.

### d.   Finance Committee

628.   Countrywide also maintained a Finance Committee, which met ten times in 2006 and continued to meet regularly in 2007.  The Finance Committee was responsible for reviewing, assessing and monitoring the Company's activities with respect to the following finance and market risk-related matters, among others, during the Relevant Period:

(i)     capital structure;

(ii)    liquidity;

(iii)   capital adequacy;

(iv)   reserves;

(v)    long-term financing strategy and plans;

(vi)   the Company's policies relating to liquidity management and capital structure; and

(vii)  mortgage loan sales and securitizations, and the Company's secondary marketing objectives, strategies, policies, procedures and controls relating to such activities.

629.   The Finance Committee also reviewed matters related to equity purchases, "taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, liquidity and capital requirements and such other matters that the Committee deems appropriate."

630.   Thus, the Individual Defendants, in particular, Defendants Mozilo and Sambol, who sat directly on the Countrywide Board to which the Finance Committee reported, were aware of issues concerning the Company's liquidity reserves and related financial matters.

### e.    Audit and Ethics Committee

631.   Countrywide also maintained an Audit and Ethics Committee during the Relevant Period, which met fourteen times per year.  The Audit and Ethics Committee

was responsible for assisting the Board in overseeing the integrity of the Company's financial statements, the financial reporting processes of the Company, the Company's internal audit function and the performance thereof, the Company's system of internal controls, and the Company's Code of Business Ethics.

632.   The Charter of the Audit and Ethics Committee outlines these areas of responsibility as follows:

> 9.   **Risk Management**.   The Committee shall discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures and liabilities, including the Company's risk management policies.
>
> 10.   **Risk Assessment**.   The Committee shall discuss with management the Company's major risk exposures and the systems management utilizes to assess, monitor and control such exposures through the enterprise, including the Company's risk assessment policies.
>
> *   *   *
>
> 22.   **Internal Audit Reports**.   The Committee shall review the significant reports to

management prepared by the internal auditing department and management's responses.

23. **Internal Audit Department**. At least once each year, the Committee shall review (a) the internal audit department responsibilities budget and staffing, (b) the scope of the internal audit program and any changes thereto, (c) the risk assessment methodology proposed by the internal audit department, (d) the results of the internal audit program, and (e) any procedures for implementing accepted recommendations made by the independent auditor. Periodically, the Committee shall review the internal audit department's adherence to the audit plan.

633.   Thus, the Individual Defendants, in particular, Defendants Mozilo and Sambol who sat directly on the Countrywide Board to which the Audit and Ethics Committee reported, were aware of the Company's major financial risk exposure during the Relevant Period and actively monitored the steps management took to manage risk.

**5.    The Individual Defendants Knowingly Ignored Numerous
Market Warnings of Accelerated Delinquencies and
Defaults and Rapidly Declining Home Values**

634.    The Individual Defendants, as industry experts with decades of mortgage
lending experience, were charged with managing the business operations of the largest
mortgage lender in the country, and were keenly aware of all aspects and major
developments that occurred in the mortgage lending market.

635.    Specifically, as a result of the Individual Defendants' knowledge,
experience and positions as the highest-level executive officers at Countrywide, they
were clearly aware of at least the following market facts alerting them by no later than
mid-2006 that Countrywide's undisclosed imprudent lending practices, would result in
imminent and substantial losses to the Company:  (i) home prices began a steep decline
beginning in late 2005, indicating that borrowers who became delinquent, particularly
those with piggyback loans, would have insufficient equity in their homes to refinance or
sell the home; (ii) subprime delinquencies and foreclosures were increasing at
extraordinary rates; and (iii) Countrywide's competitors were recording record-level
write-downs and/or closing shop.

636.    Despite this knowledge, Countrywide continued to provide inherently risky
loans primarily to non-creditworthy borrowers, without requiring supporting
documentation to verify the borrower's income or collateral on the loan prior to and
during the Relevant Period.  Defendants engaged in these practices while assuring
investors that the Company produced quality loans.  Despite the Company's increased

227

origination of high-risk loans that likely would, and did, cause massive losses to the Company, Defendants misrepresented that Countrywide's reserves were "adequate," when those reserves were grossly understated.

### a. The Individual Defendants Knew That Steep Declines in Home Prices, Beginning In Late 2005, Would Lead to Heighted Loan Defaults

637. According to the <u>Standard & Poors Case-Shiller Home Price Index</u> (the "Case-Shiller Home Price Index"), home prices began their rapid decent beginning in mid-2005 to late 2005, and continued to decline throughout the Relevant Period. The Case-Shiller Home Price Index measures the residential housing market, tracking changes in the value of the residential real estate market in 20 metropolitan regions across the United States.

638. Specifically, the Case-Shiller Home Price Index showed the following decline in home prices:



228

639.   In August 2006, the Case-Schiller Home Price Index reported that the price of homes in ten major U.S. Metro areas declined by the most in more than a decade and overall home values experienced the biggest housing price decline since December 1995.

640.   At the same time home prices were declining, the introductory "teaser" rates on a material amount of Countrywide's ARM loan portfolio, which comprised approximately one-half of Countrywide's loans, were about to reset to much higher rates that non-creditworthy borrowers, whom Defendants targeted for years, could not afford. Accordingly, the Individual Defendants knew that it was highly likely that a significant portion of the Company's piggyback, pay-option ARMs and other low documentation loans would become delinquent.  As a result of unprecedented decline in home values, borrowers would be unable to escape foreclosure by refinancing or selling their homes, as they had done in the past, because such borrowers had little or no equity in the home, particularly with respect to piggyback loans.

641.   Defendants' e-mails demonstrate their knowledge of the negative impact that the Company's slipshod underwriting practices would have upon Countrywide and its borrowers.  For example, Defendant Mozilo's April 4, 2006 e-mail to Defendant Sambol and others noted that growing delinquencies in the Company's pay-option portfolio posted "serious problems that could cause Countrywide to "face both financial and regulatory consequences."  Further, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others acknowledged that Countrywide's extension of pay-option

loans to subprime borrowers were subject to likely rate increases that would cause "a

payment shock which is going to be difficult if not impossible for them to manage." For

this reason, Mozilo recognized that Countrywide "should take a careful look at [its]

reserves and begin to assume the worst."

642.   As the housing market continued its downward trend, Defendants' concerns

over the Company's portfolio of poorly written pay-option ARM loans intensified.  In

his September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo

stated "[w]e have no way, with any reasonable certainty, to assess the real risk of

holding these loans on our balance sheet."  Mozilo further confessed "we are flying

blind on how these loans will perform in a stressed environment of higher

unemployment, reduced values and slowing home sales."

643.   Defendants' concerns with holding risky and poorly underwritten loans in

the midst of the faltering housing market led Defendant Mozilo to instruct Defendant

Sambol and others to begin unloading such loans in order to mitigate the Company's

almost certain resulting losses.  In Defendant Mozilo's June 1, 2006 e-mail, he advised,

among other things, "[s]ince we know or can reliably predict what's going to happen in

the next couple of years [regarding pay-option loans] it is imperative that we address the

issue now."  Mozilo's strategy for attempting to mitigate the known risks of pay-option

ARMs included "comb[ing] the [Company's] assets to assess the risks that we face on

FICO's [sic] under 700 and determine if we can sell them out of the Bank and replace

them with higher quality paper."  Similarly, Defendant Mozilo's September 26, 2006 e-

mail to Defendants Sambol and Sieracki suggested "rolling off the Bank balance sheet"
pay-option ARMs because Countrywide was "flying blind on how these loans will
perform."

644.    Despite Defendants' knowledge and internal warnings, Countrywide did not
reduce its origination of pay-option ARMs and other poorly underwritten loans during
the Relevant Period.  Further, Countrywide never reduced its inventory of damaging
pay-option ARMs.  Thus, Defendants knew the Company would experience significant
losses on unavoidable foreclosures from borrower defaults as a result of the Company's
undisclosed imprudent lending practices and the borrowers' inability to refinance or sell
their homes.

**b.**    **The Individual Defendants Knew of Rising**
**Delinquencies and Foreclosures in the Company's**
**Subprime Loan Portfolio During the Relevant Period**

645.    By late 2005, all market indicators confirmed that subprime borrowers with
weak credit had gone deep into debt from entering into mortgages with no down
payment and with variable interest rates that reset after as early as two years.
Accordingly, an increasing number of subprime borrowers began to default on their
loans as short-term teaser interest rates expired and interest rates reset to double-digit
figures, leaving those borrowers with large increases in monthly payments.

646.    In this regard, according to the MBAA's National Delinquency Survey, in
the fourth quarter of 2005, average delinquencies were 4.7%, as compared to 4.38% only
one year prior and 4.44% in the prior quarter.  Similarly, U.S. home foreclosures rose

25% in 2005, according to RealtyTrac. RealtyTrac purports to be the nation's number one database of pre-foreclosure, auction and Real Estate Owned Properties and the second largest real estate website in its category.

647.   By the second quarter of 2006, the MBAA stated in a September 13, 2006 report (the "September 2006 MBAA Report") that "increases in delinquency rates for subprime loans, particularly for subprime ARMs" were apparent. In the September 2006 MBAA Report, the MBAA predicted a further slowing of the housing market and resulting increases in delinquencies.

648.   Defendants knew that escalating defaults would negatively impact Countrywide -- especially based upon its HELOC and pay-option ARM holdings. In this regard, Defendants Mozilo's May 18, 2006 e-mail to Defendants Sambol and Sieracki warned:

> . . . we must pay special attention to HELOCs and pay options. With interest rates continuing to rise unabated HELOCs will become increasingly toxic in that mortgagors will be and are facing substantially higher payments that [sic] when the loan was originated.
>
> \*       \*       \*
>
> As for pay options the Bank faces potential unexpected losses because higher rates will cause

these loans to reset much earlier than anticipated
and as result [sic] causing mortgagors to default
due to the substantial increase in their payments.

649.    The next day, on May 19, 2006, Defendant Mozilo reiterated his concern in
an e-mail to Defendants Sambol and Sieracki indicating that the Company's subprime
portfolio would wreak havoc on Countrywide: "the payoptions [sic] continue to present
a longer term problem unless rates are reduced dramatically from this level and there are
no indications, absent another terrorist attack, that this will happen."

650.    Consistent with rapidly deteriorating subprime market conditions, internal
Company documents cited in the August 26, 2007 <u>New York Times</u> article also showed
that, by mid-2006, as a result of Countrywide's undisclosed imprudent and lax lending
practices, subprime defaults had started running far higher than projected by the
Company's computer model.  According to a February 23, 2008 <u>Wall Street Journal</u>
article, Countrywide's risk analysts communicated the rising defaults to Defendant
Sambol who brushed their concerns aside.

651.    By the third quarter of 2006, RealtyTrac reported in its "Q3 2006 U.S.
Foreclosure Market Report" that foreclosures in the third quarter increased by an
astounding 17% as compared to the second quarter of 2006, and by 43% since the third
quarter of 2005.  Then, in November 2006, UBS AG reported that borrowers with
subprime loans were falling behind on their payments at a record pace.  By the fourth

quarter of 2006, delinquencies hit a four-year high and foreclosures hit record levels, prompting lenders to seek bankruptcy protection or simply close.

652.   Not surprisingly, Countrywide reported, for the year-ended December 31, 2006, that 5.02% of the loans in Countrywide's servicing portfolio were delinquent, as compared to 4.11% in July 2006.  Notably, according to the MBAA, the industry-wide rate of delinquencies in late 2006 was 4.95%.

653.   On March 13, 2007, the MBAA issued the results of the National Delinquency Survey for 2006, reporting further rising delinquencies in the fourth quarter of 2006.  Specifically, according to the National Delinquency Survey, delinquencies on residential properties were 4.95%, up 28 basis points from the third quarter of 2006 and up 25 basis points from one year prior, as a result of "increases in delinquencies for all major loan types, most notably for subprime and FHA loans."

654.   Despite increasing delinquencies and defaults in Countrywide's loan portfolio, and the crashing subprime market, Countrywide continued to originate highly risky loans during the Relevant Period.  Defendants failed to fully reveal the true extent of the Company's known loss exposure or record such losses in the Company's financial statements, in violation of GAAP, as alleged above in Section IX.

**c.**   **The Individual Defendants Knew That Competing Mortgage Companies Were Collapsing as a Result of the Rise in Defaults and Delinquencies on Subprime Loans**

655.   The Individual Defendants were also aware that numerous competing mortgage companies that engaged in subprime lending had started feeling the effects of

234

the credit crunch in 2006, eventually leading them to file for bankruptcy in 2006 and early 2007.  The shutdown of major mortgage firms across the industry was a clear manifestation of the financial impact that rising delinquencies and defaults would have on subprime lenders, like Countrywide.

656.   In his September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo encouraged Countywide to begin off-loading the Company's pay-option ARMs to take advantage of market conditions before another subprime lender went belly up.  In this regard, Mozilo stated:

> It appears to me that pay options are currently mispriced in the secondary market and that spread could disappear quickly if there is an unforeseen headline event such as another lender getting into deep trouble with this product or because of a negative investor occurrence.

Yet, the Company concealed that the failing market was battling its loan portfolio. Instead, Defendants represented that Countrywide had sufficient reserves to cover loan losses and adequate liquidity to run its operations.

657.   On February 7, 2007, Countrywide competitor New Century, the second-largest subprime lender in the United States at that time, announced it would restate financial results for the first three quarters of 2006 to correct improper accounting for loan repurchase losses due to increasing trends in early-payment defaults of subprime

235

loans.  New Century eventually filed for bankruptcy in April 2007, a few months after its restatement was announced.  Also, in February 2007, HSBC Holdings PLC shut down its subprime operations and reported a major loss of $10.6 billion from subprime operations.  Other subprime lenders, including ResMAE, Ownit and Mortgage Lenders Network USA filed for bankruptcy protection around this time.

658.   In spite of this industry-wide collapse, Defendants attempted to differentiate Countrywide from the competition, and claimed that the Company was not significantly involved in subprime lending, unlike its failed competitors, as described above in ¶ 657. In this regard, Defendants continued to miscategorize loans provided to subprime borrowers as "prime" in order to boost loan volume, while withholding the true extent of its growing exposure to delinquencies and defaults on its loans.

659.   Those misrepresentations directly contradicted Defendants' knowledge of the imminent problems that the Company faced from its subprime loan portfolio.  For example, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others warned:

> Since we know or can reliably predict what's going to happen in the next couple of years it is imperative that we address the issue now. First and foremost, the Bank should not be accumulating any loans below 680 unless the LTV is 75% or lower.  Secondly we should comb the

assets to assess the risks that we face on Fico's

[sic] under 700 and determine if we can sell them

out of the Bank and replace them with higher

quality paper.   Thirdly we should take a careful

look at our reserves and begin to assume the worst.

660.   Defendants, nevertheless, failed to increase Countrywide's reserves to a

sufficient level to cover the Company's exposure to these miscategorized subprime

loans.  Defendants' eventual admission of insufficient loan loss reserves and

miscategorization of subprime loans as "prime" reflected the truth that the Company was

indeed more like its fallen competitors, such as New Century, than it had initially

represented.

### C.   Defendants Were Motivated to Commit the Fraud Alleged Herein

#### 1.   The Individual Defendants Were Motivated to Commit the Fraud Alleged Herein to Profit From Insider Sales

661.   During the Relevant Period, the Individual Defendants were motivated to

engage in the fraudulent practices detailed herein so that they could sell their personally

held shares of Company common stock at artificially inflated prices.

662.   Notwithstanding the Individual Defendants' duty not to sell Countrywide

common stock under these circumstances, or to disclose the non-public, inside

information prior to selling their stock, each of the Individual Defendants sold

Countrywide stock during the Relevant Period at prices that were artificially inflated by

Defendants' materially false and misleading statements and omissions.  In total,

Countrywide insiders sold approximately 2,338,615 shares of Countrywide common stock for proceeds of approximately $71.3 million during the Relevant Period.

663.   Defendant Mozilo, alone, sold approximately 2,299,588 shares of Countrywide stock for proceeds of approximately $69.8 million during the Relevant Period at artificially inflated prices, as detailed below:

**ANGELO R. MOZILO, CHAIRMAN AND CEO**
**RELEVANT PERIOD SALES**

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 5/18/2007 | 70,000 | $41.14 | $2,879,513 |
| 5/21/2007 | 46,000 | $40.64 | $1,869,518 |
| 5/31/2007 | 46,000 | $39.80 | $1,830,883 |
| 6/1/2007 | 70,000 | $39.01 | $2,730,497 |
| 6/4/2007 | 70,000 | $39.15 | $2,740,332 |
| 6/6/2007 | 46,000 | $39.06 | $1,796,769 |
| 6/8/2007 | 70,000 | $37.95 | $2,656,759 |
| 6/11/2007 | 70,000 | $37.67 | $2,636,991 |
| 6/13/2007 | 70,000 | $37.81 | $2,647,008 |
| 6/14/2007 | 46,000 | $37.83 | $1,740,240 |
| 6/15/2007 | 46,000 | $37.99 | $1,747,673 |
| 6/18/2007 | 46,000 | $38.48 | $1,770,149 |
| 6/19/2007 | 46,000 | $38.90 | $1,789,432 |
| 7/11/2007 | 70,000 | $35.68 | $2,497,929 |
| 7/12/2007 | 46,000 | $36.45 | $1,676,700 |
| 7/13/2007 | 70,000 | $36.64 | $2,565,073 |
| 7/16/2007 | 70,000 | $35.83 | $2,508,436 |
| 7/18/2007 | 46,000 | $34.32 | $1,578,587 |
| 7/20/2007 | 70,000 | $34.12 | $2,388,253 |

238

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 7/23/2007 | 70,000 | $34.22 | $2,395,099 |
| 7/25/2007 | 46,000 | $30.52 | $1,404,035 |
| 7/27/2007 | 46,000 | $29.59 | $1,360,979 |
| 7/31/2007 | 46,000 | $29.89 | $1,374,922 |
| 8/1/2007 | 30,000 | $28.16 | $844,893 |
| 8/7/2007 | 110,000 | $28.06 | $3,086,666 |
| 8/8/2007 | 92,000 | $28.74 | $2,643,997 |
| 8/13/2007 | 46,000 | $28.40 | $1,306,400 |
| 10/8/2007 | 139,918 | $20.14 | $2,818,368 |
| 10/9/2007 | 139,918 | $19.87 | $2,780,632 |
| 10/10/2007 | 139,918 | $18.74 | $2,622,623 |
| 10/11/2007 | 139,918 | $18.36 | $2,569,160 |
| 10/12/2007 | 139,916 | $18.38 | $2,571,642 |
| **Total** | **2,299,588** | | **$69,830,158** |

664.   Defendant Mozilo's sales of Countrywide stock during the Relevant Period were made pursuant to Rule 10b5-1 plans, which purportedly allow corporate insiders to sell stock without any direct involvement.  Most executives adopt a plan and stick with it -- not Mozilo.  Instead, amid rapidly rising delinquencies and foreclosures in Countrywide's loan portfolio during the fourth quarter of 2006, Mozilo began a series of Rule 10b5-1 plan manipulations while in possession of non-public material information.

665.   Specifically, on October 27, 2006, Defendant Mozilo adopted a stock trading plan that called for selling 350,000 shares per month (the "October Plan") at the same time the Board authorized a share repurchase program of up to $2.5 billion.  Rather than use Countrywide's cash to finance the stock buy-back program, the Company used

investors' money by issuing debt securities to finance $1 to $2 billion of the stock repurchases. The stock buy-back had a significant effect on Countrywide's stock. Indeed, when the plan was announced on October 24, 2006, Countrywide's stock price was $37.33 per share. By February, Countrywide's stock had increased in value to an all-time-high of $45.03 per share.

666.    At the time that he established the October Plan, Mozilo possessed material non-public information concerning, among other things, the risks to the Company that its portfolio of pay-option ARMs presented, as detailed in Mozilo's April 17, June 1, and September 26, 2006 e-mails.

667.    Mozilo did not stop there. When other mortgage lenders were being pressured by the slumping housing market and rising loan defaults, Mozilo continued to manipulate his so-called "passive" stock plans. According to publicly filed documents, Mozilo adopted a trading plan on November 13, 2006, pursuant to which he sold 97,999 shares of Countrywide stock in late November 2006 and early December 2006 (the "November Plan").

668.    On December 12, 2006, Mozilo filed a new stock trading plan that allowed him to sell an additional 115,000 shares each month (the "December Plan," together with the October and November Plans, the "2006 Plans"). Soon after, when Countrywide's stock price reached an all-time high of $45.03 on February 2, 2007, Mozilo revised the December Plan, doubling the number of additional shares he was